No. 22-1890

# United States Court of Appeals for the Federal Circuit

## APPLE INC.,

*Appellant,*

*v.*

## MASIMO CORPORATION,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NO. IPR2020-01523

## APPLE INC.'S OPENING BRIEF

Lauren A. Degnan
W. Karl Renner
Christopher Dryer
Michael J. Ballanco
Laura E. Powell
FISH & RICHARDSON P.C.
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com

*Attorneys for Appellant Apple Inc.*

October 19, 2022

**Claim 1 of U.S. Patent No. 8,457,703 (Appx40-60).**

1.  A method of managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor, the method comprising:

>  driving one or more light sources configured to emit light into tissue of a monitored patient;

>  receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue;

>  continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;

>  comparing processing characteristics to a predetermined threshold; and

>  when said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level,

>  wherein said continuously operating at said lower power consumption level comprises reducing activation of an attached sensor,

>  said sensor positioning said light sources and said detectors proximate said tissue.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Apple Inc. ("Apple") certifies the following:

1.    Provide the full names of all entities represented by undersigned counsel in this case.

**Apple Inc.**

2.    Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

**Apple Inc.**

3.    Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

**None**

4.    List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

**Fish & Richardson P.C.: Daniel D. Smith, and Kim H. Leung**

5.    Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

*Masimo Corporation, et al. v. Apple Inc.,*
    **Case No. 8:20-cv-00048 (C.D. Cal.)**

*Apple Inc. v. Masimo Corporation,*
    **Case No. 22-1891 (Fed. Cir.)**

6.    Provide any information required under Fed. R. App. P. 26.1(b)
       (organizational victims in criminal cases) and 26.1(c) (bankruptcy case
       debtors and trustees). Fed. Cir. R. 47.4(a)(6).

       **None/Not Applicable**

Dated: October 19, 2022              */s/ Lauren A. Degnan*
                                     Lauren A. Degnan

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF RELATED CASES ................................................. xii

JURISDICTIONAL STATEMENT ................................................... xiii

STATEMENT OF ISSUES ................................................................ xiv

INTRODUCTION ................................................................................ 1

STATEMENT OF THE CASE AND FACTS ....................................... 2

I.      THE '703 PATENT PURPORTS TO INVENT A LOW
        POWER PULSE OXIMETER .....................................................2

        A.      "Multiple Sampling Mechanisms" / "Power
                Consumption"...................................................................2

        B.      The '703 Patent Relies on Conventional and Known
                Technology ......................................................................4

II.     DIAB AND AMANO DISCLOSE LOW POWER PULSE
        OXIMETERS ............................................................................5

        A.      Diab ..................................................................................5

        B.      Amano ..............................................................................7

III.    THE PATENT TRIAL AND APPEAL BOARD
        PROCEEDINGS.........................................................................8

SUMMARY OF THE ARGUMENT ................................................. 11

ARGUMENT ..................................................................................... 12

I.      STANDARD OF REVIEW .......................................................12

II.     THE BOARD LIMITED THE TERM "PROCESSING
        CHARACTERISTICS" TO A PREFERRED EMBODIMENT
        IN A MANNER THAT CONFLICTS WITH THE CLAIM
        LANGUAGE ...........................................................................14

        A.     The '703 Patent's Claims Confirm that the Board's
               Construction Is Incorrect ......................................................14

               1.     The Term "Processing Characteristics" Is Not
                      Limited Under the Plain Claim Language ................ 14

               2.     Dependent Claim 4 Provides the Light Detector
                      Limitation the Board Read into Independent
                      Claim 1 ..................................................................... 17

               3.     Claim 8 Further Demonstrates the Absence of a
                      Light Detector Limitation in Claim 1 ...................... 20

        B.     The Board Improperly Imputed a Narrowing Light-
               Detector Limitation Based Solely on the Disclosed
               Embodiment ...........................................................................23

               1.     The Specification Does Not Contain a
                      Lexicographer Definition of "Processing
                      Characteristics" ....................................................... 24

               2.     The Specification Does Not Disavow Use of Non-
                      Light Detector Signals ............................................. 27

               3.     The Preferred Embodiment's Use of a Light
                      Detector Does Not Limit the Claim ......................... 27

        C.     The Board Improperly Permitted Masimo To Narrow Its
               Claims Without Amending Them .........................................31

III.    THE BOARD ERRED IN DETERMINING DIAB DOES NOT
        RENDER OBVIOUS TRANSITIONING FROM A HIGH TO
        A LOW POWER CONSUMPTION LEVEL..................................33

        A.     Diab's Pulse Oximeter Teaches Complex Signal
               Processing When Motion Occurs and Simpler
               "Traditional" Processing When It Does Not ........................34

B.      The Board Failed To Consider a Modification of Diab
that Renders the High/Low Power Consumption
Transition Limitation Obvious ............................................................41

      1.     Apple Argued that a Skilled Artisan Would Have
Known To Modify Diab To Suspend Some of Its
Processing When Motion Was Not Present ............................ 41

      2.     The Board Violated the APA and Erred as a Matter
of Law by Sidestepping Apple's Obviousness
Argument Regarding Diab ....................................................... 45

           a.     The Board Must Explain the Bases for Its
Decision in Light of the Evidence and
Argument Presented ..................................................... 45

           b.     The Board Must Consider Arguments that
Are Properly Presented ................................................. 48

           c.     The Board's Failure To Address and
Resolve the Diab Obviousness Grounds
Requires Vacatur and Remand ..................................... 50

      3.     Modification of Diab's Motion Suppression
Artifact Module According to Diab's Teaching
Sets Up a *Prima Facie* Case of Obviousness .......................... 51

C.      The Board Incorrectly Applied an Inherency Standard to
Apple's Obviousness Arguments ........................................................54

      1.     A Skilled Artisan Would Reasonably Expect Diab
To Have Lower Power Consumption with Less
Motion Suppression Processing, as Taught by
Amano ..................................................................................... 55

      2.     The Board Improperly Focused on Whether
Amano's Teachings Would "Necessarily" Reduce
Power Consumption ................................................................ 56

           a.     The Board Erroneously Required Apple To
Prove Inherency ........................................................... 57

b. The Board's Necessity Requirement Is Incompatible with the Challenged Claims .................... 60

c. The Board Must Address the Power Reduction Limitation with Diab as Modified To Reduce Its Processing ............................................. 61

CONCLUSION ................................................... 61

ADDENDUM ...................................................... 63

CERTIFICATE OF SERVICE AND FILING ..................................................... 124

CERTIFICATE OF COMPLIANCE .................................................... 125

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AC Techs. S.A. v. Amazon.com, Inc.*,
   912 F.3d 1358 (Fed. Cir. 2019) ........................................................46

*Allergan, Inc. v. Sandoz Inc.*,
   796 F.3d 1293 (Fed. Cir. 2015) .........................................................57

*Apple Inc. v. Andrea Elecs. Corp.*,
   949 F.3d 697 (Fed. Cir. 2020) ...........................................................48

*Apple Inc. v. Wi-LAN Inc.*,
   25 F.4th 960 (Fed. Cir. 2022) ............................................................28

*Aqua Prods., Inc. v. Matal*,
   872 F.3d 1290 (Fed. Cir. 2017) .........................................................32

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
   709 F.3d 1348 (Fed. Cir. 2013) .........................................................20

*Aventis Pharma S.A. v. Hospira, Inc.*,
   675 F.3d 1324 (Fed. Cir. 2012) .........................................................30

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006) ...........................................................20

*Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*,
   998 F.3d 1320 (Fed. Cir. 2021) .........................................................33

*Boston Scientific Scimed, Inc. v. Cordis Corp.*,
   554 F.3d 982 (Fed. Cir. 2009) ...........................................................54

*Broadcom Corp v. Emulex Corp.*,
   732 F.3d 1325 (Fed. Cir. 2013) .........................................................61

*Cioffi v. Google, Inc.*,
   632 F. App'x 1013 (Fed. Cir. 2015) ..............................................18, 19

*Consol. Edison Co. of New York v. N.L.R.B.*,
   305 U.S. 197 (1938).............................................................................13

*Cont'l Circuits, LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019) ............................................................27

*CRFD Rsch., Inc. v. Matal*,
876 F.3d 1330 (Fed. Cir. 2017) ..........................................................60

*Enercon GmbH v. Int'l Trade Comm'n*,
151 F.3d 1376 (Fed. Cir. 1998) ..........................................................24

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010) ..........................................................16

*Evolusion Concepts, Inc. v. HOC Events, Inc.*,
22 F.4th 1361 (Fed. Cir. 2022) ...........................................................28

*Fred Meyer Stores, Inc. v. NLRB*,
865 F.3d 630 (D.C. Cir. 2017).............................................................50

*Game & Tech. Co. v. Activision Blizzard Inc.*,
926 F.3d 1370 (Fed. Cir. 2019) ..........................................................53

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) ..........................................................19

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
340 F.3d 1314 (Fed. Cir. 2003) ..........................................................60

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ..........................................................24

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017) ..........................................................14

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017) ..........................................................13

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
783 F.3d 1262 (Fed. Cir. 2015) ..........................................................26

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) .............................................................12

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*,
    902 F.3d 1372 (Fed. Cir. 2018) ...........................................................15

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)....................................................13, 53, 54, 58

*KSR. Nike, Inc. v. Adidas AG*,
    812 F.3d 1326 (Fed. Cir. 2016) ...........................................................52

*In re Kubin*,
    561 F.3d 1351 (Fed. Cir. 2009) ...................................................58, 59

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
    687 F.3d 1377 (Fed. Cir. 2012) ...........................................16, 17, 18

*Merck & Cie v. Gnosis S.P.A.*,
    808 F.3d 829 (Fed. Cir. 2015) .............................................................12

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*,
    764 F.3d 1392 (Fed. Cir. 2014) ...........................................................20

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Inc. Co.*,
    463 U.S. 29 (1983)..............................................................................13

*In re Mouttet*,
    686 F.3d 1322 (Fed. Cir. 2012) ...................................................53, 59

*MTD Prod. Inc. v. Iancu*,
    933 F.3d 1336 (Fed. Cir. 2019) ...........................................................28

*Ormco Corp. v. Align Technology, Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) ...................................................29, 30

*Outdry Techs. Corp. v. Geox S.p.A.*,
    859 F.3d 1364 (Fed. Cir. 2017) ...........................................................13

*Paice LLC v. Ford Motor Co.*,
    681 F. App'x 904 (Fed. Cir. 2017) .....................................................54

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
    773 F.3d 1186 (Fed. Cir. 2014) ...........................................................57

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................19, 23, 28, 31

*Power Integrations, Inc. v. Lee*,
   797 F.3d 1318 (Fed. Cir. 2015) ....................................................................13, 50

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
   815 F.3d 734 (Fed. Cir. 2016) ............................................................................32

*Provisur Techs., Inc. v. Weber, Inc.*,
   --- F.4th ----, No. 2021-1942, 2022 WL 4474941
   (Fed. Cir. Sept. 27, 2022)..................................................................13, 47, 48, 50

*Quantum Corp. v. Rodime, PLC*,
   65 F.3d 1577 (Fed. Cir. 1995) ............................................................................31

*SAS Inst., Inc. v. ComplementSoft, LLC.*,
   825 F.3d 1341 (Fed. Cir. 2016) ..........................................................................46

*SAS Inst., Inc. v. Iancu*,
   138 S. Ct. 1348 (2018)........................................................................................46

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*,
   225 F.3d 1349 (Fed. Cir. 2000) ..........................................................................53

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005) ..........................................................................31

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
   279 F.3d 1357 (Fed. Cir. 2002) ..........................................................................32

*Thorner v. Sony Computer Ent. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ..........................................................................27

*In re Thrift*,
   298 F.3d 1357 (Fed. Cir. 2002) ..........................................................................51

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
   853 F.3d 1272 (Fed. Cir. 2017) ..........................................................................15

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ..........................................................................23

**Statutes**

5 U.S.C. § 556(d) ..................................................................47

5 U.S.C. § 706(2)(E) ..............................................................12

35 U.S.C. § 316(d) .................................................................32

Administrative Procedure Act............................................*passim*

**Other Authorities**

Black's Law Dictionary 652 (11th ed. 2019) ........................26

Fed. Cir. R. 32.1(d) ...............................................................18

## <u>STATEMENT OF RELATED CASES</u>

Per Federal Circuit Rule 47.5(a), Apple states that no other appeals from this proceeding have previously been before this or any other appellate court.

Per Federal Circuit Rule 47.5(b), Apple is aware of the following pending case that may directly affect or be directly affected by this Court's decision in the pending appeal as it also concerns the same patent:

- *Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020).

## <u>JURISDICTIONAL STATEMENT</u>

This Court has jurisdiction over the Board's final written decision in an *inter partes* review proceeding under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## <u>STATEMENT OF ISSUES</u>

1.      Whether the Board erred in importing a limitation from the preferred embodiment into the construction of "processing characteristics."

2.      Whether the Board erred in declining to address on the merits whether it would have been obvious to modify the Diab reference based on a further express teaching within Diab.

3.      Whether the Board erred in requiring Apple to demonstrate that the combination of express teachings from two prior art references would "necessarily" result in lower power consumption, rather than whether a skilled artisan would have a reasonable expectation of success in making the combination.

# **INTRODUCTION**

This appeal arises from an IPR proceeding reviewing U.S. Patent No. 8,457,703. The Board determined that Apple had not shown the challenged claims to be unpatentable over the asserted prior art based on two fundamental errors, one regarding claim construction and one regarding obviousness, both of which require this Court to vacate the Board's decision and remand to the Board.

First, the Board erred in its construction of the independent claim term "processing characteristics." The Board's analysis effectively skipped over the remaining language of the independent claims, which demonstrates that the applicant intended for "processing characteristics" to be a broad term. Making matters worse, the Board's construction is not in harmony with, and is contradicted by, two dependent claims. Although the intrinsic record of the '703 patent includes no lexicography or disavowal, the Board plucked from a preferred embodiment and grafted onto the claims a limitation that the "processing characteristics" must be derived from a signal coming from a light detector. The Board's construction is a textbook violation of this Court's instruction that claims are not limited by unclaimed matter in the written description, including preferred embodiments.

Second, the Board erred in its handling of the obviousness arguments Apple made regarding the Diab reference. Apple argued that one of ordinary skill would

have been motivated to modify a component of Diab based on an explicit teaching found in Diab itself.  The Board failed to recognize Apple's evidence or decide the argument on the merits, which constitutes error.  Further, the Board applied an inherency standard to Apple's combination of express teachings in Diab and the Amano reference, rather than the correct standard of reasonable expectation of success.  At bottom, the Board's decision is plagued with errors relating to the Diab-based obviousness arguments.

For these reasons, the Board's decision should be vacated and remanded, instructing the Board to proceed under the proper, plain-meaning construction for "processing characteristics" and to address Apple's Diab-based obviousness arguments applying the correct law for obviousness.

## STATEMENT OF THE CASE AND FACTS

### I. THE '703 PATENT PURPORTS TO INVENT A LOW POWER PULSE OXIMETER

#### A. "Multiple Sampling Mechanisms" / "Power Consumption"

The '703 patent generally describes a "pulse oximeter."  Appx54 (1:18-35). "Pulse oximetry is a widely accepted noninvasive procedure for measuring the oxygen saturation level of a person's arterial blood, an indicator of their oxygen supply," and a pulse oximeter is a device used to facilitate this process.  *Id.*

The '703 patent describes a pulse oximeter that is "low power" in that it "utilizes multiple sampling mechanisms to alter power consumption" by

"increasing or decreasing the number of input samples received and processed."
Appx54-56 (2:39-41, 4:64-5:14, 6:9-11).  The '703 patent adopts a sampling
mechanism that, for example, employs an "emitter duty cycle control" that
"determines the duty cycle of the current supplied by the emitter drive outputs 482
to [multiple] sensor emitters."  Appx56 (5:61-66).  The sampling mechanism
described by the patent first "acquir[es]" an input signal sample and subsequently
"processe[s]" the input signal sample to determine whether it should modify power
consumption.  Appx56 (6:9-15).  Once the determination is made to modify the
power consumption, the '703 patent explains that "multiple sampling
mechanisms," Appx56 (5:59-61), "modify power consumption by, in effect,
increasing or decreasing the number of input samples received and processed[,]"
Appx56 (6:9-11).  By modifying the power consumption, the sampling can be
reduced during high signal quality periods and increased when the signal quality
period is low or when important measurements are deemed necessary.  Appx56
(6:11-15).

Claim 1 is illustrative of the claims at issue, with emphasis added to show
claim language particularly relevant to this appeal.

> 1. A method of managing power consumption during continuous
> patient monitoring by adjusting behavior of a patient monitor, the
> method comprising:
>
>> driving one or more light sources configured to emit light
>> into tissue of a monitored patient;

receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue;

continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;

comparing **processing characteristics** to a predetermined threshold; and

when said processing characteristics pass said threshold, **transitioning to continuously operating said patient monitor at a higher power consumption level**,

wherein said continuously operating at said lower power consumption level comprises reducing activation of an attached sensor,

said sensor positioning said light sources and said detectors proximate said tissue.

Appx59 (cl. 1 at 11:33-51).[1]

## B.    The '703 Patent Relies on Conventional and Known Technology

Pulse oximeters like those described in the '703 patent were not new at the time of the alleged invention.  Physiological monitoring for pulse oximetry, for example, was available in the late 1990s.  *See, e.g.*, Appx606; Appx645 (2:27-3:9).  The general concept of modifying the functioning of a pulse oximeter to reduce its power consumption was also not new at the time of the '703 patent's alleged invention.  Indeed, the '703 patent admits that, at the time of invention, pulse

---

[1] Unless noted, all emphasis added.

4

oximetry was "[i]ncreasingly . . . utilized in portable, battery-operated applications," and that "[a] conventional approach for reducing power consumption in portable electronics . . . is to have a 'sleep mode' where the circuitry is powered-down when the devices are idle."  Appx54 (1:55-67).

During prosecution of the '703 patent, Masimo faced rejections based on prior art which it characterized as disclosing a "sleep mode" for a pulse oximeter where that sleep mode turns "off" the device for predetermined periods of time. Appx238.  Masimo overcame this rejection by amending its claims and directing them towards a specific purported improvement to a pulse oximeter's power consumption regulation in which the device transitions between various power modes upon passing a threshold.  Appx249-256; *see* Appx54 (1:63-2:2).

## II.    DIAB AND AMANO DISCLOSE LOW POWER PULSE OXIMETERS

Two prior art references relevant to this appeal are U.S. Patent No. 5,632,272 to Diab ("Diab"), Appx606, and U.S. Patent No. 6,293,915 to Amano ("Amano"), Appx454-544.

### A.    Diab

Like the '703 patent, Diab is directed to "a physiological monitor for pulse oximetry," i.e., a pulse oximeter.  Appx661 (34:10-12).  In particular, Diab's pulse oximeter analyzes light signals to measure blood oximetry.  Appx606; Appx662 (35:23-59).  Diab's pulse oximeter includes a "digital signal processing system

334" that detects signals and provides values for oxygen saturation and pulse rate to its display. Appx662 (35:34-47, 34:24-28).

Diab's signal processing system is facilitated through a pulse rate module 410. Appx668 (47:30-38). A component of this pulse rate module is a motion artifact suppression module 580 that is generally used to process the detected signals to adjust for motion, which is determined from a "motion status module" 584. Appx668 (47:30-49). When motion is detected, motion artifacts are suppressed using the motion artifact suppression module 580 shown in Diab's Figure 20:



Appx633.

When a motion is not detected, however, Diab explicitly identifies certain input signals that do not undergo full motion artifact suppression processing—the

infrared signal instead undergoes only DC removal and bandpass filtering at least for generating a heart rate.  Appx668 (47:52-56); Appx25-26.  In other words, if motion is not detected, there is no artifact suppression.

### B.    Amano

Amano describes a pulse wave detection section that detects a pulse wave using an LED and phototransistor.  Appx530 (40:23-43).  Amano's teachings can be used in both a wrist monitor (shown in Figure 37A) and as a finger monitor (depicted in Figure 37B).



Appx487 (Figs. 37A and 37B).

Amano detects body movement using an acceleration sensor. Appx521 (21:9-12). Amano explains that performing a body movement eliminating operation consumes power even in the absence of body movement. Appx521 (21:3-57). Importantly, the body movement component section of Amano is suspended when no body movement is present. Appx521 (21:65-22:2); Appx528 (35:54-64). By suspending the body movement component, Amano reduces power consumption in the apparatus because unnecessary processing operations are not performed. *Id.*

## III.    THE PATENT TRIAL AND APPEAL BOARD PROCEEDINGS

Apple's petition for *inter partes* review of the '703 patent asserts eight obviousness grounds of unpatentability, six using Diab as the base reference and two using Amano as the base reference. Appx71. Apple also presented several other prior art references, not directly at issue in this appeal, in combination with Diab and/or Amano. *Id.* Two issues that developed during the proceeding form the basis of this appeal.

First is the construction of the claim term "processing characteristics." Apple did not seek construction of this term in its petition. Masimo, however, alleged that "processing characteristics" should be limited to those "determined from a signal received from one or more detectors configured to detect light."

8

Appx1289.  Apple opposed this construction in favor of plain meaning, arguing that neither the claims nor the written description imposes such a restriction, and that dependent claims 4 and 8 demonstrate that this restriction is improper. Appx1683-1685.[2]

The Board agreed with Masimo and construed the claim term "processing characteristics" to require that they be "determined from a signal received from one or more detectors configured to detect light." Appx14.  The Board's primary support for this construction was an embodiment provided in the written description.  *Id.*  The Board did not identify any specific definitional language or disavowal in the written description for this term.  Appx9-14.  The Board further concluded that dependent claims 4 and 8 "fall short" in informing the meaning of the processing characteristics limitation and did not rely on them.  Appx14. Because Amano receives processing characteristics using an acceleration sensor, not a light detector, the Board applied its construction and upheld the claims over Amano alone and in combination with Turcott.  Appx35-36.

Second, the Board concluded that the Diab-based grounds fail to demonstrate the limitation requiring transitioning from a low to high power consumption level.  Appx28.  In reaching this conclusion, however, the Board

_____

[2] Apple separately noted that, even under a construction that so limited "processing characteristics," certain of its prior art grounds, particularly Ground 1A, would still read on the term.  Appx118 (citing Appx402-403 (¶97)).

neglected to address Apple's argument that a skilled artisan would have been motivated to modify Diab's system so that it performed only a subset of its motion suppression processing when no motion was encountered. The Board focused exclusively on the separate and independent argument that, when no motion is sensed, Diab teaches bypassing its motion suppression processing module altogether. Appx24-28. Ultimately, the Board found that the motion suppression module must operate to form a clean waveform even when the device experiences no motion. Appx28. In addition, the Board determined that Apple had not shown that combining Diab with Amano would "necessarily" lead to a reduction in power consumption "if Diab's motion artifact suppression module was suspended." Appx30-32.

These errors infected the Board's analysis of every ground involving Diab. *See* Appx32 (upholding patentability of claims 11 and 21 based on Diab, Amano, and Edgar "[f]or the same reasons discussed above (*see supra* § II.D.3)"); Appx34 ("conclud[ing] that the deficiencies discussed above (*see supra* § II.D.3.) also extend to the proposed ground for claims 1-7 and 15-18 based on Diab, Amano, and Turcott"); Appx35 (noting the alleged failure of "general knowledge" "to overcome the deficiencies discussed above in connection with the reasoning for, and potential implications of, suspending or eliminating Diab's motion artifact suppression module" citing the Board's discussion in §§ II.D.3, II.E, II.F).

## SUMMARY OF THE ARGUMENT

The independent claim in which the "processing characteristics" term appears demonstrates that the term should be interpreted broadly. The '703 patent dependent claims—namely 4 and 8—further demonstrate that the Board's "light detector" construction is erroneous. Yet, without any definitional statement in the '703 patent's written description, or any clear and unmistakable disavowal, the Board's construction of "processing characteristics" is a classic case of impermissibly reading a preferred embodiment into the claims. This flawed construction plagued all the grounds using Amano as a primary reference. The Board's construction should be set aside and the case remanded so the Board may analyze the Amano-based grounds (i.e., those based on Amano alone or in combination with Turcott) under the plain meaning of "processing characteristics."

The Board independently erred in its treatment of Apple's Diab-based obviousness arguments. Diab teaches that, when motion is not sensed, motion suppression processing does not need to occur. Diab also discloses a motion artifact suppression module that includes (1) components specifically directed towards ameliorating the effects motion has on a signal, and (2) components that represent traditional filters. Apple argued a skilled artisan would have been motivated to combine these teachings so as not to use the motion-focused components in Diab's motion artifact suppression module when the device

11

experiences no motion.  The Board, however, did not even acknowledge Apple's evidence for this argument and did not address it.  The Board's failure to address this argument and evidence is a violation of the Administrative Procedure Act ("APA") that requires, at the very least, a remand for the Board to reconsider all grounds involving Diab.

Also misplaced is the Board's conclusion that combining the teachings of Diab and Amano would not "necessarily" result in Diab's device having reduced power when it performed less processing.  The necessity test the Board adopted is the touchstone for inherency, which is used when a claim limitation is not expressly disclosed in a reference.  Here, however, Apple proposed a combination based on explicit teachings of Diab and Amano.  Apple thus needed to demonstrate reasonable expectation of success with this combination, which it did.  The Board's decision should be vacated and remanded with instruction for the correct obviousness law to be applied to all the grounds involving Diab.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews questions of law, such as claim construction and ultimate obviousness determinations, *de novo* and factual determinations underlying obviousness for substantial evidence.  *See* 5 U.S.C. § 706(2)(E); *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 833 (Fed. Cir. 2015); *Intel Corp. v. Qualcomm Inc.*,

21 F.4th 801, 808 (Fed. Cir. 2021).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

Agency decisions that "fail[] to consider . . . important aspect[s] of the problem" being considered are arbitrary and capricious and cannot stand.  *See Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Inc. Co.*, 463 U.S. 29, 43 (1983).  The APA thus requires the Board to provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.*; *see also Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) (quoting same in context of Board determinations).  A sufficient explanation must "straightforwardly and thoroughly assess" each party's arguments.  *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1325 (Fed. Cir. 2015); *see also Provisur Techs., Inc. v. Weber, Inc.*, --- F.4th ----, No. 2021-1942, 2022 WL 4474941, at *4 (Fed. Cir. Sept. 27, 2022).  The need for a specific and thorough explanation applies with particular force to the Board's analysis of obviousness, which "should be made explicit."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *Outdry Techs. Corp. v. Geox S.p.A.*, 859 F.3d 1364, 1370 (Fed. Cir. 2017).

## II. THE BOARD LIMITED THE TERM "PROCESSING CHARACTERISTICS" TO A PREFERRED EMBODIMENT IN A MANNER THAT CONFLICTS WITH THE CLAIM LANGUAGE

The Board erred in interpreting "processing characteristics" to require that they be determined from a signal received from a light detector. Appx14. This construction improperly injects limitations from the preferred embodiment and contradicts the '703 patent's claims. The Board's limiting construction should be reversed and the case remanded so that the Board may analyze the petition's Amano-based grounds under the correct construction.

### A. The '703 Patent's Claims Confirm that the Board's Construction Is Incorrect

#### 1. The Term "Processing Characteristics" Is Not Limited Under the Plain Claim Language

Claim construction begins with the language of the claims themselves. *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017) ("The claim construction inquiry begins and ends in all cases with the actual words of the claim." (quotation omitted)). The Board's decision, however, skips this key part of the analysis, beginning and largely ending with the written description, without meaningfully discussing the claim language. This approach dooms the Board's analysis from the outset.

Each challenged independent claim includes a limitation directed to "processing characteristics." Claim 1 is representative, and recites: "comparing ***processing characteristics*** to a predetermined threshold; [] when said ***processing***

14

***characteristics*** pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level." Appx59 (11:43-47). The "processing characteristics" limitation does not restrict ***how*** the pulse oximeter derives these characteristics, and other limitations of the independent claims show that any such restriction would have been stated explicitly. For example, the method of claim 1 includes a separate step of "receiving one or more signals ***from one or more detectors configured to detect said light***." Appx59 (11:37-39). Noticeably absent from the "processing characteristics" term is similar language restricting it to a light detector.

The distinction between these limitations is meaningful because "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of terms in a claim." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 (Fed. Cir. 2017) (quotation omitted). Applying that principle here, claim 1's explicit requirement that a signal come from a light detector shows that there is not a similar limitation for "processing characteristics." When a patent applicant uses a term in one claim, it suggests that the applicant's non-use in a related claim means that the related claim is not similarly limited by the term. *See Intell. Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1379 (Fed. Cir. 2018) (explaining use of restrictive language in one claim "shows that the patentee knew how to restrict" claims as such, and claim

without restrictive language is not so restricted); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1333 (Fed. Cir. 2010) (use of disputed term in claims of related patented demonstrated applicant "knew how to claim" that term in patent at issue, but did not).

The Board's claim construction analysis does not substantively address the language surrounding the "processing characteristics" term in claim 1.  The Board instead simply repeated Masimo's argument that the recitation of light detectors in the "signal" limitation implies that the claimed "processing characteristics" are likewise derived from the light detectors.  *See* Appx10-11.  To the extent the Board accepted that argument, that was error.

Additionally, claim 1 introduces its limitations with the transitional word "comprising," the use of which "signals that the entire claim is presumptively open-ended" and "creates a presumption that . . . the claim does not exclude additional, unrecited elements."  *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1383 (Fed. Cir. 2012) (citations omitted).  Thus, the claim does not exclude a method additionally having a non-light detector used for deriving processing characteristics, and that restriction should not be grafted onto the plain claim language.

Thus, given the "signal" limitation and the use of "comprising," claim 1 demonstrates that the "processing characteristics" term as used in the claims carries with it no light detector restriction.

### 2.    Dependent Claim 4 Provides the Light Detector Limitation the Board Read into Independent Claim 1

Dependent claim 4 introduces the notion of light detectors as they relate to "processing characteristics."  Claim 4 recites: "The method of claim 1, wherein ***said processing characteristics comprise signal characteristics from one or more light sensitive detectors***."  Appx59.  As can be seen, this claim explicitly recites that the "processing characteristics" comes from light detectors.

If the Board were correct that "processing characteristics," properly construed, includes the notion of a light detector, it would be unnecessary and repetitive for claim 4 to include this limitation separately.  Substituting the term "processing characteristics" with the Board's construction in claim 4 illustrates this redundancy:

> 4. The method of claim 1, wherein said ~~processing characteristics~~ <u>processing characteristics determined from a signal received from one or more detectors configured to detect light</u> comprise signal characteristics from one or more light sensitive detectors.

*Id.* (deletion in strike-through, additions underlined).  As can be seen, inserting the Board's construction into claim 4 reveals improper surplusage with the language that already exists.  Namely, the claim requires "processing characteristics

determined from a signal ***received from one or more detectors configured to***

***detect light***" and separately that these processing characteristics comprise signal

characteristics that come "***from one or more light sensitive detectors***." *Id.*

The Board disregarded this argument on the basis that claim 4 also

introduces the notion that "processing characteristics" comprise "signal

characteristics." Appx12-14. Even if the Board's construction does not render

claim 4 entirely duplicative of claim 1, the Board ignored that it still introduces

surplusage into the claim, which shows error in the Board's construction.

*Cioffi v. Google, Inc.*, 632 F. App'x 1013 (Fed. Cir. 2015) (nonprecedential),

features a highly similar circumstance and is instructive.[3] The dispute in *Cioffi*

concerned whether the term "web browser process" required "direct" access

capability. *Id.* at 1018. A dependent claim required that the "web browser

process" be "capable of ***directly*** exchanging data with the network interface,"

which the patent owner argued would render a directness requirement in the

independent claim "superfluous." *Id.* at 1019. Like the Board, the defendant in

*Cioffi* argued that, because the dependent claim included other language limiting

the claim beyond the "direct" limitation, the independent and dependent claims

were not "identical in scope" and the dependent claim did not undermine the

---

[3] Although *Cioffi* issued as a nonprecedential decision, it is relevant persuasive authority because of the close factual relationship between it and this case. *See* Fed. Cir. R. 32.1(d).

proposed construction's importing direct access capability into "web browser process." *Id.*

The Court disagreed, holding that if the independent claim "already required a capability for 'direct' access to the network," then the "direct" limitation of the dependent claim "would be entirely duplicative." *Id.* Even though the dependent claim also included another limitation not present in the independent claim, that did "not change the fact that the 'directly exchanges data with a network' limitation would be rendered superfluous." *Id.* (citing *Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1399 (Fed. Cir. 2014)). The Court thus held that the "the addition of the direct access capability limitation in" the dependent claim "gives rise to a presumption that [the independent claim] lacks such a limitation." *Id.*; *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014) (holding "district court erred by incorporating the dependent claim limitations into the construction" of a term in the independent claim).

The conclusion the Court drew in *Cioffi* aligns with *Phillips*, which also recognizes that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). It also is in accord with the established law that "claims are interpreted with an eye toward giving effect to all terms in the claim," including the light

detector limitation of claim 4.  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).  The admonishment to avoid a construction that renders claim language superfluous furthers the public notice of patent claims.  "Allowing a patentee to argue that . . . characteristics specifically described in a claim are merely superfluous"—essentially what Masimo argued in part, and the Board adopted, for claim 4, Appx12 (quoting Appx1811-1812)—"would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration."  *Bicon*, 441 F.3d at 950; *see also Mformation*, 764 F.3d at 1399 (rejecting proposed construction that would render another limitation "superfluous"); *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1356–57 (Fed. Cir. 2013) (same).

Thus, the inclusion of the light detector limitation in claim 4 shows that the limitation is not a part of the claim 1 "processing characteristics" term.

### 3. Claim 8 Further Demonstrates the Absence of a Light Detector Limitation in Claim 1

Dependent claim 8 also demonstrates that the Board erred by grafting the light detector limitation into the "processing characteristics" term.  Claim 8 limits the "processing characteristics" limitation, reciting that "said processing characteristics include ***determining an estimate of current power consumption*** and comparing said estimate with a target power consumption."  Appx59 (cl. 8).

The '703 patent demonstrates, however, that this power consumption estimate does not come from a light detector, but from a separate component of the disclosed device: its power status calculator. The "power status calculator 460" communicates with the device's "control engine 440." Appx56 (6:42-55). Specifically, this power status calculator 460 "generates the power status output 462 *as an indication that the current average power estimate* is above or below the power target" and then "provides this output 462 to the control engine 440." Appx56 (6:49-55). This relationship is depicted in Figure 4:



FIG. 4

Appx1685 (citing and annotating Appx46). As Figure 4 shows, the power status calculator 460 is a subcomponent of the sampling controller 360, not the signal processor 340 that receives the input signal 322 from the light detector. *Id.*;

Appx56 (5:55-57).  Thus, the power consumption estimate relevant for claim 8 is "received from" the power status calculator 460, and not from the light detector, i.e., detector front-end 490, which feeds into the signal processor 340. Accordingly, claim 8 confirms that "processing characteristics" include data not "determined from a signal received from one or more detectors configured to detect a light," contrary to the Board's construction.

The Board disregarded this clear teaching by adopting Masimo's argument that the power status calculator's output 462 is determined from a signal received at the light detector.  Appx12-14 (citing Appx1812-1813).  Masimo's sole basis for this assertion is that a lengthy series of arrows in Figure 4 can be traced from the power status calculator 460 back to the detector front-end 490.  Appx1812-1813. However, apart from the figure itself, Masimo cited no evidence for this clumsy interpretation of the '703 patent.  *Id.*  Nor did Masimo (or the Board) provide any explanation of how "an estimate of current power consumption" could be determined based on the signals received at Figure 4's light detector(s).  *Id.*; *see also* Appx12-14.

Unsurprisingly, that is not how the '703 patent describes determining an estimate of current power consumption.  The control engine 440 does not provide a light signal to the power status calculator 460; instead, it provides a "control state input 442" that "indicates the current status of the control engine."  Appx56 (6:42-

22

45).  The power status calculator 460 uses this control state input together with an

internal timer to calculate an estimate of current power consumption.  Appx56

(6:45-49).  Thus, it is clear that not every calculation performed in the '703

patent's pulse oximeter is determined from a signal received at its light detector

merely because the light detector ultimately connects to every other component.

Therefore, the Board erred by adopting Masimo's unsupported attorney

argument that the power consumption estimate is determined from the light

detector.  Appx13-14.  When the '703 patent is properly interpreted, claim 8

further demonstrates that "processing characteristics" are not confined by signals

received from a light detector.

### B. The Board Improperly Imputed a Narrowing Light-Detector Limitation Based Solely on the Disclosed Embodiment

The written description is relevant to claim construction and may be

probative of a term's meaning.  *See Phillips*, 415 F.3d at 1317.  However, this

Court has repeatedly emphasized that "the ***claims***, not the written description, []

define the scope of the patent right," and that although the written description may

be used to interpret claim terms, "[a] court may not import limitations from the

written description into the claims."  *Williamson v. Citrix Online, LLC*, 792 F.3d

1339, 1346 (Fed. Cir. 2015) (original emphasis) (quoting *Laitram Corp. v. NEC

Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998)).  For "while claims are to be

construed in light of the specification, they are not necessarily limited by the

23

specification." *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed.

Cir. 1998). The Board's overreliance on the specification here contravened that

important principle, erroneously importing a limitation from the written description

to the claims.

"[D]epart[ing] from the plain and ordinary meaning of claim terms based on

the specification" may occur "in only two instances: lexicography and disavowal."

*Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014).

Although the Board relied heavily on the specification to impute the light detector

on the "processing characteristics" term, it never engaged in a lexicography or

disavowal analysis. As a result, it failed to apply the "exacting" standards for

finding lexicography and disavowal. *Id.*

The Board's recognition of a light detector merely being contained within

the disclosed embodiment, Appx10-11, Appx13-14, does not meet these exacting

standards. The Board's errant construction should therefore be reversed.

### 1.    The Specification Does Not Contain a Lexicographer Definition of "Processing Characteristics"

"'To act as its own lexicographer, a patentee must clearly set forth a

definition of the disputed claim term other than its plain and ordinary meaning' and

must 'clearly express an intent to redefine the term.'" *Hill-Rom*, 755 F.3d at 1371

(quoting *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir.

2012)). No such definition of the "processing characteristics" exists in the '703

patent's specification. The term "processing characteristics" appears in the written description only once and in a non-definitional way: "The sampling controls 362, 364, 366 regulate pulse oximeter power dissipation by causing the sensor interface 320 to vary the sampling characteristics of the sensor port 302 and by causing the signal processor 340 to vary its sample ***processing characteristics***, as described in further detail with respect to FIG. 4, below." Appx56 (5:18-23). This passage, at best, simply relates "processing characteristics" with the signal processor 340 for this embodiment.[4]

Even the "detector front-end 490," to which Masimo directed the Board for the "detector configured to detect light" restriction, is not so limited. *See, e.g.*, Appx1291-1292; Appx11. As the '703 patent explains, "[t]he detector front-end 490 receives an input signal 492 from a sensor attached to the sensor port 302." Appx56 (5:35-36). The detector front-end 490 digitizes this signal and sends it to the "signal processor 340," which is the component where "processing characteristics" are used in this embodiment. Appx56 (5:36-38).

Significantly, the signal on which the detector 490 operates is not restricted to a light signal in the written description. The '703 patent explains that the

---

[4] As explained above, dependent claim 8 separately relates "processing characteristics" with the pulse oximeter's power status calculator 460, which is part of the sampling controller 360, not signal processor 340. *See* Arg. Sec.II.A.3, *infra*.

"sensor port 302," which sends the signal to the detector 490, "connects to an external sensor, *e.g.* sensor 110 (FIG. 1)."  Appx56 (5:1-2).  Although "sensor 110" happens to be a light sensor, use of "e.g." is non-limiting.  *See* Black's Law Dictionary 652 (11th ed. 2019) (defining "e.g." as Latin for "for example").  Thus, even the portion of the written description on which the Board relied does not limit the detector 490 to one configured to detect light.

Ultimately, the Board's reliance on the written description—which amounts to about eight lines and one figure—does not meet the exacting standard for lexicography.[5]  The cited portions are not definitional and only confirm that a detector configured for light is simply an implementation detail of the preferred embodiment.  These citations certainly do not demonstrate, expressly or by implication, "a clear intention to restrict the scope of the claims" as is necessary to form a lexicographic exception to the rule against "read[ing] limitations from the preferred embodiment into the claims."  *Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1267 (Fed. Cir. 2015); *see also id.* ("Absent an intentional statement of restriction, we refuse to restrict the patent's claims to cover only [the preferred embodiment].").

---

[5] The Board also cited additional lines that come from the '703 patent's claims, but not the written description.  *See* Appx11 (citing Appx59-60 (11:43-47, 12:16-20, 12:40-44, 12:62-66, 13:25-41:1, 14:15-19)).  As explained above, the claim language also does not support restricting processing characteristics to those derived from a signal received from a light detector.  *See* Arg. Sec.II.A, *supra*.

### 2.     The Specification Does Not Disavow Use of Non-Light Detector Signals

The written description also contains no disavowal that could support restricting the "processing characteristics" term.  To disavow claim scope, the specification or prosecution history "must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."  *Cont'l Circuits, LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (quotations omitted); *Thorner*, 669 F.3d at 1365.

Neither Masimo nor the Board alleged that there is a disavowing statement related to "processing characteristics," and none exists.  As described the above, the specification describes "processing characteristics" without any mention of a definition or restriction that pertains to a light detector.  Further, neither party identified any portion of the prosecution history that bears on the "processing characteristics" term, and thus neither did the Board.  Therefore, there is no evidence of "clear disavowal" in the intrinsic record from which the Board could have based its limiting construction.  *Cont'l Circuits*, 915 F.3d at 797.

### 3.     The Preferred Embodiment's Use of a Light Detector Does Not Limit the Claim

Instead of engaging in lexicography or disavowal analysis as would be required to import the light detector limitation into "processing characteristics," the Board accepted Masimo's argument that "the specification consistently describes"

27

processing characteristics with respect to a signal received from a light detector. Appx11, Appx14.  This argument relies on the disclosed embodiment in the '703 patent, depicted in Figure 4.  Appx11 (citing Fig. 4; Appx46; and related written description disclosure, Appx56 (5:28-30, 5:35-38, 5:40-41, 5:46-48)).

The Board's naked reliance on the disclosed embodiment is insufficient, without more, to read limitations from that embodiment into the claims. Embodiments alone do not confine and limit claim language.  *Evolusion Concepts, Inc. v. HOC Events, Inc.*, 22 F.4th 1361, 1367 (Fed. Cir. 2022) ("We have repeatedly held that 'it is not enough that the only embodiments, or all of the embodiments, contain a particular limitation to limit claims beyond their plain meaning.'" (quotations omitted)).  "'[I]t is not enough for a patentee to simply disclose a single embodiment,'" but instead, "the patentee must '***clearly express an intent' to redefine the term***."  *MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1343 (Fed. Cir. 2019) (quoting *Thorner*, 669 F.3d at 1365).  Even where, like here, "there is only one embodiment," it is improper to "limit the scope of the claims" to that one embodiment "absent the patentee's 'words or expressions of manifest exclusion or restriction.'"  *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 967 (Fed. Cir. 2022) (quoting *Hill-Rom*, 755 F.3d at 1371); *see also Phillips*, 415 F.3d at 1323 ("We have expressly rejected the contention that if a patent describes only a single

embodiment, the claims of the patent must be construed as being limited to that embodiment.").

The Board did not explain why Figure 4 and its related disclosure somehow ascribe definitional meaning to "processing characteristics," and they do not. The Board's conclusory explanation is that it adopted its construction in "rel[iance] on the written description of the '703 patent as a useful guide in informing the meaning of 'processing characteristics' . . . ." and cited specifically to the '703 patent's Figure 4. Appx12-14. However, the Figure 4 embodiment demonstrates merely that a light detector is used to derive certain "processing characteristics" in that embodiment. Appx46; Appx56 (5:28-6:55).

In this respect, *Ormco Corp. v. Align Technology, Inc.*, 463 F.3d 1299 (Fed. Cir. 2006), is notable. The patent at issue in *Ormco* related to the orthodontic appliances for correcting the positing of teeth. *Id.* at 1302. The claim recited several of these orthodontic appliances, each having different "geometries," the term at the heart of the parties' claim construction dispute. *Id.* at 1302-03, 1306. Specifically, the parties disputed whether "appliances have different geometries only if the positions of the tooth cavities change from one appliance to another." *Id.* at 1306. Reversing the district court's construction, this Court refused to infer such a limitation from the specification. First, it recognized that the "the specification does not define the term 'geometry.'" *Id.* Instead, the defendant

argued that "only appliances with different tooth positions" were described in the patent. The Court determined this description insufficient evidence for construing the claims as limited to such a design, explaining that this "language does no more than describe preferred embodiments," and reiterating that the Court has "repeatedly warned against confining the claims to the disclosed embodiments." *Id.* (citing *Phillips*, 415 F.3d at 1323).

Here too, there is no purported definitional language in the specification from which to derive the Board's limiting construction. Instead, the Board attempted to graft the "light detector" feature from the preferred embodiment onto the claims. As in *Ormco*, however, a happenstance feature of a disclosed embodiment cannot, without more, confine and limit claim the term "processing characteristics." *See also Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1331 (Fed. Cir. 2012) ("[G]eneral descriptions of the characteristics of embodiments do not suffice to limit the claims.").

Indeed, it is particularly inappropriate to limit claims to preferred embodiments where "the specification expressly instructs that the disclosed examples are not to be considered as limiting the invention"—as is the case here. *Aventis Pharma S.A.*, 675 F.3d at 1331  (citation omitted). Specifically, the '703 patent proclaims that its "embodiments are disclosed by way of examples only and

30

are not to limit the scope of the claims that follow" because a skilled artisan "will appreciate many variations and modifications."  Appx59 (11:26-29).

Thus, even if a light detector is "consistently" used to derive "processing characteristics" in the preferred embodiment as the Board concluded, Appx10-11, Appx13-14,[6] that alone is an inadequate and improper basis for re-writing the claims to limit the breadth of the plain and ordinary meaning of "processing characteristics" under the guise of claim construction.

### C.     The Board Improperly Permitted Masimo To Narrow Its Claims Without Amending Them

"[I]t is well settled that no matter how great the temptations of fairness or policy making, courts do not redraft claims."  *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340 (Fed. Cir. 2005).  Yet, the Board's construction unjustifiably narrowed the '703 patent's claims to a single embodiment in a manner that allowed these claims to avoid invalidation under the Amano grounds.  Adopting an unjustifiably narrow construction to avoid prior art and preserve validity is not the proper function of claim construction.  *See Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis is a

---

[6] As discussed above, however, the written description teaches that "processing characteristics" includes data not "determined from a signal received from one or more detectors configured to detect a light."  *See* Arg. Sec.II.A.3, *supra*.

regular component of claim construction."); *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1372 (Fed. Cir. 2002) ("[W]here claim language is clear we must accord it full breadth even if the result is a claim that is clearly invalid.").

Indeed, in *inter partes* review, the claim amendment process exists for this very purpose. Patent owners who wish to narrow their claims to avoid prior art are given the opportunity to seek amendment of the claims within the proceeding. *See* 35 U.S.C. § 316(d); *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1309 (Fed. Cir. 2017) (noting "the patent owner may use amendment as a tool to narrow claim scope in an effort to ensure its patentable subject matter remains properly protected"). The same is true during original prosecution of the claims. *See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 740 (Fed. Cir. 2016) ("[T]he patentee can amend the claim language during prosecution— and narrow it if necessary—to clarify the scope of the invention and avoid rejection or cancellation of the claims.").

Masimo did not avail itself of the opportunity to amend during prosecution or during the '703 patent's IPR proceeding. As Apple explained at the oral hearing, by "usurp[ing] the amendment process," Masimo improperly "inject[ed] unclaimed subject matter from the specification into the claim." Appx2016. "Inventors are masters of their claims, and the words they use to describe and

claim their invention are decisive and binding." *Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1331 (Fed. Cir. 2021). Had Masimo wanted to narrow its claims to a particular embodiment in the specification, amendment was the proper mechanism, not claim construction.

For these reasons, the Board's construction of "processing characteristics" should be reversed and the case remanded so that the Board may address the Amano grounds on the merits.

## III. THE BOARD ERRED IN DETERMINING DIAB DOES NOT RENDER OBVIOUS TRANSITIONING FROM A HIGH TO A LOW POWER CONSUMPTION LEVEL

The Board's rejection of Apple's Diab-based obviousness arguments is rooted in its disagreement with Apple's assertion that Diab suspends operation of its "motion artifact suppression module" when no motion is detected and its conclusion that suspending the module would not "necessarily" reduce power consumption. Appx23-32. This reasoning, however, rests on two fundamental flaws that independently require the Board's decision to be set aside.

First, even assuming *arguendo* that the Board is correct that Diab never wholly suspends all operation of its "motion artifact suppression module," Apple further argued that it would have been obvious to reduce at least motion suppression processing in the modified device of Diab, thereby reducing power consumption. Indeed, the motivation for this modification comes from Diab itself.

33

Yet, the Board failed to address this argument substantively, instead mischaracterizing Apple's sole position as requiring *all* processing performed by the module be suspended. Had the Board properly considered what the prior-art teachings would have rendered obvious to a skilled artisan, it would have found the "transitioning" limitation obvious.

Second, the Board further erred by imposing on Apple an incorrect inherency legal standard when it came to combining explicit teachings of Diab and Amano to satisfy the "transitioning" limitation. Neither the challenged claims nor Apple's obviousness theory requires power consumption to "necessarily" be reduced in all circumstances as Masimo and the Board suggested. The Board's errant decision should be set aside.

### A.   Diab's Pulse Oximeter Teaches Complex Signal Processing When Motion Occurs and Simpler "Traditional" Processing When It Does Not

Diab, Appx606-679, describes a system having a pulse oximeter, like the device described by the '703 patent. Appx661 (34:10-12); Appx54 (1:18-66). As the '703 patent explains, pulse oximetry was "a widely accepted noninvasive procedure for measuring the oxygen saturation level of a person's arterial blood" in the art at the time of the patent. Appx54 (1:18-20).

Diab's pulse oximeter uses two LEDs for its oximeter measurements. The LEDs "are positioned on one side of a portion of the body where blood flows close

to the surface, such as a finger," and "a photodetector is positioned on the opposite side of the finger." Appx661 (33:53-55). Diab explains that, in the typical operation of its device, "one LED emits a visible wavelength, preferably red," while "the other LED emits an infrared wavelength." Appx661 (33:56-58). This approach of sensing light through a finger is consistent with a class of pulse oximeters the '703 patent describes as having been known in the art. Appx54 (1:27-35).

The Diab device further contains a "digital signal processing system 334." Appx661 (34:21-29). This system processes the sensed LED signals so that it may provide "clean plethysmographic waveforms[7] of the detected signals" and "values for oxygen saturation and pulse rate to" a display. Appx662 (35:43-47). This system is shown in Diab's Figure 11, reproduced below with the digital signal processing system 334 highlighted. Raw digital light signals are input into the digital signal processor 334, and oxygen saturation, heart rate, and plethysmographic waveform signals are output to the display 336.

---

[7] Diab explains that a "plethysmographic wave" is a signal representative of arterial pulse and is shown in its Figure 1. Appx646 (4:20-23); Appx608.



FIG. 11

Appx623 (highlighting added).

Diab further describes the processing that occurs within the digital signal

processor system 334, and particularly within its pulse rate module 410.  Appx668

(47:30-31).  Most relevant here, Diab explains that the pulse rate module 410

includes a motion artifact suppression module 580, which operates on signal

samples from the red and infrared LED photodetectors, motion information for the

device, and a saturation value.  Appx668 (47:47-49); Appx664 (40:43-45);

Appx668 (47:50-51).  The purpose of this motion artifact suppression module 580

is to counteract the ill-effects motion can have on the light signals:  "***In the case of***

***motion***, motion artifacts are suppressed using the motion artifact suppression

module 580."  Appx668 (47:55-56).

The pulse rate module 410, and its motion artifact suppression module 580, are shown in detail in Figure 20, reproduced below.  Appx623; Appx633; Appx663-664 (38:67-39:3); Appx668 (47:30-31).  The highlighting added to the figure depicts the inputs to the motion artifact suppression module 580 when motion is detected.



Appx633 (highlighting added).

Critically, however, Diab explains that, in situations where a signal is "constant" and "predictable"—i.e., without motion—"traditional filtering techniques, such as . . . band pass . . . filtering" can be used to produce a favorable output.  Appx649 (9:18-21).  Applying this principle to the pulse rate module 410, Diab discloses that it behaves differently when no motion is detected.  Describing the infrared signal in particular, Diab explains: "***In the case of no motion***, one of

the signals (the infrared signal in the present embodiment) is subjected to DC removal and bandpass filtering as represented in the DC removal and bandpass filter module 578." Appx668 (48:6-9). In other words, "[i]f motion is not detected, spectral estimation on the signals is carried out directly ***without motion artifact suppression***." Appx668 (47:52-54).

The use of these traditional methods when motion is absent, in lieu of the full-blown motion artifact suppression module 580 processing, can be seen with the alternative path depicted in Figure 20 below. In this path, shown in green, the infrared signal bypasses the motion artifact suppression module 580 and instead passes through the DC removal and bandpass filter 578, at least for its generation of a heart rate.



Appx84 (annotations added); Appx633; Appx371-372 (¶53).

Although its own module 578, the traditional bandpass filtering and DC
removal processing in module 578 simply replicates a subset of the processing that
the motion artifact suppression module 580 performs. Diab explains as much
through several related passages. Diab first explains that "[t]he DC removal and
bandpass filter module 578 *provide the same filtering as the DC removal and
bandpass filter modules 5536 [sic, 536], 538*." Appx668 (48:9-11). The reference
to DC removal and bandpass filter modules 536 and 538 are to sub-components of
a saturation transform module 406 that Diab discloses. Importantly, Diab explains
that "[t]he motion artifact suppression module 580 *is nearly identical to the
saturation transform module 406*." Appx668 (48:38-39). In other words, the
module that operates on the infrared signal when motion is present—the motion
artifact suppression module 580—itself contains the same key blocks present in
saturation transform module 406: (1) a traditional DC removal module and (2) a
traditional bandpass filter module.

The similarities between the motion artifact suppression module 580 and the
saturation transform module 406 do not end there. The artifact suppression module
580 has a "motion artifact reference processor 570" that "*is the same as the
reference processor 530* of the saturation transform module 406," and its sub-
modules "*are the same as corresponding modules* in the saturation transform

reference processor 530." Appx668 (48:43-53). The DC removal and bandpass filter modules are contained within these identical "reference processors" as shown below, with Figure 18 (left) showing the saturation transform module 406 and Figure 21 (right) showing the motion artifact suppression module 580:



Appx631 (excerpted; highlighting added); Appx634 (excerpted; highlighting added); *see also* Appx1500-1501 (47:19-48:2).

Thus, taken together, Diab provides that (1) the DC removal modules 536 and 583, (2) the bandpass filters 538 and 585, and (3) the distinct DC removal and bandpass filtering module 578 provide the same filtering operations. This disclosure helps to describe Diab's no-motion infrared signal path for generation of a heart rate, discussed above, wherein the infrared signal passes through DC removal and bandpass filtering module 578 instead of motion artifact suppression module 580. Appx668 (47:52-54, 48:6-9); Appx633; Appx371-372 (¶53). In this path, a subset of the same filtering operations normally executed by the motion

artifact suppression module 580 are performed on the infrared signal: the DC

removal and bandpass filter operations.

**B.    The Board Failed To Consider a Modification of Diab that Renders the High/Low Power Consumption Transition Limitation Obvious**

**1.    Apple Argued that a Skilled Artisan Would Have Known To Modify Diab To Suspend Some of Its Processing When Motion Was Not Present**

The '703 patent's challenged independent claims require transitioning

between a "higher power consumption level" and a "lower power consumption

level" upon reaching a certain threshold.  Appx59 (cl. 9 at 12:13-23).  Apple

argued that adjusting Diab's signal processing behavior based on whether motion

is present reads on this limitation.

Apple's argument was two-fold.  Apple first argued that Diab teaches in

cases of no detected motion that it does not execute the motion artifact suppression

module 580, bypassing it altogether.  Appx83-85.  This argument centered on

Diab's disclosure that "[i]f motion is not detected, spectral estimation on the

signals is carried out directly *without motion artifact suppression*."  Appx668

(47:52-54).  The Board disagreed with Apple that Diab teaches suspending its

motion artifact suppression module 580 when no motion is present.  Appx27-28.

Specifically, the Board found that Diab discloses generating a clean

plethysmograph waveform no matter whether motion is sensed or not.  Appx28.

41

The Board interpreted Diab as always requiring the light signals to pass through an active motion artifact suppression module 580 to create this clean plethysmograph waveform. Appx27-28. Although Apple disagrees with this conclusion, Apple accepts this finding for the limited purpose of this appeal.[8]

That is not all Apple argued, however. Fundamental to this appeal, Apple also argued that an obvious modification of Diab would be to utilize only a subset of the motion artifact suppression module 580's processing when motion is not detected. Apple developed this argument relying on Diab's disclosure that, for the infrared signal, only the DC removal and bandpass filtering sub-modules of the motion artifact suppression module 580 are executed. Appx668 (48:6-11, 43-53). For example, Apple's petition annotates Diab's Figure 20 to show that, for the infrared signal, the "[h]eart rate determination without motion artifact suppression" passes through only the DC removal and bandpass filter 578 and does not experience the full processing of the motion artifact suppression module 580.

---

[8] The Board acknowledged, however, that at least for generation of a heart rate signal, Diab teaches that the infrared signal would not be processed by motion artifact suppression module 580, but instead by DC removal and bandpass filter 578. Appx25-26.



Appx83-84 (reproducing Appx633 with annotation).  Indeed, even Masimo agreed that certain of the pulse rate monitor 410's modules "operate ***differently*** depending on whether motion is detected."  Appx1312 (emphasis in original).

Apple then argued that it would have also been obvious not to execute this "[a]dditional processing for motion artifact suppression" where "motion is not detected."  Appx84-85; Appx1689-1690; Appx2004 (7:16-18) ("[O]ne of skill would find it ***obvious in view of Diab's other disclosure*** as well as the namesake of module 580 itself ***that it foregoes motion artifact suppression processes when informed of no motion*** . . . ."); Appx2005 (8:17-20) ("you shut down at least the portion of processing that are devoted to motion suppression").  Apple's expert provided testimony in support of this obviousness argument.  *See* Appx372-373 (¶54); Appx1507 (54:10-17); Appx1521-1522 (68:15-69:6).

As Apple explained, the motivation for suspending the motion-focused operations in the motion artifact suppression module 580—including to produce the clean plethysmograph waveform—comes from Diab itself:

> [B]ecause Diab's FIG. 21 DC removal module 583 and the bandpass filter module 585 are the same as the FIG. 20 DC removal and bandpass filter module 578, *a POSITA would have found it obvious to suspend and not execute all the operations of the motion artifact suppression module 580* and instead provide the clean plethysmograph waveform from the FIG. 20 DC removal and bandpass filter module 578.

Appx1689-1690 (citing Appx665-668 (48:6-11, 48:48-53, 42:27-30)).

To the extent it was not already clear, Apple clarified at the oral hearing that this modification would result in the motion artifact suppression module 580 performing only the traditional filtering of the DC removal and bandpass filter:

> Masimo still fails to account for contentions that *a POSITA would find it obvious to suspend performance of processes after which module 580 is named, the ones that deal with motion artifact suppression in the absence of motion* and to be clear about this point, recall figure 21 -- we just saw it -- which showed that several of the module 580 sub-components, there's a DC band filter and a bandpass filter but they're not fully devoted to artifact suppression . . . .

Appx2006 (9:13-19); *see also* Appx2008-2009 (11:9-12:15).

This discussion prompted dialogue with the Board, which asked questions directed at turning off Diab's motion artifact suppression functions.  Appx2008 (11:9-23).  Apple engaged with these questions, explaining that "in the existence of motion you want to suppress the artifacts that are motion laden and that's what the 580 module" does, but "in the absence of motion, you need not pursue all of the

processing that it contemplates on motion artifacts." Appx2009 (12:2-15).

Instead, to remove artifacts that remain even without motion, for example, "ones

that are respiratory in nature," Apple explained that "those are going to pass

through different filters," meaning the DC removal and bandpass filter.

Appx2008-2009 (11:24-12:15).

### 2. The Board Violated the APA and Erred as a Matter of Law by Sidestepping Apple's Obviousness Argument Regarding Diab

#### a. The Board Must Explain the Bases for Its Decision in Light of the Evidence and Argument Presented

Despite this discussion at the hearing, the Board's analysis focused heavily,

if not exclusively, on Apple's first argument that Diab discloses completely

shutting down the motion artifact suppression module 580 when no motion is

present. *See* Appx24-28. In doing so, the Board glossed over Apple's alternative

argument, described above, that Diab's own teachings would have rendered

obvious having the motion artifact suppression module 580 perform only

traditional filtering operations when no motion is detected.

Specifically, the Board's decision repeatedly characterizes Apple's position

as making only the all-or-nothing argument that the motion artifact suppression

module 580 either operates because motion is detected, or does not operate at all

because motion is not detected. *See, e.g.*, Appx 24; Appx25; Appx27. The

Board's conclusion proceeds according to this understanding of Apple's argument:

"As a result, we find unpersuasive Petitioner's apparent view that Diab, itself, suggests . . . suspending or shutting off operation of motion artifact suppression module 580." Appx28.

Not only does the Board's decision fail to analyze Apple's alternative argument, it also fails to discuss the impact of Diab's disclosure that only DC removal and bandpass filtering is performed on the infrared signal when no motion is detected. Appx668 (48:6-9) ("In the case of no motion . . . the infrared signal . . . is subjected to DC removal and bandpass filtering."). Similarly, the decision fails to recognize that these traditional filters are also sub-components of the motion artifact suppression module 580. Appx668 (48:6-11, 43-53); Appx634 (Fig. 21).

The Board improperly treated Apple's argument, and thus Diab, too narrowly and failed to analyze portions of Diab that render the "transitioning" limitation obvious, contrary to this Court's precedent that "mandates that the Board consider all grounds of unpatentability raised in an instituted petition." *AC Techs. S.A. v. Amazon.com, Inc.*, 912 F.3d 1358, 1360 (Fed. Cir. 2019). Moreover, because "IPR proceedings are formal administrative adjudications" the Board is "subject to the procedural requirements of the Administrative Procedure Act[.]" *SAS Inst., Inc. v. ComplementSoft, LLC.*, 825 F.3d 1341, 1351 (Fed. Cir. 2016), *rev'd and remanded on other grounds sub nom. SAS Inst., Inc. v. Iancu*, 138 S. Ct.

1348 (2018).  Because the APA requires "consideration of the whole record," the Board should have fully contemplated and addressed Apple's obviousness argument concerning Diab.  5 U.S.C. § 556(d).

The Court's application of these principles in *Provisur Technologies, Inc. v. Weber, Inc.*, 2022 WL 4474941, at *4, is revelatory and applicable in this case. There, the Board "never explained how the [asserted] combination teaches or suggests" a certain limitation, despite finding the challenged patent obvious under the combination.  *Id.* at *4.  The patent owner had "plainly argued that the prior art did not render obvious" this limitation for various reasons.  *Id.*  Yet "the Board's analysis d[id] not explicitly address those arguments or even implicitly explain how the combined system could" meet the limitation "in a way that fairly contemplates and resolves [the patent owner]'s arguments."  *Id.*

The Court recognized that, "[t]o permit effective appellate review, the Board's patentability analysis must be 'clearly disclosed and adequately sustained.'"  *Id.* (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).  As such, it held that "[t]he Board's adoption of [petitioner's] argument and evidence, coupled with its mischaracterization of [patent owner's] arguments, precludes us from engaging in meaningful appellate review and, therefore, violates the APA."  *Id.*

The Board's inaction is much like that in *Provisur*, except that the Board failed to explain here why it found the claims not obvious instead of why it found

47

them obvious. That distinction does not matter, as the Board's failure to provide a basis for rejecting Apple's Diab-based obviousness argument constitutes an APA violation. Like in *Provisur*, the Board's decision must be vacated and the case remanded for the Board to address Apple's argument. *Id.* at *5.

### b.    The Board Must Consider Arguments that Are Properly Presented

Even apart from the APA, this Court also has held that the Board's "refus[al] to consider arguments and evidence" that have been properly presented is "not supported as a matter of law." *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 705, 707 (Fed. Cir. 2020). In *Andrea*, the Board made a particular finding that Apple, who was also the petitioner there, had raised an argument for the first time in its reply brief. *Id.* at 699. The Board "declined to consider" that argument. *Id.* This Court reversed, finding that Apple's reply arguments did "not cite any new evidence" and were "responsive to arguments raised in [the] Patent Owner's Response." *Id.* at 706. Thus, "the Board's decision to ignore Apple's responsive arguments" was wrong "as a matter of law" and "not supported as a matter of law." *Id.* at 707.

It was similarly improper for the Board not to consider Apple's arguments about modifying Diab's motion suppression artifact module based on its own teachings. The Board not only failed to grapple with Apple's argument, it never alleged that the argument was new or somehow improper. The Board permitted

Masimo to submit a sur-reply, in which Masimo did not argue that Apple's obvious argument with Diab was new.  Rather, Masimo addressed on the merits Apple's argument that "in the case of no motion 'a plethysmograph waveform can be generated from the signal using 'traditional filtering techniques . . . such as a bandpass filter.'"  Appx1818 (quoting Appx1686-1687; Appx649 (9:16-20); Appx646 (4:59-64)).

Read most charitably to the Board, its decision suggests in a single sentence that it considered Apple's Diab-based obviousness argument not fully presented. *See* Appx28 ("Petitioner does not offer adequate evidence or argument that Diab contemplates . . . some non-use of [motion artifact suppression module 580] in so generating a clean waveform.").  As noted earlier, the Board completely ignored the evidence and argument the Apple submitted on this point.

For example, the Board never recognized Diab's disclosure that "traditional filtering" like bandpass filtering can be advantageously used when no motion is sensed.  Appx1686-1687 (citing Appx606-679 (2:31-45, 4:20-35, 4:59-64, 9:16-20, 33:45-47, 33:64-34:1, 47:52-54, 48:6-13, Fig. 1)).  It also never analyzed Apple's argument or evidence that Diab discloses performing only DC removal and bandpass filtering of the infrared signal when no motion is present, which renders obvious to a skilled artisan similarly executing only those modules in the motion artifact suppression module 580 to generate the clean plethysmograph waveform, if

there is no motion. *See, e.g.*, Appx1689-1690 (citing Appx665-668 (48:6-11, 48:48-53, 42:27-30)), Appx2006 (9:10-22), Appx2004 (7:14-21); *see also* Appx83-85, Appx372-373 (¶54), Appx1507 (54:10-17), Appx1521-1522 (68:15-69:6), Appx1312.[9]

Thus, to the extent the Board mischaracterized Apple's Diab obviousness argument as underdeveloped, it is because the Board simply failed to grasp or consider the cogent arguments Apple presented. This failure is error. *See, e.g. Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (vacating agency decision that "evidences a complete failure to reasonably reflect upon the information contained in the record and grapple with contrary evidence"); *see also Provisur*, 2022 WL 4474941, at *4-5.

### c.    The Board's Failure To Address and Resolve the Diab Obviousness Grounds Requires Vacatur and Remand

This Court should therefore vacate the Board's decision and remand so the Board may properly consider Apple's argument. *See id.*; *Power Integrations, Inc.*,

---

[9] The Board's citation to Masimo's expert, Dr. Madisetti, did not resolve Apple's argument. The cited portion merely provides an "[o]verview [o]f Diab." Appx28 (citing Appx1378-1385 (¶¶53-59)). Dr. Madisetti did not opine on whether one of skill would have been motivated to modify Diab's motion artifact suppression module 580 to perform only the DC removal and bandpass filter modules. *See Provisur*, 2022 WL 4474941, at *5 (rejecting argument that Board's summary of prior art reference's teachings made the Board's obviousness logic "reasonably discernable from the record"). If anything, Dr. Madisetti's identification of only these two modules as critical for deriving a clean plethysmograph waveform supports Apple's obviousness theory. Appx1384-1385 (¶59).

797 F.3d at 1325 (vacating Board decision that "failed to straightforwardly and thoroughly assess [a] critical issue" because it provided the Court "with an inadequate predicate upon which to evaluate its decision" (citing in part *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947))); *In re Thrift*, 298 F.3d 1357, 1366 (Fed. Cir. 2002) (vacating Board decision because it "failed to provide an adequate ground" for rejecting a claim).

### 3. Modification of Diab's Motion Suppression Artifact Module According to Diab's Teaching Sets Up a *Prima Facie* Case of Obviousness

The Board's failure to adjudicate properly Apple's argument that modifying Diab's signal processing behavior if no motion is sensed is not harmless error. This argument established the groundwork for a *prima facie* case of obviousness with more than adequate factual support.

As described above, Diab explains describes bandpass filtering as a "traditional filtering technique" that can "easily remove[]" the constant and predictable portions of a signal. Appx649 (9:16-27); *see also* Appx661 (33:64-34:1); Appx651 (13:62-67); Appx653 (17:43-50); Appx646 (4:59-64); Appx1687. As an example, Diab also explains that the infrared light signal is subjected to this traditional "bandpass filtering" and "DC removal" only in "the case of no motion." Appx668 (48:6-13); *see also* Appx668 (47:52-54) ("If motion is not detected, spectral estimation on the signals is carried out directly without motion artifact

suppression."). Those very modules—"DC removal" and "bandpass filtering"—are present in Diab's motion artifact suppression module 580. Appx668 (48:6-11, 43-53).

As such, the teaching to modify Diab's motion suppression module 580 so as to perform only "DC removal" and "bandpass filtering" comes from Diab itself. The modification can be visualized using in the annotated version of Figure 21 shown below.



Appx631 (annotations added).[10]

Precedent embraces this sort of modification in an obviousness analysis. The overall obviousness inquiry must be "expansive and flexible" according to *KSR*. *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1335 (Fed. Cir. 2016), *overruled on*

---

[10] This depiction is a further adaptation of the annotated Figure 21 Apple presented to the Board. *See* Appx1689.

*other grounds by Aqua Prods.*, 872 F.3d at 1296 & n.1.  Under that flexible

framework, "[i]f a person of ordinary skill can implement a predictable variation,

§ 103 likely bars its patentability."  *KSR*, 550 U.S. at 417.  The variation to the

motion artifact suppression module 580 envisioned by Apple's obviousness

argument is demonstrably a "predictable variation" because Diab itself instructs

using only traditional processing for infrared signals if there is no motion.

Also consistent with *KSR*'s flexible approach to obviousness is that "[a]

patent can be obvious in light of a single prior art reference if it would have been

obvious to modify that reference to arrive at the patented invention."  *Game &

Tech. Co. v. Activision Blizzard Inc.*, 926 F.3d 1370, 1381 (Fed. Cir. 2019)

(quoting *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016);

citing *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1336–37 (Fed.

Cir. 2010) (affirming an invalidity judgment where claims were held obvious over

a single reference)).  Indeed, this Court's pre-*KSR* caselaw established that "a

single prior art reference can render a claim obvious" when there is "a showing of

a suggestion or motivation to modify the teachings of that reference to the claimed

invention . . . ."  *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349,

1356 (Fed. Cir. 2000) (citations omitted).  Like here, "[t]his suggestion or

motivation may be derived from the prior art reference itself . . . ."  *Id.* (citing *In re

O'Farrell*, 853 F.2d 894, 902 (Fed. Cir. 1988)); *see also In re Mouttet*, 686 F.3d

1322, 1331 (Fed. Cir. 2012) ("A reference may be read for all that it teaches . . . ."). Thus, even before *KSR* did away with an overly restrictive application of the teaching, suggestion, motivation test, Apple's proposed modification of Diab found support in the law.

The Court's decision in *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982 (Fed. Cir. 2009), is particularly relevant. There, the defendant proposed combining portions of one embodiment with those of another embodiment in a single prior-art reference to demonstrate obviousness. *Id.* at 991. The Court agreed that there was a motivation to modify the one embodiment to include advantageous features of the other embodiment, commenting that "***[c]ombining two embodiments disclosed adjacent to each other in a prior art patent does not require a leap of inventiveness***." *Id.*; *see also Paice LLC v. Ford Motor Co.*, 681 F. App'x 904, 917 (Fed. Cir. 2017) (holding that "combination of elements from the optimal and sub-optimal embodiments" is "a 'predictable variation' that does not 'require a leap of inventiveness'" (quoting *Boston Sci.*, 554 F.3d at 991)). The same holds true here. The Board's decision should be vacated so that the Board may properly address Apple's obviousness argument.

### C. The Board Incorrectly Applied an Inherency Standard to Apple's Obviousness Arguments

As discussed above, the '703 patent limitation at issue requires transitioning from a high-power mode to a low-power mode. *See* Appx59 (cl. 1 at 11:43-51).

Apple argued that Diab would be in a high-power mode when it processes signals to compensate for motion, and in a low power mode when does not fully perform motion artifact suppression processing.  Apple cited the Amano reference's teachings to support its argument that it would have been obvious for power consumption to fluctuate with the amount of processing performed.  The Board separately erred in analyzing this argument, applying a heightened standard akin to inherency that was legally incorrect and inconsistent with the scope of the challenged claims.  For this additional reason, the Board's conclusion regarding Diab's power consumption in view of Amano must be set aside.

### 1.    A Skilled Artisan Would Reasonably Expect Diab To Have Lower Power Consumption with Less Motion Suppression Processing, as Taught by Amano

Apple and its expert explained that, if the motion artifact suppression module 580 were either bypassed altogether or modified to perform only DC removal and bandpass filtering, Diab's overall power consumption would naturally decrease because of its decrease in processing.  Appx85-86; Appx372-379 (¶¶54-55, 61-62); *see also* Appx1690-1695; Appx2010-2011 (13:8-14:10).  To demonstrate this proposition, Apple relied on explicit teachings from Amano.  Amano, liked Diab, is directed to processing a detected pulse wave from LED signals.  Appx521 21:3-57; Appx76.  Apple and its expert explained that Amano teaches "suspending 'the operations of . . . [its] body movement component

55

eliminating section' 'when no body movement is present.'"  Appx85-86 (ellipsis in original) (citing Appx521-522 (21:65-22:6)); Appx372-373 (¶54); Appx1690.

Significantly, Amano further teaches that suspending its "body movement component elimination section" both "reduc[es] calculation time" and "***reduce[s] power consumption*** in the apparatus."  Appx521 (21:50-22:6), Appx528 (35:54-64).  As Apple explained, this teaching from Amano forms the basis of combining Diab with Amano: "Diab and Amano is a combination in which ***Amano is offered to demonstrate*** a broader concept that is well understood by a POSITA, namely ***that reducing the amount of processing by suspending operations reduces power consumption***."  Appx115; *see also* Appx78 ("Amano is offered to demonstrate that reducing the amount of processing by suspending operations reduces power consumption.").

### 2.    The Board Improperly Focused on Whether Amano's Teachings Would "Necessarily" Reduce Power Consumption

Apple's argument was thus simple: one of skill would understand, as taught explicitly by Amano, that reducing the processing of Diab's motion artifact suppression module 580 would reduce Diab's power consumption.  The Board rejected Apple's argument.  Accepting an argument from Masimo, the Board was "not persuaded by Petitioner's view that suspending Diab's motion artifact suppression module ***necessarily*** will result in reduced power consumption."

Appx31.  The Board therefore found Apple had not shown the limitation was
satisfied.  Appx30-32.

### a.     The Board Erroneously Required Apple To Prove Inherency

The Board's analysis features a fundamental legal flaw, as it required Apple
essentially to prove inherency.  Inherency, when part of an obviousness argument,
is used to "supply a missing claim limitation" not found in the proffered prior art
references.  *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1194-95 (Fed.
Cir. 2014).  It is only if a party wishes to "rely on *inherency* . . . in an obviousness
analysis[, that] the limitation at issue *necessarily must be present* . . . ."  *Id.* at
1195-96.

Even still, inherency is typically not the proper framework to view an
obviousness argument.  *See id.* ("[T]he use of inherency, a doctrine originally
rooted in anticipation, must be carefully circumscribed in the context of
obviousness."); *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1307 (Fed. Cir. 2015)
("Inherency and obviousness are distinct concepts." (quoting *W.L. Gore & Assocs.,
Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1555 (Fed. Cir. 1983))).  It certainly was not
the correct framework here.  Apple did not argue that Diab would *inherently*
experience a power reduction if it performed less motion artifact suppression
processing; instead, Apple relied on an explicit teaching in Amano to show that it
would have been obvious that power consumption is reduced by suspending

motion processing in the modified device of Diab.  Appx85-86; Appx521 (21:50-22:6), Appx528 (35:54-64).

With an explicit recitation of the power reduction teaching present, Apple's argument should have been subjected to the traditional obviousness framework, not the heightened standard of inherency.  Per *KSR*, under that framework, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."  550 U.S. at 417.  Moreover, this Court has long established that, when modifying one prior art using the teaching of another, "obviousness does not require absolute predictability of success[,] ***all that is required is a reasonable expectation of succes***s," a legal tenet that "[t]he Supreme Court in *KSR* reinvigorated."  *In re Kubin*, 561 F.3d 1351, 1360 (Fed. Cir. 2009) (original emphasis, internal quotations omitted).

A reasonable expectation of success at reducing power consumption exists here, and the Board tellingly did not conclude otherwise.  Indeed, the Board did not find that Diab would ***never*** experience a power consumption reduction if it performed less motion artifact suppression processing.  Rather, it explained that "Patent Owner presents ***plausible*** reasoning and evidence that such power reduction ***may*** not occur in Diab[]."  Appx31.  By couching Masimo's argument as

"plausible" and using the modal verb "may," the Board found, at most, that it is possible Diab would not experience power reduction. *Id.* The inverse, of course, is that Diab's experiencing a power reduction—just as taught by Amano—is a possible outcome.

Critically, Masimo's evidence is equally conditional. Masimo argued only that Diab's specific algorithms "when 'no motion' is detected ***could*** consume more power than the algorithms utilized by Diab when motion is detected." Appx1320; *see also* Appx1319 ("Diab's oximeter ***may*** process more data when no motion is detected." (emphasis added, other emphasis in original omitted)); Appx1824. Not only are these assertions conditional, they are premised on using the exact algorithms of Diab, rather than addressing how the modified device Apple proposed would work, which is not the correct legal standard. *See, e.g.*, *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012). Masimo's expert testimony is no different, repeating these conditional statements from Masimo's briefing verbatim. *See* Appx1400-1402 (¶¶87, 89). Thus, even accepting Masimo's argument, all it purports to show is that there is a chance Diab would not always experience a power reduction if it processed less data. It does not establish, or even attempt to establish, that a skilled artisan would lack a reasonable expectation that applying Amano's teaching to Diab would result in reduced power consumption.

The power reduction benefit a skilled artisan would expect in at least some circumstances—which appears to be undisputed—provides a motivation to modify Diab. The Board's additional requirement that Diab necessarily experience a reduction of power in all circumstances is misplaced. The Board's holding regarding power reduction in the Diab and Amano combinations must therefore be reversed, or at the very least vacated. *See CRFD Rsch., Inc. v. Matal*, 876 F.3d 1330, 1345 (Fed. Cir. 2017) (reversing Board determination on obviousness premised on findings on anticipation because "findings on anticipation are insufficient as a matter of law to decide the obviousness inquiry").

### b.   The Board's Necessity Requirement Is Incompatible with the Challenged Claims

The Board's "necessarily" requirement is also inconsistent with the scope of the challenged claims. Claim 1, for example, is a ***method*** claim; thus, the issue is simply whether it would have been obvious for a skilled artisan to practice the claimed method, not whether the modified device of Diab would necessarily ***always*** practice the claimed method when operated. *See Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) ("Just as an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes, a prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention."). Further, because there is no language in any of the apparatus claims requiring that the device ***necessarily***

or **always** transition between modes, the same reasoning applies to the apparatus claims as well.  *Broadcom Corp v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013).

### c. The Board Must Address the Power Reduction Limitation with Diab as Modified To Reduce Its Processing

Finally, the Board's decision separately concludes that Apple did not demonstrate a reduction in power "if Diab's motion artifact suppression module was suspended."  Appx30.  The decision does not separately address whether this limitation would be rendered obvious under Apple's argument (at issue in this appeal) that a skilled artisan would **modify** Diab's motion artifact suppression module.  *See* Appx30-32; *supra* Arg. Sec.III.B.  The case should be remanded for this additional reason so that the Board can consider its motivation to combine findings in the context of this argument.

## CONCLUSION

For the foregoing reasons, the Board's decision should be vacated and remanded, instructing the Board to proceed under the proper, plain-meaning construction for "processing characteristics" and to address Apple's Diab-based obviousness arguments applying the correct law for obviousness.

Dated:  October 19, 2022                    Respectfully submitted,

                                            */s/ Lauren A. Degnan*
                                            Lauren A. Degnan
                                            W. Karl Renner
                                            Christopher Dryer
                                            Michael J. Ballanco
                                            Laura E. Powell
                                            FISH & RICHARDSON P.C.
                                            1000 Maine Ave., Suite 1000
                                            Washington, DC 20024
                                            Telephone: (202) 783-5070

                                            **Attorneys for Appellant Apple Inc.**

# ADDENDUM

Trials@uspto.gov                                    Paper 32
571-272-7822                                Date: April 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

————————————

IPR2020-01523
Patent 8,457,703 B2

————————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

COCKS, *Administrative Patent Judge.*


JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Dismissing Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*

IPR2020-01523
Patent 8,457,703 B2

# I. INTRODUCTION

## *A. Background*

Apple Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1–7, 9–18, and 20–24 ("challenged claims") of U.S. Patent No. 8,457,703 B1 (Ex. 1001, "the '703 patent"). We instituted the petitioned review (Paper 7).

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 15, "PO Resp.") to oppose the Petition. Petitioner filed a Reply (Paper 18, "Pet. Reply") to the Patent Owner Response. Patent Owner filed a Sur-reply (Paper 20, "Sur-reply") to the Reply. Patent Owner filed a Motion to Exclude Petitioner's Evidence (Paper 25). Petitioner filed an Opposition to the Motion to Exclude (Paper 26). Patent Owner filed a Reply (Paper 27) to Petitioner's Opposition. We conducted an oral hearing on January 19, 2022. A transcript has been entered in the record (Paper 31, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a). This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–7, 9–18, and 20–24 of the '703 patent. We determine Petitioner has not shown by a preponderance of the evidence that those claims are unpatentable.

IPR2020-01523
Patent 8,457,703 B2

## B.  Related Matters

The parties identify the following matters related to the '703 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2). Pet. 75; Paper 3, 2.

## C.  The '703 Patent

The '703 patent is titled "Low Power Pulse Oximeter," and issued on June 4, 2013, from U.S. Patent Application No. 16/174,144, filed November 13, 2007.  Ex. 1001, codes (21), (22), (45), (54).  The '703 patent relates to a pulse oximeter that may reduce power consumption in the

3

**Appx3**

IPR2020-01523
Patent 8,457,703 B2

absence of certain parameters that may be monitored to trigger or override the reduced power consumption state. *Id*. at code (57). "In this manner, a pulse oximeter can lower power consumption without sacrificing performance during, for example, high noise conditions or oxygen desaturations." *Id.*

As depicted below, the low power pulse oximeter has signal processor 340 that derives physiological measurements 342, including oxygen saturation, pulse rate, and plethysmograph, from input sensor signal 322. Ex.1001, 4:64–5:10, Figs. 3, 4.



FIG. 3

Figure 3 above illustrates a top-level block diagram of a low power pulse oximeter. *Id.* at 4:40–41. Signal processor 340 may also derive signal statistics 344, such as signal strength, noise, and motion artifact. *Id.* at 5:14–15, Figs. 3, 4. Physiological measurements 342 and signal statistics 344 may be input into sampling controller 360, which outputs sampling controls 362 that in turn are used to regulate pulse oximeter power dissipation by causing sensor interface 320 to vary the sampling characteristics of sensor

4
**Appx4**

IPR2020-01523
Patent 8,457,703 B2

port 302 and by causing signal processor 340 to vary its sample processing characteristics. *Id.* at 5:15–27, Figs. 3, 4. According to the '703 patent, power dissipation "is responsive not only to output parameters, such as the physiological measurements 342, but also to internal parameters, such as the signal statistics 344." *Id.* at 5:24–27.

The pulse oximeter uses the physiological measurements and signal statistics to determine "the occurrence of an event or low signal quality condition." Ex. 1001, 6:25–28. An event determination is based upon the physiological measurements and "may be any physiological-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as an oxygen desaturation, a fast or irregular pulse rate or an unusual plethysmograph waveform." *Id.* at 6:28–34. A low signal quality condition is based upon the signal statistics and "may be any signal-related indication that justifies the processing or more sensor samples and an associated higher power consumption level, such as a low signal level, a high noise level or motion artifact." *Id.* at 6:34–41.

The pulse oximeter "utilizes multiple sampling mechanisms to alter power consumption." Ex. 1001, 5:59–61. One sampling mechanism is "an emitter duty cycle control" that "determines the duty cycle of the current supplied by the emitter drive outputs 482 to both red and IR sensor emitters." *Id.* at 5:61–66. The sampling mechanisms "modify power consumption by, in effect, increasing or decreasing the number of input samples received and processed." *Id.* at 6:9–11. "Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal

IPR2020-01523
Patent 8,457,703 B2

quality periods or when critical measurements are necessary." *Id.* at 6:11–15. "In conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a 'data off' time period longer than one drive current cycle where the emitter drivers . . . are turned off." *Id.* at 7:8–12. The occurrence of an event or low signal quality triggers a higher duty sensor sampling, allowing high fidelity monitoring of the event and providing a larger signal-to-noise ratio. *Id.* at 8:44–57.

### D. Illustrative Claims

Of the challenged claims, claims 1, 9, 12, 15, 20, and 22 are independent. Claims 1 and 9 are illustrative and are reproduced below.

1. A method of managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor, the method comprising:

[a] driving one or more light sources configured to emit light into tissue of a monitored patient;

[b] receiving on or more signals from one or more detectors configured to detect said light after attenuation by said tissue;

[c] continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;

[d] comparing processing characteristics to a predetermined threshold; and

[e] when said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level,

[f] wherein said continuously operating at said lower power consumption level comprises reducing activation of an attached sensor,

[g] said sensor positioning said light sources and said detectors proximate said tissue.

6

**Appx6**

IPR2020-01523
Patent 8,457,703 B2

> 9. A method of managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor, the method comprising:
>
> [a] driving one or more light sources configured to emit light into tissue of a monitored patient;
>
> [b] receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue;
>
> [c] continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;
>
> [d] comparing processing characteristics to a predetermined threshold; and
>
> [e] when said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level,
>
> [f] wherein said continuously operating at said lower power consumption level comprises reducing an amount of processing by a signal processor.

Ex. 1001, 11:32–51, 12:5–22 (bracketed identifiers [a]–[g] and [a]–[f] added).

Independent claim 12 is also a method claim that includes similar limitations, but its last clause recites "wherein said processing characteristics include an override condition." *Id.* at 12:29–46. Independent claims 15, 20, and 22 are corresponding apparatus claims, each directed to a "patient monitor." *Id.* at 12:53–67, 13:16–14:3, 14:6–21.

IPR2020-01523
Patent 8,457,703 B2

*E. Evidence Relied Upon*

Petitioner relies on the following references:

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Diab | U.S. Patent No. 5,632,272 issued May 27, 1997 | 1007 |
| Amano | U.S. Patent No. 6,293915 B1 issued Sept. 25, 2001 | 1004 |
| Edgar | U.S. Patent No. 6,393,311 B1 issued May 21, 2002 | 1005 |
| Turcott | U.S. Patent No. 6,527,729 B1 issued Mar. 4, 2003 | 1006 |

Pet. 3.

Petitioner also relies on the declaration testimony of Brian W. Anthony, Ph.D. (Exhibit 1003). Patent Owner relies on the declaration testimony of Vijay K. Madisetti, Ph.D. (Exhibit 2001).

*F. Asserted Grounds*

We instituted trial to determine if claims 1–7, 9–18, and 20–24 are unpatentable based upon the following grounds:

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 9, 10, 12–14, 20, 22–24 | 103 | Diab, Amano |
| 11, 21 | 103 | Diab, Amano, Edgar |
| 1–7, 15–18 | 103 | Diab, Amano, Turcott |
| 9, 10, 12–14, 20, 22–24 | 103 | Diab and "the General Knowledge of a [person of ordinary skill in the art]" ("GK-POSITA") |
| 11, 21 | 103 | Diab, GK-POSITA, Edgar |
| 1–7, 15–18 | 103 | Diab, GK-POSITA, Turcott |
| 9, 10, 12–14, 20, 22–24 | 103 | Amano |
| 1–3, 15–17 | 103 | Amano, Turcott |

IPR2020-01523
Patent 8,457,703 B2

## II.  ANALYSIS

### A.  Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2019).  The parties offer constructions for the following claim terms or phrases (1) "reducing/reduce activation of an attached sensor" (claims 1 and 15), and (2) "processing characteristics" (all challenged claims).  We determine that it is only necessary to consider the meaning of "processing characteristics."

### 1.  "processing characteristics"

The term "processing characteristics" is one that is required by all of the challenged claims.  In the body of the Petition, Petitioner offers two apparent constructions of the term.  In one instance, Petitioner sets forth a "limiting interpretation requiring 'processing characteristics' to be obtained from a signal provided by a photodetector."  Pet. 50 (citing Ex. 1003 ¶ 97).  In another instance, Petitioner expresses that "the plain meaning of 'processing characteristics' includes characteristics or features obtained from or used for processing information."  *Id.* at 51 (citing Ex. 1003 ¶ 98; Ex. 1004, 21:9–49).  Dr. Anthony characterizes this "plain meaning" construction as constituting "an alternative non-limiting interpretation." Ex. 1003 ¶ 98.

In its Response, Patent Owner lays out disagreement with Petitioner on the construction of "processing characteristics."  Patent Owner contends that neither Petitioner nor Dr. Anthony has adequately taken a position as to

IPR2020-01523
Patent 8,457,703 B2

what is the proper or correct construction of "processing characteristics."
Patent Owner indicates that on cross-examination, Dr. Anthony, "admitted
he had not formed an opinion regarding the correct construction."  PO Resp.
22 (citing Ex. 2003, 126:13–127:5).  Because in Patent Owner's view, Dr.
Anthony "never formed an opinion regarding the proper construction,"
Patent Owner submits that Petitioner's claim construction positions should
be regarded with skepticism.  *See id.* at 23.  Patent Owner expresses that the
panel should "construe 'processing characteristics' to require that the
processing characteristics are determined from a signal received from one or
more detectors configured to detect light."  *Id.* at 23 (citing Ex. 2001 ¶ 44).
Notably, Patent Owner likens its proposed construction to "Petitioner's
'limiting construction'" and characterizes that construction as "the plain and
ordinary meaning" of "processing characteristics," rather than Petitioner's
broader proposed construction of the term.  *Id.* at 24.  Patent Owner
contends that its proposed construction draws supports from the claims
themselves as well as the Specification of the '703 patent.  *Id.* at 24–27.

In particular, Patent Owner notes that all of the challenged claims
require that one or more signals are received from one or more detectors that
are configured to detect the light after attenuation by body tissue.  *Id.* at 24
(referencing independent claims 1, 9, 12, 15, 20, 22).  Patent Owner also
observes that all of the claims require "comparing processing characteristics
to a predetermined threshold."  *Id.*  Patent Owner reasons the following:

> A POSITA would have understood that the processing
> characteristics are determined from the signal received from the
> detector because (1) the signal received from the detector is the
> only signal referenced in the claims, (2) all data processing in the
> claims depends on the signal from the detector, and (3) as
> discussed herein, the specification consistently describes

IPR2020-01523
Patent 8,457,703 B2

> determining the processing characteristics from the signal
> received [from] the detector.

*Id.* at 24–25 (citing Ex. 2001 ¶ 46).

Patent Owner also explains that throughout the Specification
the characteristics that are described and shown as being processed are
those conveyed via signals from light detectors. *Id.* at 24–27 (citing
Ex. 1001, 5:28–30, 5:35–38, 5:40–41, 5:46–48, 11:43–47, 12:16–20,
12:40–44, 12:62–66, 13:25–41:1, 14:15–19, Fig. 4; Ex. 2001 ¶¶ 43–
49).

In its Reply, Petitioner characterizes Patent Owner's proposed
construction as "unjustifiably limiting." Pet. Reply 1. In support of its
view, Petitioner points to claims 4 and 8 that, according to Petitioner, convey
a more expansive meaning of "processing characteristics." Specifically,
Petitioner contends that because claim 4 recites "said processing
characteristics comprise signal characteristics from one or more light
sensitive detectors" the claim allegedly would be "meaningless" if
"processing characteristics are already required to be 'determined from a
signal received from one or more detectors.'" *Id.*

Claim 8 recites "said processing characteristics include determining
an estimate of current power consumption and comparing said estimate with
a target power consumption." Ex. 1001, 12:1–4. Petitioner contends that
the meaning of that claim as informed by the Specification is that in
determining an estimate of current power consumption, the processing
characteristics are determined from control engine 440 rather than detector
front-end 490 (i.e., a light detector). *Id.* at 2–3.

In its Sur-reply, Patent Owner responds to Petitioner's interpretation
of claims 4 and 8 as allegedly informing the meaning of "processing

11

IPR2020-01523
Patent 8,457,703 B2

characteristics." Specifically, with respect to claim 4, Patent Owner argues

that Petitioner's understanding of the claim is incorrect, stating the

following:

> Petitioner assumes the limitation "from one or more light sensitive detectors" is the narrowing limitation of claim 4. However, Petitioner ignores that claim 4 is narrower than claim 1 because the "processing characteristics ***comprise signal characteristics***." The '703 patent discloses that processing characteristics can include (1) physiological measurements and (2) signal statistics, both of which are received from the one or more light sensitive detectors. (Ex. 1001, 4:11-27, Figs. 3-4.) Claim 4 is limited to signal characteristics (i.e., as opposed to physiological measurements).
>
> The clause identified by Petitioner, "from one more light sensitive detectors," ***supports*** Masimo's construction that the "processing characteristics" must come "from a signal received from one or more detectors configured to detect light." (*See also* POR 23-27.)

Sur-reply 4–5.

In connection with claim 8, and the portions of the Specification cited

by Petitioner in construing the claim, Patent Owner expresses that Petitioner

is incorrect in its view that a power consumption estimate is not determined

from a signal received from detector 490. Patent Owner argues "[a]s

illustrated by the red lines below, the 'process status calculator 460' [orange]

estimates the current power consumption using a signal received from the

detector front-end 490 [green]." *Id.* at 5–6. Patent Owner's annotated

version of Figure 4 is reproduced below.

IPR2020-01523
Patent 8,457,703 B2



FIG. 4

The annotated version of Figure 4 above shows a signal path from detector front-end 490 to power status calculator 460. Patent Owner explains that, while the signal passes through other processing modules before reaching power status calculator 460, the power consumption estimate is still "determined from a signal received from one or more detectors [490] configured to detect light." *Id.* at 6.

In our view, Patent Owner has the better explanation for what a person of ordinary skill in the art would understand from the '703 patent as to what constitutes the "processing characteristics" that factor into the patient monitoring described by the claims. In that respect, we agree with Patent Owner's above-noted assessments of the requirements of claims 4 and 8. Patent Owner persuasively explains that claim 4 does not emerge as meaningless based on Patent Owner's construction of "processing

characteristics" but instead claim 4 further refines the understanding of the type of processing characteristics that are received from the light detectors, i.e., signal characteristics rather than physiological measurements. We also share Patent Owner's view that the understanding of claim 8 taken in the context of the Specification (e.g., Fig. 4), establishes that the estimate of power consumption is determined based on signals from light detector 490. We agree that Petitioner's views as to how claims 4 and 8 inform the meaning of "processing characteristics" lack support and fall short.

We conclude that it is inconsistent with the '703 patent to tease out the sweeping premise advanced by Petitioner that simply any information that is processed, regardless of its source, can constitute the "processing characteristics" that are employed as a part of all of the challenged claims to monitor a patient based on light signals. Rather, we rely on the written description of the '703 patent as a useful guide in informing the meaning of "processing characteristics," and conclude that the proper understanding of the term is that such characteristics are derived from signals from light detectors. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims.").

Accordingly, we conclude that, in the context of the '703 patent, "processing characteristics" are determined from a signal received from one or more detectors configured to detect light.

### 2. *Other Claim Terms*

Upon consideration of the entirety of the arguments and evidence presented, we conclude no further explicit construction of any claim term is

IPR2020-01523
Patent 8,457,703 B2

needed to resolve the issues presented by the arguments and evidence of record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (per curiam) (claim terms need to be construed "only to the extent necessary to resolve the controversy" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

## B. *Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[1] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

---

[1] Neither party presents objective evidence of non-obviousness.

IPR2020-01523
Patent 8,457,703 B2

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). It is Petitioner's burden to show unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having

> a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies or a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline.

Pet. 5 (citing Ex. 1003 ¶ 33).

Patent Owner does not offer its own assessment of the level of ordinary skill. Patent Owner, however, does level a measure of criticism of Petitioner's assessment of the level of skill in the art as being inconsistent with Petitioner's own declarant, Dr. Anthony, in not accounting for experience in "non-invasive optical biosensors." PO Resp. 16–17. Nevertheless, Patent Owner expresses that it "applies the asserted level of skill identified in the Petition." *Id.* at 17 (citing Ex. 2001 ¶ 22). We

16

IPR2020-01523
Patent 8,457,703 B2

determine that the Petitioner's expressed level of ordinary skill in the art is consistent with the '703 patent and the prior art of record. Accordingly, we adopt it in this Decision.

### D. Ground Based on Diab and Amano

Petitioner contends that claims 9, 10, 12–14, 20, and 22–24 of the '703 patent would have been obvious over the combined teachings of Diab and Amano. Pet. 6–28. Patent Owner challenges that obviousness contention. *See generally* PO Resp.; Sur-reply.

### 1. Overview of Diab (Ex. 1007)

Diab is a U.S. Patent titled "Signal Processing Apparatus." Ex. 1007, code [54]. Diab discloses a "method and apparatus for analyzing two measured signals that are modeled as containing primary and secondary portions" particularly with respect to blood oximetry measurements. *Id.* at code [57]. Diab further presents "[a] physiological monitor particularly adapted to pulse oximetry oxygen saturation measurement comprises two light emitting diodes (LED[]s) which emit light at difference wavelengths to produce first and second signals." *Id.* at 4:51–54.

IPR2020-01523
Patent 8,457,703 B2

Diab's Figure 11 is reproduced below:



FIG. 11

Figure 11 above shows "[a] schematic of a physiological monitor for pulse oximetry" that "depicts a general hardware block diagram of a pulse oximeter 299." *Id.* at 34:10–12. Pulse oximeter 299 includes sensor 300 with light emitters 301 and 302, digital signal processing system 334, and display 336. *Id.* at 34:12–25. Digital signal processing system 334 provides outputs to display 336 that may include "blood oxygen saturation, heart rate, and a clean plethysmographic waveform." *Id.* at 34:25–29.

18

Diab's Figure 14 is reproduced below:



FIG. 14

Figure 14 depicts a "functional block diagram[] of the operations of the pulse oximeter 299 carried out by the digital signal processing system 334." *Id.* at 38:61–63. Data entering processing system 334 undergoes various operations including "demodulation" by demodulation module 400, "decimation" by decimation module 402, certain statistical calculations by statistics module 404, and a "saturation transform" by saturation transform module 406. *Id.* at 38:66–39:10. "The data subjected to the statistics operations and the data subjected to the saturation transform operations are forwarded to the saturation operations as represented by a saturation calculation module 408 and pulse rate operations as represented in a pulse rate calculation module 410." *Id.* at 39:10–15.

IPR2020-01523
Patent 8,457,703 B2

Diab's Figure 20 is reproduced below:



*FIG. 20*

Figure 20 shows pulse rate module 410. *Id.* at 47:30. Pulse rate module 410 includes, *inter alia*, motion status module 584 and "motion artifact suppression module 580." *Id.* at 47:33–34. An "average peak width value" is provided to motion status module 584 and, "if the peaks are wide, this is taken as an indication of motion." *Id.* at 47:50–52. "In the case of motion, motion artifacts are suppressed using the motion artifact suppression module 580." *Id.* at 47:55–56. "If motion is not detected, spectral estimation on the signals is carried out directly without motion artifact suppression." *Id.* at 47:52–54.

## 2. *Overview of Amano (Ex. 1004)*

Amano is a U.S. Patent titled "Pulse Wave Examination Apparatus, Blood Pressure Monitor, Pulse Waveform Motion, and Pharmacological

IPR2020-01523
Patent 8,457,703 B2

Action Monitor." Ex. 1004, code (54). Amano characterizes its disclosure
as follows:

> The present invention relates to a pulse wave examination
> apparatus suitable for specifying the type of human pulse wave,
> a blood pressure monitor using the mean blood pressure and
> pulse pressure as its parameters and a pulse waveform monitor
> and a pharmacological action monitor which use a parameter
> related to a dicrotic notch part of an arterial pressure waveform.

*Id.* at 1:7–13.[2]

Amano's Figures 37A and 37B are reproduced below:



Figure 37A "is a view showing the condition of a wrist watch-type pulse
wave examination apparatus which is installed." *Id.* at 16:38–40.

---

[2] A "pulse wave is usually defined as a wave of blood which is output from
the heart and propagates through a blood vessel." *Id.* at 1:17–19.

IPR2020-01523
Patent 8,457,703 B2

Figure 37B "is a view showing a pulse wave detecting section of a wrist watch-type pulse wave examination apparatus" that is mounted on "the root of a finger." *Id.* at 16:41–43, 40:44–45. Wrist watch-type pulse examination apparatus 1 includes device body 100 with cable 101 connecting to pulse wave detecting section 10. *Id.* at 40:23–27.

Amano's Figure 1 is reproduced below:



Figure 1 above "is a block diagram showing the functional structure of the pulse wave examination apparatus according to" an embodiment. *Id.* at 21:3–5. Pulse wave detecting section 10 detects a pulse waveform and outputs the detected signal to body movement elimination section 30. *Id.* at 21:5–8. The pulse wave examination apparatus also includes, *inter alia*,

body movement detecting section 20, waveform treating section 21, and judging section 22. "[B]ody movement detection section 20 comprises, for instance, an acceleration sensor and detects the body movement of a subject to output the detected signal as a signal TH to . . . waveform treating section 21." *Id.* at 21:9–12. "[J]udging section 22 determines whether body movement is present or not, based on the body movement waveform TH, to yield a control signal C." *Id.* at 21:58–60. "[W]hen control signal C indicates that no body movement is present the operations of the waveform treating section 21 and body movement component elimination section 30 are suspended." *Id.* at 21:64–22:2. Such suspension can result in "reduce[d] power consumption in the apparatus." *Id.* at 22:6.

### 3. *Discussion*

Petitioner takes the position that Diab and Amano satisfy all the features required by claims 9, 10, 12–14, 20, and 22–24. Pet. 6–28. Patent Owner disagrees. *See generally* PO Resp.; Sur-reply. Patent Owner expresses that each of independent claims 9, 12, 20, and 22 requires "(1) operating a patient monitor 'at a lower power consumption level to determine measurement values for one or more physiological parameters of (a/said) patient,' and (2) 'transitioning to continuously operating . . . at a higher power consumption level.'" PO Resp. 29. Patent Owner contends that Petitioner's ground based on Diab and Amano fails to account for those features characterized by Patent Owner as the "power consumption

IPR2020-01523
Patent 8,457,703 B2

limitations." *Id.* at 30.[3]  We focus first on the parties' views as to Diab's disclosure.

### i. *Diab's Motion Artifact Suppression Module*

A principal basis of disagreement between the parties with respect to the power consumption limitations centers on operation of Diab's "motion artifact suppression" module 580.  Petitioner contends that Diab describes that when motion is detected, "motion artifacts are suppressed using the motion artifact suppression module 580," but "[i]f motion is not detected, spectral estimation on the signals is carried out directly without motion artifact suppression."  Pet. 17 (citing Ex. 1007, 47:52–56).  In Petitioner's view, that means that Diab "teaches not executing the motion artifact suppression module 580 if motion is not detected." *Id.*  It is clear that this view plays a role in Petitioner's general proposal that Diab contemplates reduced power consumption when the motion artifact suppression module allegedly is not executing or operating.

Patent Owner contends that Petitioner misunderstands Diab's disclosure.  For instance, Patent Owner submits that Petitioner's statement that Diab "teaches not executing the motion artifact suppression module 580 if motion is not detected" is inaccurate.  PO Resp. 31 (quoting Pet. 17).  Rather, Patent Owner explains the following:

> Diab merely discloses that "spectral estimation on the signals is carried out directly without motion artifact suppression" to calculate the heart rate when motion is not detected.  The continuous operation of the motion artifact suppression module is still necessary to generate the clean plethysmograph

---

[3] For convenience, at times we also refer to the noted features collectively as the power consumption limitations in this Decision.

IPR2020-01523
Patent 8,457,703 B2

> waveform. This is why Diab ***never*** discloses "suspend[ing] and
> not execut[ing]" the motion artifact suppression module.
> Petitioner incorrectly ignores the clean plethysmograph
> waveform in its analysis.

*Id.* at 31–32 (citing Ex. 1007, 47:52–54; Ex. 2001 ¶¶ 53–59, 65–69).

Thus, Patent Owner argues that Petitioner mischaracterizes Diab's
teachings as conveying that its motion artifact suppression module is ever
suspended and not executed because the module is required to continuously
operate for the generation of a "clean plethysmograph waveform." *Id.*; *see
id.* at 34–35 (citing Ex. 2001 ¶¶ 57–59). In that regard, we understand
Patent Owner's position as being that although Diab contemplates omitting
motion artifact suppression in some circumstances to calculate heart rate, the
motion artifact suppression module 580 is never suspended but instead
operates continuously, because it functions at all times to enable generation
of a "clean plethysmograph waveform." Patent Owner provides the
following annotated versions of Diab's Figure 20 to illustrate that
understanding:



*FIG. 20*

25

IPR2020-01523
Patent 8,457,703 B2



FIG. 20

PO Resp. 34–35. The annotated versions of Figure 20 above illustrate that
although Diab contemplates calculating "heart rate" in a situation in which
the "infrared" signal (i.e., designated the "infrared snapshot" in Figure 20) is
not passed through motion artifact suppression module 580, in all
circumstances generation of the clean plethysmograph waveform occurs
after each of the "infrared" signal and the "red" signal pass through the
motion artifact suppression module. Patent Owner also emphasizes that
Diab necessitates that motion artifact suppression module 580 uses each of
the infrared and red signals to generate the clean waveform, providing the
following annotated version of Diab's Figure 21 in making that point:

IPR2020-01523
Patent 8,457,703 B2



FIG. 21

*Id.* at 36.  Figure 21 above illustrates the internal operating components of motion artifact suppression module 580.  Ex. 1007, 8:19–20.  We agree with Patent Owner that Diab makes clear that operation of the motion artifact suppression module includes a single processing path that uses each of the infrared and red signals to generate the clean plethysmograph waveform, which is necessary for Diab's approach to patient monitoring.  *Id.* at 36–41 (citing Ex. 2001 ¶¶ 53–59, 65–73).

We also note that, as is shown in Diab's Figure 20, Diab's system provides for "spectral estimation" (via modules 586 and 588) for only the processing paths that result in calculation of the heart rate.  *See, e.g.*, Ex. 1007, 47:30–39; PO Resp. 38–39.  We, therefore, agree with Patent Owner that Petitioner's argument that "[i]f motion is not detected, ***spectral estimation*** on the signals is carried out directly without artifact suppression" means Diab "teaches not executing the motion artifact suppression module 580 if motion is not detected" is questionable.  *See* PO Resp. 38–39.  As Patent Owner observes, "[s]pectral estimation is not part of the clean plethysmograph waveform processing path."  *Id.* at 39 (citing Ex. 2001

27

IPR2020-01523
Patent 8,457,703 B2

¶¶ 53–54, 65–66).  That is evident from Diab's Figure 20.  Yet, generation of the clean plethysmograph waveform necessarily occurs based on signals that have passed through motion artifact suppression module 580.  Thus, whether spectral estimation occurs does not impact the function of motion artifact suppression module 580 in generating a clean plethysmograph waveform.  Simply put, Petitioner's assessment of what Diab would have taught a skilled artisan as to the function of motion artifact suppression module 580 does not find adequate support within Diab's own disclosure, and does not address sufficiently the impact of Figures 20–21 on its position.

Accordingly, we agree with Patent Owner that the record does not support Petitioner's view that Diab contemplates "suspend[ing] and not execut[ing]" motion artifact suppression module 580.  PO Resp. 32.  In that regard, we conclude that Petitioner does not offer adequate evidence or argument that Diab contemplates either not generating a clean plethysmograph waveform or some non-use of that module in so generating a clean waveform.  We credit Dr. Madisetti's testimony to that effect, as we conclude that his testimony accurately reflects what an ordinarily skilled artisan would have gleaned from Diab's teachings.  *See, e.g.,* Ex. 2001 ¶¶ 53–59.  As a result, we find unpersuasive Petitioner's apparent view that Diab, itself, suggests reducing power consumption of its patient monitoring system by suspending or shutting off operation of motion artifact suppression module 580.

### ii.  *Petitioner's Proposed Reasoning to Combine Diab and Amano*

Petitioner also theorizes that it would have been obvious to "suspend and not execute the operations of Diab's motion artifact suppression

28

IPR2020-01523
Patent 8,457,703 B2

module 580 if motion is not detected based on Amano's teaching of

suspending 'the operations of. . . body movement component elimination

section' 'when no body movement is presented.'"  Pet. 17 (citing Ex. 1004,

21:65–22:6).  According to Petitioner,

> A POSITA would have been motivated and would have found it
> obvious and straightforward to combine Diab with Amano to
> "reduc[e] calculation time and power consumption," as
> suggested by Amano, "[i]f motion is not detected" by performing
> "spectral estimation on the signals... directly *without* motion
> artifact suppression," as taught by Diab. Accordingly, the
> combination of Diab and Amano renders obvious continuously
> operating the oximeter at a lower power consumption level "[i]f
> motion is not detected" to determine measurement values for one
> or more physiological parameters of a patient.

*Id.* at 18 (citing Ex. 1004, 21:50–22:6, 35:54–64; Ex. 1007, 48:34–49:38;

Ex. 1003 ¶ 55).

Patent Owner challenges Petitioner's position.  *See, e.g.*, PO

Resp. 41–45.  We find Patent Owner's arguments availing as we do not find

Petitioner's position persuasive as to what one of ordinary skill in the art

would have taken from the teachings of Diab and Amano.  Although Diab

and Amano are both directed to systems for the physiological monitoring of

patients, we agree with Patent Owner that "Diab and Amano disclose

different processing algorithms that result in different outputs that are not

directly applicable to each other."  PO Resp. 41 (citing Ex. 2001 ¶¶ 70–73).

For instance, we agree with Patent Owner that where Diab discloses

producing "multiple patient-monitoring outputs, including a heart rate and

clean plethysmograph waveform," the portions of Amano on which

Petitioner relies seemingly produce a "single output" that is descriptive of a

patient's pulse condition.  *Id.* at 41 (citing Ex. 1004, 213–57, 23:5–9, 40:23–

24).  Although Amano does teach that some of the modules of its particular

29

IPR2020-01523
Patent 8,457,703 B2

system may be suspended (*see, e.g.*, Ex. 1004, 21:57–60), Petitioner does not explain adequately why a skilled artisan would have applied such a teaching to Diab's particular motion artifact suppression module 580. As Patent Owner observes, and as discussed above, Diab's system is one that requires operation of motion artifact suppression module 580 to produce a clean plethysmograph waveform. *See* PO Resp. 42–43 (citing Ex. 2001 ¶¶ 61–62, 71); *supra* § II.D.3.i. Petitioner's proposed modification, however, is premised on the conclusion that a skilled artisan would, nevertheless, suspend operation of that module under the guise of reducing power consumption. Yet, that circumstance would seemingly result in no clean plethysmograph waveform being generated. Petitioner simply does not explain adequately why that outcome follows from the teachings of the prior art.

We further take note of the disagreement between the parties as to whether, even if Diab's motion artifact suppression module was suspended, such suspension necessarily would result in reduced power consumption of Diab's system. *Compare* Pet. 10, 17–18; Pet. Reply 8–13 *with* PO Resp. 52–54; Sur-reply 15–17. The main thrust of Petitioner's position is that suspending Diab's motion artifact suppression module would eliminate its processing requirements and result in "reduce[d] calculation time and power consumption." *See, e.g.*, Pet. Reply 9 (citing Ex. 1004, 21:50–22:6, 35:54–64; Ex. 1007, 48:34–49:38; Ex. 1003 ¶¶ 54–55). Patent Owner counters that Petitioner's reasoning in that regard is speculative, and submits argument and evidence that one of ordinary skill in the art would have regarded suspending Diab's motion artifact suppression module as requiring *more* overall data processing, not less, thus increasing power consumption of

IPR2020-01523
Patent 8,457,703 B2

Diab's system. *See, e.g.*, PO Resp. 52–54; Sur-reply 15–17. Specifically, Patent Owner points to disclosure in Diab conveying that output filter 594 processes samples "much faster" when no motion is detected. PO Resp. 53; Sur-reply 17. And, Patent Owner submits that the filter's capacity to sample much faster means more data is processed potentially causing more power consumption. PO Resp. 53–54 (citing Ex. 1007, 50:23–27; Ex. 2001 ¶ 88); Sur-reply 16 (citing Ex. 2001 ¶ 76). Patent Owner also contends that Diab's spectrum analysis module 590 "operates differently" based on motion status, and that eliminating the function of motion artifact suppression module 580 could also cause increased power consumption. PO Resp. 54 (citing Ex. 1007, 50:8–14; Ex. 2001 ¶ 89); Sur-reply 17 (citing Ex. 2001 ¶ 77; Ex. 1039 68:2–72:2).

We are not persuaded by Petitioner's view that suspending Diab's motion artifact suppression module necessarily will result in reduced power consumption. Although Amano does describe that its particular system enjoys reduced power consumption when its body movement component eliminating section 30 is suspended (Ex. 1004, 21:65–22:6), Patent Owner presents plausible reasoning and evidence that such power reduction may not occur in Diab's differently structured and configured system. As between the conflicting testimony of Dr. Anthony and Dr. Madisetti on this matter, we find more credible the testimony of Dr. Madisetti in explaining why the same power consumption reduction attributed in Amano may not occur in Diab's differently structured system. *See, e.g.*, Ex. 2001 ¶¶ 76–77, 87–90. Yet, the premise of supposed power reduction is the foundational reason that Petitioner advances in combining the teachings of Amano with

IPR2020-01523
Patent 8,457,703 B2

Diab.  We conclude that Petitioner has not met its burden of persuasion on this issue.  *See Dynamic Drinkware,* 800 F.3d at 1378.

### iii.  Summary

We have considered the respective positions of the parties, including the proffered briefings and underlying evidence.  For the foregoing reasons, we conclude that Petitioner has not met its burden to show that claims 9, 10, 12–14, 20, and 22–24 of the '703 patent would have been obvious over the teachings of Diab and Amano.

### E.  Ground Based on Diab, Amano, and Edgar

Petitioner contends that claims 11 and 21 would have been obvious based on Diab, Amano, and Edgar.  Pet. 29–37.  Claim 11 ultimately depends from claim 9.  Claim 21 depends from claim 20.  Petitioner relies on Edgar to account for features added by claims 11 and 21.  Patent Owner argues that Petitioner's ground has the same deficiencies noted above with respect to the ground based on Diab and Amano, and that Petitioner does not rely on Edgar to account for the deficiencies.  PO Resp. 55.  We agree with Patent Owner.  For the same reasons discussed above (*see supra* § II.D.3), we conclude that Petitioner has not shown by a preponderance of the evidence that claims 11 and 21 are unpatentable based on Diab, Amano, and Edgar.

### F.  Ground Based on Diab, Amano, and Turcott

Petitioner contends that claims 1–7 and 15–18 of the '703 patent would have been obvious over the combined teachings of Diab, Amano, and Turcott.  Pet. 37–47.  Claim 1, like claim 9, is directed to a "method of

IPR2020-01523
Patent 8,457,703 B2

managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor." Ex. 1001, 11:32–34. Claim 1 requires the same limitations of claim 9 that are designated [a]–[e] in this Decision. Claims 2–7 ultimately depend from claim 1. Independent claim 15 is drawn to a "patient monitor" that corresponds to the method of claim 1, including corresponding steps for noted limitations [a]–[e]. Claims 16–18 ultimately depend from claim 15. Petitioner relies on the combined teachings of Diab and Amano in the same manner as it did for the limitations in claim 9. *See* Pet. 40–41.

Patent Owner contends that the proposed ground of unpatentability based on Diab, Amano, and Turcott and applied to claims 1–7 and 15–18 suffers from the same flaws that Patent Owner submits for the ground based on Diab and Amano and applied to claims 9, 10, 12–14, 20, and 22–24. PO Resp. 56. In particular, Patent Owner contends the following:

> Independent claims 1 and 15 include similar limitations as the claims discussed in [the ground based on Diab and Amano], except for their final limitation (Limitations 1[f] and 15[e]). Limitations 1[f] and 15[e] require "reducing/reduce activation of an attached sensor." Petitioner argues that Turcott discloses this limitation. (Pet. 41-42, 46.) Petitioner does not allege that Turcott satisfies any other limitations in independent claims 1 and 15. (*Id.*) Consequently, [the ground based on Diab, Amano, and Turcott] fails to show obviousness for many of the same reasons as [the ground based on Diab and Amano].

*Id.*

> Patent Owner further expresses the following:

> [I]ndependent claims 1 and 15 require (1) operating a patient monitor "at a lower power consumption level to determine measurement values for one or more physiological parameters of (a/said) patient," and (2) "transitioning to continuously operating … at a higher power consumption level." Petitioner does not

> make any new arguments regarding these limitations in [the ground based on Diab, Amano, and Turcott]. (Pet. 41, 46.) Rather, Petitioner simply refers back to its arguments in [the ground based on Diab and Amano]. Therefore, [the ground based on Diab, Amano, and Turcott] fails to render these limitations obvious for the same reasons as [the ground based on Diab and Amano].

*Id.* at 57.

We agree with all of Patent Owner's above-noted assertions. We conclude that the deficiencies discussed above (*see supra* § II.D.3) also extend to the proposed ground for claims 1–7 and 15–18 based on Diab, Amano, and Turcott. Therefore, for the same reasons discussed above, we conclude that Petitioner has not shown by a preponderance of the evidence that claims 1–7 and 15–18 are unpatentable based on Diab, Amano, and Turcott.

### G.  Grounds Based on: (1) Diab and GK-POSITA; (2) Diab, GK-POSITA, and Edgar; and (3) Diab, GK-POSITA, and Turcott

Petitioner contends that: (1) claims 9, 10, 12–14, 20, and 22–24 are unpatentable over Diab and GK-POSITA; (2) claims 11, and 21 are unpatentable over Diab, GK-POSITA, and Edgar; and (3) claims 1–7 and 15–18 are unpatentable over Diab, GK-POSITA, and Turcott. These three grounds largely mirror those discussed above that employ Amano for its asserted teachings of reducing power consumption by not performing motion artifact suppression when no motion is detected. For these grounds, however, in lieu of Amano's teachings, Petitioner seeks recourse to the "general knowledge and ordinary level of skill" in proposing that "changes in power consumption were obvious from changes in the amount of processing that are contemplated by Diab." Pet. 47. This theory of the

IPR2020-01523
Patent 8,457,703 B2

"general knowledge" is said to be collectively "corroborated by" seven additional prior art references. *Id.* at 48.

Patent Owner urges that the same arguments that it advanced for the grounds using Amano also apply for the grounds that reference GK-POSITA, and specifically that "Diab never suspends the motion artifact suppression module and a POSITA would not have been motivated to do so." PO Resp. 68 (referencing §§ VII.A and VII.C of the Patent Owner Response). Patent Owner additionally contends that "Diab does not operate at a lower power level or process less data when motion is not detected." *Id.* (also referencing §§ VII.A and VII.C of the Patent Owner Response).

We are not persuaded by Petitioner that the "general knowledge" of an ordinarily skilled artisan in lieu of Amano's teachings bootstraps these grounds to overcome the deficiencies discussed above in connection with the reasoning for, and potential implications of, suspending or eliminating Diab's motion artifact suppression module. *See supra* §§ II.D.3, II.E, II.F. For the same reasons as those discussed above, we are not persuaded that any of the grounds employing GK-POSITA establish the unpatentability of any of the challenged claims.

### H.  Grounds Based on: (1) Amano; and (2) Amano and Turcott

Petitioner contends that claims 9, 10, 12–14, 20, and 22–24 are unpatentable based on Amano. Pet. 49–63. Petitioner also contends that claims 1–5 and 15–17 are unpatentable over Amano and Turcott. *Id.* at 64–70. Patent Owner disputes that any of the noted claims have been shown to be unpatentable based on the noted grounds. PO Resp. 69–79. We find Patent Owner's dispute availing.

35

IPR2020-01523
Patent 8,457,703 B2

A central issue with the grounds that are based primarily on Amano lies in the meaning of "processing characteristics." As discussed above (*supra* § II.A.1), we conclude that, in the context of the '703 patent, "processing characteristics" must necessarily be determined from a signal received from one or more detectors configured to detect light. Petitioner's grounds based on Amano, however, rely on an "acceleration sensor" that outputs a signal. *See, e.g.*, Pet. 50. Patent Owner contends that "[t]he Parties agree that Amano receives the alleged processing characteristics from an acceleration sensor, not one or more detectors configured to detect light." Sur-reply 29 (citing Petitioner's Reply 24). Petitioner also notes that the parties "agree that Amano receives processing characteristics from an acceleration sensor[.]" Pet. Reply 24. We do not discern any dispute that Amano's "acceleration sensor" is not configured to detect light.

All of the challenged claims require "comparing processing characteristics to a predetermined threshold." Because in the context of the '703 patent, processing characteristics must be derived from detectors configured to detect light, and because there is no dispute that Amano's acceleration sensor is not such a detector, we find Petitioner's proposed grounds based on Amano to be ineffective to establish the unpatentability of any of the challenged claims. Accordingly, we conclude that Petitioner has not shown by a preponderance of the evidence that claims 9, 10, 12–14, 20, and 22–24 are unpatentable based on Amano or that claims 1–5 and 15–17 are unpatentable based on Amano and Turcott.

### I.  *Patent Owner's Motion to Exclude*

Patent Owner moves to exclude Exhibit 1038 as being inadmissible evidence because it is not authenticated and contains hearsay. Paper 25, 1–

IPR2020-01523
Patent 8,457,703 B2

4.  Because we do not rely on Exhibit 1038 in this Decision, we *dismiss*

Patent Owner's Motion as moot.

### III. CONCLUSION

In summary:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 9, 10, 12–14, 20, 22–24 | 103 | Diab, Amano | | 9, 10, 12–14, 20, 22–24 |
| 11, 21 | 103 | Diab, Amano, Edgar | | 11, 21 |
| 1–7, 15–18 | 103 | Diab, Amano, Turcott | | 1–7, 15–18 |
| 9, 10, 12–14, 20, 22–24 | 103 | Diab, GK-POSITA | | 9, 10, 12–14, 20, 22–24 |
| 11, 21 | 103 | Diab, GK-POSITA, Edgar | | 11, 21 |
| 1–7, 15–18 | 103 | Diab, GK-POSITA, Turcott | | 1–7, 15–18 |
| 9, 10, 12–14, 20, 22–24 | 103 | Amano | | 9, 10, 12–14, 20, 22–24 |
| 1–3, 15–17 | 103 | Amano, Turcott | | 1–3, 15–17 |
| **Overall Outcome** | | | | 1–7, 9–18, 20–24 |

IPR2020-01523
Patent 8,457,703 B2

## IV. ORDER

Upon consideration of the record before us, it is:

ORDERED that Petitioner has not shown that claims 1–7, 9–18, and 20–24 of the '703 patent are unpatentable by a preponderance of the evidence;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *dismissed as moot*; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01523
Patent 8,457,703 B2

FOR PETITIONER:

W. Karl Renner
Dan Smith
Kim Leung
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
leung@fr.com


FOR PATENT OWNER:

Joshua Stowell
Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Jacob L. Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jys@knobbe.com
2jrr@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

39



US008457703B2

(12) **United States Patent**  (10) **Patent No.:**    US 8,457,703 B2
Al-Ali                          (45) **Date of Patent:**        Jun. 4, 2013

(54) **LOW POWER PULSE OXIMETER**

(75) Inventor:  **Ammar Al-Ali**, Tustin, CA (US)

(73) Assignee:  **Masimo Corporation**, Irvine, CA (US)

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1603 days.

(21) Appl. No.: **11/939,519**

(22) Filed:  **Nov. 13, 2007**

(65)              **Prior Publication Data**

US 2008/0064936 A1    Mar. 13, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 10/785,573, filed on Feb. 24, 2004, now Pat. No. 7,295,866, which is a continuation of application No. 10/184,028, filed on Jun. 26, 2002, now Pat. No. 6,697,658.

(60) Provisional application No. 60/302,564, filed on Jul. 2, 2001.

(51) **Int. Cl.**
     *A61B 5/1455*        (2006.01)
(52) **U.S. Cl.**
     USPC ............................ **600/323**; 600/310; 600/322
(58) **Field of Classification Search**
     USPC ................. 600/309, 310, 322, 323, 324, 333, 600/473, 476; 356/41
     See application file for complete search history.

(56)              **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,960,128 | A | 10/1990 | Gordon et al. |
| 4,964,408 | A | 10/1990 | Hink et al. |
| 5,041,187 | A | 8/1991 | Hink et al. |

| | | | |
|---|---|---|---|
| 5,069,213 | A | 12/1991 | Polczynski |
| 5,163,438 | A | 11/1992 | Gordon et al. |
| 5,337,744 | A | 8/1994 | Branigan |
| 5,341,805 | A | 8/1994 | Stavridi et al. |
| D353,195 | S | 12/1994 | Savage et al. |
| D353,196 | S | 12/1994 | Savage et al. |
| 5,377,676 | A | 1/1995 | Vari et al. |
| D359,546 | S | 6/1995 | Savage et al. |
| 5,431,170 | A | 7/1995 | Mathews |
| D361,840 | S | 8/1995 | Savage et al. |
| D362,063 | S | 9/1995 | Savage et al. |
| 5,452,717 | A | 9/1995 | Branigan et al. |
| D363,120 | S | 10/1995 | Savage et al. |
| 5,456,252 | A | 10/1995 | Vari et al. |
| 5,482,036 | A | 1/1996 | Diab et al. |
| 5,490,505 | A | 2/1996 | Diab et al. |
| 5,494,043 | A | 2/1996 | O'Sullivan et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 872 210 A1 | 10/1998 |
| WO | WO 99/63883 | 12/1999 |

OTHER PUBLICATIONS

PCT International Search Report, App. No. PCT/US02/20675, App. Date: Jun. 28, 2002, 4 pages.

*Primary Examiner* — Eric Winakur
*Assistant Examiner* — Chu Chuan (JJ) Liu
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear LLP

(57)              **ABSTRACT**

A pulse oximeter may reduce power consumption in the absence of overriding conditions. Various sampling mechanisms may be used individually or in combination. Various parameters may be monitored to trigger or override a reduced power consumption state. In this manner, a pulse oximeter can lower power consumption without sacrificing performance during, for example, high noise conditions or oxygen desaturations.

**24 Claims, 11 Drawing Sheets**



APPLE 1001

**Appx40**

US 8,457,703 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,533,511 | A | 7/1996 | Kaspari et al. |
| 5,561,275 | A | 10/1996 | Savage et al. |
| 5,562,002 | A | 10/1996 | Lalin |
| 5,590,649 | A | 1/1997 | Caro et al. |
| 5,602,924 | A | 2/1997 | Durand et al. |
| 5,632,272 | A | 5/1997 | Diab et al. |
| 5,638,816 | A | 6/1997 | Kiani-Azarbayjany et al. |
| 5,638,818 | A | 6/1997 | Diab et al. |
| 5,645,440 | A | 7/1997 | Tobler et al. |
| 5,685,299 | A | 11/1997 | Diab et al. |
| D393,830 | S | 4/1998 | Tobler et al. |
| 5,743,262 | A | 4/1998 | Lepper, Jr. et al. |
| 5,758,644 | A | 6/1998 | Diab et al. |
| 5,760,910 | A | 6/1998 | Lepper, Jr. et al. |
| 5,769,785 | A | 6/1998 | Diab et al. |
| 5,782,757 | A | 7/1998 | Diab et al. |
| 5,785,659 | A | 7/1998 | Caro et al. |
| 5,791,347 | A | 8/1998 | Flaherty et al. |
| 5,810,734 | A | 9/1998 | Caro et al. |
| 5,823,950 | A | 10/1998 | Diab et al. |
| 5,827,969 | A * | 10/1998 | Lee et al. ...................... 600/455 |
| 5,830,131 | A | 11/1998 | Caro et al. |
| 5,833,618 | A | 11/1998 | Caro et al. |
| 5,860,919 | A | 1/1999 | Kiani-Azarbayjany et al. |
| 5,890,929 | A | 4/1999 | Mills et al. |
| 5,904,654 | A | 5/1999 | Wohltmann et al. |
| 5,919,134 | A | 7/1999 | Diab |
| 5,924,979 | A | 7/1999 | Swedlow et al. |
| 5,934,925 | A | 8/1999 | Tobler et al. |
| 5,940,182 | A | 8/1999 | Lepper, Jr. et al. |
| 5,995,855 | A | 11/1999 | Kiani et al. |
| 5,997,343 | A | 12/1999 | Mills et al. |
| 6,002,952 | A | 12/1999 | Diab et al. |
| 6,011,986 | A | 1/2000 | Diab et al. |
| 6,027,452 | A | 2/2000 | Flaherty et al. |
| 6,036,642 | A | 3/2000 | Diab et al. |
| 6,045,509 | A | 4/2000 | Caro et al. |
| 6,067,462 | A | 5/2000 | Diab et al. |
| 6,081,735 | A | 6/2000 | Diab et al. |
| 6,088,607 | A | 7/2000 | Diab et al. |
| 6,110,522 | A | 8/2000 | Lepper, Jr. et al. |
| 6,115,622 | A * | 9/2000 | Minoz ........................... 600/309 |
| 6,124,597 | A | 9/2000 | Shehada |
| 6,144,868 | A | 11/2000 | Parker |
| 6,151,516 | A | 11/2000 | Kiani-Azarbayjany et al. |
| 6,152,754 | A | 11/2000 | Gerhardt et al. |
| 6,157,850 | A | 12/2000 | Diab et al. |
| 6,165,005 | A | 12/2000 | Mills et al. |
| 6,184,521 | B1 | 2/2001 | Coffin, IV et al. |
| 6,206,830 | B1 | 3/2001 | Diab et al. |
| 6,229,856 | B1 | 5/2001 | Diab et al. |
| 6,232,609 | B1 | 5/2001 | Snyder et al. |
| 6,236,872 | B1 | 5/2001 | Diab et al. |
| 6,241,683 | B1 | 6/2001 | Macklem et al. |
| 6,256,523 | B1 | 7/2001 | Diab et al. |
| 6,263,222 | B1 | 7/2001 | Diab et al. |
| 6,278,522 | B1 | 8/2001 | Lepper, Jr. et al. |
| 6,280,213 | B1 | 8/2001 | Tobler et al. |
| 6,285,896 | B1 | 9/2001 | Tobler et al. |
| 6,321,100 | B1 | 11/2001 | Parker |
| 6,334,065 | B1 | 12/2001 | Al-Ali et al. |
| 6,343,224 | B1 | 1/2002 | Parker |
| 6,349,228 | B1 | 2/2002 | Kiani et al. |
| 6,360,114 | B1 | 3/2002 | Diab et al. |
| 6,368,283 | B1 | 4/2002 | Xu et al. |
| 6,371,921 | B1 | 4/2002 | Caro et al. |
| 6,377,829 | B1 | 4/2002 | Al-Ali |
| 6,388,240 | B2 | 5/2002 | Schulz et al. |
| 6,397,091 | B2 | 5/2002 | Diab et al. |
| 6,402,690 | B1 * | 6/2002 | Rhee et al. ................... 600/323 |
| 6,430,525 | B1 | 8/2002 | Weber et al. |
| 6,463,311 | B1 | 10/2002 | Diab |
| 6,470,199 | B1 | 10/2002 | Kopotic et al. |
| 6,501,975 | B2 | 12/2002 | Diab et al. |
| 6,505,059 | B1 | 1/2003 | Kollias et al. |
| 6,515,273 | B2 | 2/2003 | Al-Ali |
| 6,519,487 | B1 | 2/2003 | Parker |
| 6,525,386 | B1 | 2/2003 | Mills et al. |
| 6,526,300 | B1 | 2/2003 | Kiani et al. |
| 6,541,756 | B2 | 4/2003 | Schulz et al. |
| 6,542,764 | B1 | 4/2003 | Al-Ali et al. |
| 6,580,086 | B1 | 6/2003 | Schulz et al. |
| 6,584,336 | B1 | 6/2003 | Ali et al. |
| 6,595,316 | B2 | 7/2003 | Cybulski et al. |
| 6,597,932 | B2 | 7/2003 | Tian et al. |
| 6,597,933 | B2 | 7/2003 | Kiani et al. |
| 6,606,511 | B1 | 8/2003 | Ali et al. |
| 6,632,181 | B2 | 10/2003 | Flaherty et al. |
| 6,639,668 | B1 | 10/2003 | Trepagnier |
| 6,640,116 | B2 | 10/2003 | Diab |
| 6,643,530 | B2 | 11/2003 | Diab et al. |
| 6,650,917 | B2 | 11/2003 | Diab et al. |
| 6,654,624 | B2 | 11/2003 | Diab et al. |
| 6,658,276 | B2 | 12/2003 | Kiani et al. |
| 6,661,161 | B1 | 12/2003 | Lanzo et al. |
| 6,671,531 | B2 | 12/2003 | Al-Ali et al. |
| 6,678,543 | B2 | 1/2004 | Diab et al. |
| 6,684,090 | B2 | 1/2004 | Ali et al. |
| 6,684,091 | B2 | 1/2004 | Parker |
| 6,697,656 | B1 | 2/2004 | Al-Ali |
| 6,697,657 | B1 | 2/2004 | Shehada et al. |
| 6,697,658 | B2 | 2/2004 | Al-Ali |
| RE38,476 | E | 3/2004 | Diab et al. |
| 6,699,194 | B1 | 3/2004 | Diab et al. |
| 6,714,804 | B2 | 3/2004 | Al-Ali et al. |
| RE38,492 | E | 4/2004 | Diab et al. |
| 6,721,582 | B2 | 4/2004 | Trepagnier et al. |
| 6,721,585 | B1 | 4/2004 | Parker |
| 6,725,075 | B2 | 4/2004 | Al-Ali |
| 6,728,560 | B2 | 4/2004 | Kollias et al. |
| 6,735,459 | B2 | 5/2004 | Parker |
| 6,745,060 | B2 | 6/2004 | Diab et al. |
| 6,760,607 | B2 | 7/2004 | Al-Ali |
| 6,770,028 | B1 | 8/2004 | Ali et al. |
| 6,771,994 | B2 | 8/2004 | Kiani et al. |
| 6,792,300 | B1 | 9/2004 | Diab et al. |
| 6,813,511 | B2 | 11/2004 | Diab et al. |
| 6,816,741 | B2 | 11/2004 | Diab |
| 6,822,564 | B2 | 11/2004 | Al-Ali |
| 6,826,419 | B2 | 11/2004 | Diab et al. |
| 6,830,711 | B2 | 12/2004 | Mills et al. |
| 6,850,787 | B2 | 2/2005 | Weber et al. |
| 6,850,788 | B2 | 2/2005 | Al-Ali |
| 6,852,083 | B2 | 2/2005 | Caro et al. |
| 6,861,639 | B2 | 3/2005 | Al-Ali |
| 6,898,452 | B2 | 5/2005 | Al-Ali et al. |
| 6,920,345 | B2 | 7/2005 | Al-Ali et al. |
| 6,931,268 | B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 | B2 | 8/2005 | Kiani et al. |
| 6,939,305 | B2 | 9/2005 | Flaherty et al. |
| 6,943,348 | B1 | 9/2005 | Coffin IV |
| 6,950,687 | B2 | 9/2005 | Al-Ali |
| 6,961,598 | B2 | 11/2005 | Diab |
| 6,970,792 | B1 | 11/2005 | Diab |
| 6,979,812 | B2 | 12/2005 | Al-Ali |
| 6,985,764 | B2 | 1/2006 | Mason et al. |
| 6,993,371 | B2 | 1/2006 | Kiani et al. |
| 6,996,427 | B2 | 2/2006 | Ali et al. |
| 6,999,904 | B2 | 2/2006 | Weber et al. |
| 7,003,338 | B2 | 2/2006 | Weber et al. |
| 7,003,339 | B2 | 2/2006 | Diab et al. |
| 7,015,451 | B2 | 3/2006 | Dalke et al. |
| 7,024,233 | B2 | 4/2006 | Ali et al. |
| 7,027,849 | B2 | 4/2006 | Al-Ali |
| 7,030,749 | B2 | 4/2006 | Al-Ali |
| 7,039,449 | B2 | 5/2006 | Al-Ali |
| 7,041,060 | B2 | 5/2006 | Flaherty et al. |
| 7,044,918 | B2 | 5/2006 | Diab |
| 7,067,893 | B2 | 6/2006 | Mills et al. |
| 7,096,052 | B2 | 8/2006 | Mason et al. |
| 7,096,054 | B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,132,641 | B2 | 11/2006 | Schulz et al. |
| 7,142,901 | B2 | 11/2006 | Kiani et al. |
| 7,149,561 | B2 | 12/2006 | Diab |
| 7,186,966 | B2 | 3/2007 | Al-Ali |
| 7,190,261 | B2 | 3/2007 | Al-Ali |
| 7,215,984 | B2 | 5/2007 | Diab |

2

Appx41

**US 8,457,703 B2**

Page 3

| | | |
|---|---|---|
| 7,215,986 B2 | 5/2007 | Diab |
| 7,221,971 B2 | 5/2007 | Diab |
| 7,225,006 B2 | 5/2007 | Al-Ali et al. |
| 7,225,007 B2 | 5/2007 | Al-Ali |
| RE39,672 E | 6/2007 | Shehada et al. |
| 7,239,905 B2 | 7/2007 | Kiani-Azarbayjany et al. |
| 7,245,953 B1 | 7/2007 | Parker |
| 7,254,431 B2 | 8/2007 | Al-Ali |
| 7,254,433 B2 | 8/2007 | Diab et al. |
| 7,254,434 B2 | 8/2007 | Schulz et al. |
| 7,272,425 B2 | 9/2007 | Al-Ali |
| 7,274,955 B2 | 9/2007 | Kiani et al. |
| D554,263 S | 10/2007 | Al-Ali |
| 7,280,858 B2 | 10/2007 | Al-Ali et al. |
| 7,289,835 B2 | 10/2007 | Mansfield et al. |
| 7,292,883 B2 | 11/2007 | De Felice et al. |
| 7,295,866 B2 | 11/2007 | Al-Ali |
| 2005/0234317 A1 | 10/2005 | Kiani |

* cited by examiner

Case: 22-1890     Document: 12     Page: 122     Filed: 10/19/2022



FIG. 1 (Prior Art)

**Appx43**

Case: 22-1890    Document: 12    Page: 123    Filed: 10/19/2022



FIG. 2 (Prior Art)

Appx44

Case: 22-1890     Document: 12     Page: 124     Filed: 10/19/2022



FIG. 3

Appx45

Case: 22-1890　　Document: 12　　Page: 125　　Filed: 10/19/2022



FIG. 4

Appx46



FIG. 5



FIG. 6



FIG. 7A

FIG. 7B

Case: 22-1890      Document: 12      Page: 129      Filed: 10/19/2022



FIG. 8

11

Case: 22-1890     Document: 12     Page: 130     Filed: 10/19/2022



E = EVENT
Q = LOW QUALITY
P = ABOVE POWER TARGET FOR A
PARTICULAR TIME PERIOD
T = TIMEOUT

FIG. 9

12

Case: 22-1890    Document: 12    Page: 131    Filed: 10/19/2022



FIG. 10

**Appx52**

Case: 22-1890     Document: 12     Page: 132     Filed: 10/19/2022



FIG. 11

E = EVENT
Q = LOW QUALITY
P = ABOVE POWER TARGET FOR A
    PARTICULAR TIME PERIOD

US 8,457,703 B2

1

# LOW POWER PULSE OXIMETER

## REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. application Ser. No. 10/785,573, entitled "Low Power Pulse Oximeter," filed Feb. 24, 2004, which is a continuation of application Ser. No. 10/184,028, entitled "Low Power Pulse Oximeter," filed Jun. 26, 2002, now U.S. Pat. No. 6,697,658, which claims priority benefit under 35 U.S.C. §119(e) from U.S. Provisional Application No. 60/302,564, entitled "Low Power Pulse Oximeter," filed Jul. 2, 2001. The present application incorporates each of the foregoing disclosures herein by reference.

## BACKGROUND OF THE INVENTION

Pulse oximetry is a widely accepted noninvasive procedure for measuring the oxygen saturation level of a person's arterial blood, an indicator of their oxygen supply. Oxygen saturation monitoring is crucial in critical care and surgical applications, where an insufficient blood supply can quickly lead to injury or death. FIG. 1 illustrates a conventional pulse oximetry system 100, which has a sensor 110 and a monitor 150. The sensor 110, which can be attached to an adult's finger or an infant's foot, has both red and infrared LEDs 112 and a photodiode detector 114. For a finger, the sensor is configured so that the LEDs 112 project light through the fingernail and into the blood vessels and capillaries underneath. The photodiode 114 is positioned at the finger tip opposite the fingernail so as to detect the LED emitted light as it emerges from the finger tissues. A pulse oximetry sensor is described in U.S. Pat. No. 6,088,607 entitled "Low Noise Optical Probe," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. 1, the monitor 150 has LED drivers 152, a signal conditioning and digitization front-end 154, a signal processor 156, a display driver 158 and a display 159. The LED drivers 152 alternately activate the red and IR LEDs 112 and the front-end 154 conditions and digitizes the resulting current generated by the photodiode 114, which is proportional to the intensity of the detected light. The signal processor 156 inputs the conditioned photodiode signal and determines oxygen saturation based on the differential absorption by arterial blood of the two wavelengths emitted by the LEDs 112. Specifically, a ratio of detected red and infrared intensities is calculated by the signal processor 156, and an arterial oxygen saturation value is empirically determined based on the ratio obtained. The display driver 158 and associated display 159 indicate a patient's oxygen saturation, heart rate and plethysmographic waveform.

## SUMMARY OF THE INVENTION

Increasingly, pulse oximeters are being utilized in portable, battery-operated applications. For example, a pulse oximeter may be attached to a patient during emergency transport and remain with the patient as they are moved between hospital wards. Further, pulse oximeters are often implemented as plug-in modules for multiparameter patient monitors having a restricted power budget. These applications and others create an increasing demand for lower power and higher performance pulse oximeters. A conventional approach for reducing power consumption in portable electronics, typically utilized by devices such as calculators and notebook computers, is to have a "sleep mode" where the circuitry is powered-down when the devices are idle.

2

FIG. 2 illustrates a sleep-mode pulse oximeter 200 utilizing conventional sleep-mode power reduction. The pulse oximeter 200 has a pulse oximeter processor 210 and a power control 220. The power control 220 monitors the pulse oximeter output parameters 212, such as oxygen saturation and pulse rate, and controls the processor power 214 according to measured activity. For example, if there is no significant change in the oxygen saturation value over a certain time period, the power control 220 will power down the processor 210, except perhaps for a portion of memory. The power control 220 may have a timer that triggers the processor 210 to periodically sample the oxygen saturation value, and the power control 220 determines if any changes in this parameter are occurring. If not, the power control 220 will leave the processor 210 in sleep mode.

There are a number of disadvantages to applying consumer electronic sleep mode techniques to pulse oximetry. By definition, the pulse oximeter is not functioning during sleep mode. Unlike consumer electronics, pulse oximetry cannot afford to miss events, such as patient oxygen desaturation. Further, there is a trade-off between shorter but more frequent sleep periods to avoid a missed event and the increased processing overhead to power-up after each sleep period. Also, sleep mode techniques rely only on the output parameters to determine whether the pulse oximeter should be active or in sleep mode. Finally, the caregiver is given no indication of when the pulse oximeter outputs were last updated.

One aspect of a low power pulse oximeter is a sensor interface adapted to drive a pulse oximetry sensor and receive a corresponding input signal. A processor derives a physiological measurement corresponding to the input signal, and a display driver communicates the measurement to a display. A controller generates a sampling control output to at least one of said sensor interface and said processor so as to reduce the average power consumption of the pulse oximeter consistent with a predetermined power target.

In one embodiment, a calculator derives a signal status output responsive to the input signal. The signal status output is communicated to the controller to override the sampling control output. The signal status output may indicate the occurrence of a low signal quality or the occurrence of a physiological event. In another embodiment, the sensor interface has an emitter driver adapted to provide a current output to an emitter portion of the sensor. Here, the sampling control output determines a duty cycle of the current output. In a particular embodiment, the duty cycle may be in the range of about 3.125% to about 25%.

In another embodiment, the sensor interface has a front-end adapted to receive the input signal from a detector portion of the sensor and to provide a corresponding digitized signal. Here, the sampling control output determines a powered-down period of the front-end. A confidence indicator responsive to a duration of the powered-down period may be provided and displayed.

In yet another embodiment, the pulse oximeter comprises a plurality of data blocks responsive to the input signal, wherein the sampling control output determines a time shift of successive ones of the data blocks. The time shift may vary in the range of about 1.2 seconds to about 4.8 seconds.

An aspect of a low power pulse oximetry method comprises the steps of setting a power target and receiving an input signal from a pulse oximetry sensor. Further steps include calculating signal status related to the input signal, calculating power status related to the power target, and sampling based upon the result of the calculating signal status and the calculating power status steps.

15

US 8,457,703 B2

**3**

In one embodiment, the calculating signal status step comprises the substeps of receiving a signal statistic related to the input signal, receiving a physiological measurement related to the input signal, determining a low signal quality condition from the signal statistic, determining an event occurrence from the physiological measurement, and indicating an override based upon the low signal quality condition or the event occurrence. The calculating power status step may comprise the substeps of estimating an average power consumption for at least a portion of the pulse oximeter, and indicating an above power target condition when the average power consumption is above the power target. The sampling step may comprise the substep of increasing sampling as the result of the override. The sampling step may also comprise the substep of decreasing sampling as the result of the above power target condition, except during the override.

Another aspect of a low power pulse oximetry method comprises the steps of detecting an override related to a measure of signal quality or a physiological measurement event, increasing the pulse oximeter power to a higher power level when the override exists, and reducing the pulse oximeter power to a lower power level when the override does not exist. The method may comprise the further steps of predetermining a target power level for a pulse oximeter and cycling between the lower power level and the higher power level so that an average pulse oximeter power is consistent with the target power level.

In one embodiment, the reducing step comprises the substep of decreasing the duty cycle of an emitter driver output to the sensor. In another embodiment, the reducing step comprises the substep of powering-down a detector front-end. A further step may comprise displaying a confidence indicator related to the duration of the powering-down substep. In yet another embodiment, the reducing step comprises the substep of increasing the time-shift of post-processor data blocks.

Another aspect of a low power pulse oximeter comprises a sensor interface adapted to receive an input signal from a sensor, a signal processor configured to communicate with the sensor interface and to generate an internal parameter responsive to the input signal, and a sampling controller responsive to the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The internal parameter may be indicative of the quality of the input signal. The output parameter may be indicative of oxygen saturation.

In another embodiment, the sampling controller is responsive to a predetermined power target in combination with the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters and the power target so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The sensor interface may comprise an emitter driver and the sampling control may modify a duty cycle of the emitter driver. The sensor interface may comprise a detector front-end and the sampling control may intermittently power-down the detector front-end. The processor may generate a plurality of data blocks corresponding to the input signal, where each of

**4**

the data blocks have a time shift from a preceding one of the data blocks, and where the sampling control may determine the amount of the time shift.

A further aspect of a low power pulse oximeter comprises an interface means for communicating with a sensor, a processor means for generating an internal parameter and an output parameter, and a controller means for selectively reducing the power consumption of at least one of the interface means and the processor means based upon the parameters. In one embodiment, the interface means comprises a driver means for determining the duty cycle of emitter current to the sensor, the driver means being responsive to the controller means. In another embodiment, the interface means comprises a detector front-end means for receiving an input signal from the sensor, the power for the detector front-end means being responsive to the controller means. In yet another embodiment, the processor means comprises a post-processor means for determining a time shift between data blocks, the post-processor means being responsive to the controller means. In a further embodiment, the controller means comprises a signal status calculator means for generating an indication of a low signal quality or a physiological event based upon at least one of an internal signal statistic and an output physiological measurement, and a control engine means in communications with the signal status calculator means for generating a sampling control responsive to the indication. In yet a further embodiment, the controller means comprises a power status calculator means for generating a power indication of power consumption relative to a power target, and a control engine means in communications with the power status calculator means for generating a sampling control responsive to the power indication.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a conventional pulse oximeter sensor and monitor;

FIG. **2** is a block diagram of a pulse oximeter having a conventional sleep mode;

FIG. **3** is a top-level block diagram of a low power pulse oximeter;

FIG. **4** is a detailed block diagram of a low power pulse oximeter illustrating a sensor interface, a signal processor and a sampling controller;

FIG. **5** is a graph of emitter drive current versus time illustrating variable duty cycle processing;

FIG. **6** is a graph of oxygen saturation versus time illustrating intermittent sample processing;

FIGS. **7A**-B are graphs of data buffer content versus time illustrating variable data block overlap processing;

FIG. **8** is a graph of power versus time illustrating power dissipation conformance to an average power target using variable duty cycle and intermittent sample processing;

FIG. **9** is a state diagram of the sampling controller for variable duty cycle and intermittent sample processing;

FIG. **10** is a graph of power versus time illustrating power dissipation using variable data block overlap processing; and

FIG. **11** is a state diagram of the sampling controller for variable data block overlap processing.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. **3** illustrates one embodiment of a low power pulse oximeter. The pulse oximeter **300** has a sensor interface **320**, a signal processor **340**, a sampling controller **360** and a display driver **380**. The pulse oximeter **300** also has a sensor port

16

US 8,457,703 B2

5

302 and a display port 304. The sensor port 302 connects to an external sensor, e.g. sensor 110 (FIG. 1). The sensor interface 320 drives the sensor port 302, receives a corresponding input signal from the sensor port 302, and provides a conditioned and digitized sensor signal 322 accordingly. Physiological measurements 342 are input to a display driver 380 that outputs to the display port 304. The display port 304 connects to a display device, such as a CRT or LCD, which a healthcare provider typically uses for monitoring a patient's oxygen saturation, pulse rate and plethysmograph.

As shown in FIG. 3, the signal processor 340 derives the physiological measurements 342, including oxygen saturation, pulse rate and plethysmograph, from the input signal 322. The signal processor 340 also derives signal statistics 344, such as signal strength, noise and motion artifact. The physiological measurements 342 and signal statistics 344 are input to the sampling controller 360, which outputs sampling controls 362, 364, 366 accordingly. The sampling controls 362, 364, 366 regulate pulse oximeter power dissipation by causing the sensor interface 320 to vary the sampling characteristics of the sensor port 302 and by causing the signal processor 340 to vary its sampling processing characteristics, as described in further detail with respect to FIG. 4, below. Advantageously, power dissipation is responsive not only to output parameters, such as the physiological measurements 342, but also to internal parameters, such as the signal statistics 344.

FIG. 4 illustrates further detail regarding the sensor interface 320, the signal processor 340 and the sampling controller 360. The sensor interface 320 has emitter drivers 480 and a detector front-end 490. The emitter drivers 480 are responsive to a sampling control 362, described below, and provide emitter drive outputs 482. The emitter drive outputs 482 activate the LEDs of a sensor attached to the sensor port 302 (FIG. 3). The detector front-end 490 receives an input signal 492 from a sensor attached to the sensor port 302 (FIG. 3) and provides a corresponding conditioned and digitized input signal 322 to the signal processor 340. A sampling control 364 controls power to the detector front-end 490, as described below.

As shown in FIG. 4, the signal processor 340 has a pre-processor 410 and a post processor 430. The pre-processor 410 demodulates red and IR signals from the digitized signal 322, performs filtering, and reduces the sample rate. The pre-processor provides a demodulated output, having a red channel 412 and an IR channel 414, which is input into the post-processor 430. The post processor 430 calculates the physiological measurements 342 and the signal statistics 344, which are output to a signal status calculator 450. The physiological measurements 342 are also output to a display driver 380 (FIG. 3) as described above. A pulse oximetry signal processor is described in U.S. Pat. No. 6,081,735 entitled "Signal Processing Apparatus," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. 4, the sampling controller 360 has a control engine 440, a signal status calculator 450 and a power status calculator 460. The control engine 440 outputs sampling controls 362, 364, 366 to reduce the power consumption of the pulse oximeter 300. In one embodiment, the control engine 440 advantageously utilizes multiple sampling mechanisms to alter power consumption. One sampling mechanism is an emitter duty cycle control 362 that is an input to the emitter drivers 480. The emitter duty cycle control 362 determines the duty cycle of the current supplied by the emitter drive outputs 482 to both red and IR sensor emitters, as described with respect to FIG. 5, below. Another sampling mechanism is a front-end control 364 that intermittently

6

removes power to the detector front-end 490, as described with respect to FIG. 6, below. Yet another sampling mechanism is a data block overlap control 366 that varies the number of data blocks processed by the post processor 430. These various sampling mechanisms provide the flexibility to reduce power without sacrificing performance during, for example, high noise conditions or oxygen desaturation events, as described below in further detail.

The sampling controls 362, 364, 366 modify power consumption by, in effect, increasing or decreasing the number of input samples received and processed. Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal quality periods or when critical measurements are necessary. In this manner, the control engine 440 regulates power consumption to satisfy a predetermined power target, to minimize power consumption, or to simply reduce power consumption, as described with respect to FIGS. 8 and 10, below. The current state of the control engine is provided as a control state output 442 to the power status calculator 460. The control engine 440 utilizes the power status output 462 and the signal status output 452 to determine its next control state, as described with respect to FIGS. 9 and 11, below.

Further shown in FIG. 4, the signal status calculator 450 receives physiological measurements and signal statistics from the post processor 430 and determines the occurrence of an event or a low signal quality condition. An event determination is based upon the physiological measurements output 342 and may be any physiological-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as an oxygen desaturation, a fast or irregular pulse rate or an unusual plethysmograph waveform to name a few. A low signal quality condition is based upon the signal statistics output 344 and may be any signal-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as a low signal level, a high noise level or motion artifact to name a few. The signal status calculator 450 provides the signal status output 452 that is input to the control engine 440.

In addition, FIG. 4 shows that the power status calculator 460 has a control state input 442 and a power status output 462. The control state input 442 indicates the current state of the control engine 440. The power status calculator 460 utilizes an internal time base, such as a counter, timer or real-time clock, in conjunction with the control engine state to estimate the average power consumption of at least a portion of the pulse oximeter 300. The power status calculator 460 also stores a predetermined power target and compares its power consumption estimate to this target. The power status calculator 460 generates the power status output 462 as an indication that the current average power estimate is above or below the power target and provides this output 462 to the control engine 440.

FIG. 5 illustrates emitter driver output current versus time. The graph 500 depicts the combination of a red LED drive current 510 and an IR drive current 560. The solid line graph 502 illustrates drive currents having a high duty cycle. The dashed line graph 504 illustrates drive currents having a low duty cycle. In a typical pulse oximeter, the duty cycle of the drive signals is constant and provides sufficient dark bands 508 to demodulate the detector response into red and IR channels. The emitter drivers 480 (FIG. 4), however, require a significant portion of the overall pulse oximeter power budget. Intermittently reducing the drive current duty cycle can advantageously reduce power dissipation without com-

17

US 8,457,703 B2

7

promising signal integrity. As an example, a low power pulse oximeter implementation nominally consuming 500 mw may be able to reduce power consumption on the order of 70 mw by such drive current duty cycle reductions. In a preferred embodiment, the drive current duty cycle is varied within a range from about 25% to about 3.125%. In a more preferred embodiment, the drive current duty cycle is intermittently reduced from about 25% to about 3.125%. In conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a "data off" time period longer than one drive current cycle where the emitter drivers 480 (FIG. 4) are turned off. The detector front-end 490 (FIG. 4) may also be powered down during such a data off period, as described with respect to FIGS. 8 and 9, below.

FIG. 6 is a graph 600 of a pre-processor output signal 610 over time depicting the result of intermittent sampling at the detector front-end 490 (FIG. 4). The output signal 610 is a red channel 412 (FIG. 4) or an IR channel 414 (FIG. 4) output from the pre-processor 410 (FIG. 4), which is input to the post processor 430 (FIG. 4), as described above. The output signal 610 has "on" periods 612, during which time the detector front-end 490 (FIG. 4) is powered-up and "off" periods 614, during which time the detector front-end 490 (FIG. 4) is powered-down. The location and duration of the on periods 612 and off periods 614 are determined by the front-end control 364 (FIG. 4).

Also shown in FIG. 6 is a corresponding timeline 601 of overlapping data blocks 700, which are "snap-shots" of the pre-processor output signal 610 over specific time intervals. Specifically, the post processor 430 (FIG. 4) processes a sliding window of samples of the pre-processor output signal 610, as described with respect to FIGS. 7A-B, below. Advantageously, the post processor 430 (FIG. 4) continues to function during off portions 614, marking as invalid those data blocks 640 that incorporate those portions 614. A freshness counter can be used to measure the time period 660 between valid data blocks 630, which can be displayed on a pulse oximeter monitor as an indication of confidence in the current measurements.

FIGS. 7A-B illustrate data blocks 700, which are processed by the post processor 430 (FIG. 4). Each data block 700 has n samples 702 of the pre-processor output and corresponds to a time interval 704 of n/f_s, where f_s is the sample frequency. For example, in one embodiment n=600 and f_s=62.5 Hz. Hence, each data block time interval 704 is nominally 9.6 sec.

As shown in FIG. 7A, each data block 700 also has a relative time shift 706 from the preceding data block, where is an integral number of sample periods. That is, =m/f_s, where m is an integer representing the number of samples dropped from the preceding data block and added to the succeeding data block. In the embodiment described above, m=75 and =1.2 sec, nominally. The corresponding overlap 708 of two adjacent data blocks 710, 720 is (n-m)/f_s. In the embodiment described above, the overlap 708 is nominally 9.6 sec-1.2 sec=8.4 sec. The greater the overlap 708, i.e. the smaller the time shift 706, the more data blocks there are to process in the post-processor 430 (FIG. 4), with a corresponding greater power consumption. The overlap 708 between successive data blocks 710, 720 may vary from n-1 samples to no samples, i.e. no overlap. Also, as shown in FIG. 7B, there may be a sample gap 756 or negative overlap, i.e. samples between data blocks that are not processed by the post-processor, allowing further post-processor power savings. Sample gaps 756 may correspond to detector front-end off periods 614 (FIG. 6).

FIG. 8 illustrates an exemplar power consumption versus time profile 800 for the pulse oximeter 300 (FIG. 3) during

8

various control engine states. In one embodiment, the control engine 440 (FIG. 4) has three states related to the sampling control outputs 362, 364 that affect pulse oximeter power consumption accordingly. One of ordinary skill in the art will recognize that the control engine 440 (FIG. 4) may have greater or fewer states and associated power consumption levels. The profile 800 shows the three control engine states 810 and the associated power consumption levels 820. These three states are high duty cycle 812, low duty cycle 814 and data off 818.

In the high duty cycle state 812, the control engine 440 (FIG. 4) causes the emitter drivers 480 (FIG. 4) to turn on sensor emitters for a relatively long time period, such as 25% on time for each of the red 510 and IR 560 drive currents. In the low duty cycle state 814, the control engine 440 (FIG. 4) causes the emitter drivers 480 (FIG. 4) to turn on sensor emitters for a relatively short time period, such as 3.125% of the time for each of the red 510 and IR 560 drive currents. In the data off state 818, the control engine 440 (FIG. 4) turns off the emitter drivers 480 (FIG. 4) and powers down the detector front-end 490 (FIG. 4). Also shown is a predetermined target power consumption level 830. The control engine 440 (FIG. 3) alters the sensor sampling of the pulse oximeter 300 (FIG. 3) so that the average power consumption matches the target level 830, as indicated by the power status output 462 (FIG. 4), except when overridden by the signal status output 452 (FIG. 4).

As shown in FIG. 8, power consumption changes according to the control states 810 during each of the time intervals 850. In a first time interval 851, the pulse oximeter is in a low duty cycle state 814 and transitions to a high duty cycle state 812 during a second time interval 852 due to an event or low quality signal. During a third time interval 853, the pulse oximeter is able to enter the data off state 818, during which time no sensor samples are processed. In a forth time interval 854, sensor samples are again taken, but at a low duty cycle 814. During the fifth and sixth time intervals 855, 856, sensor samples are shut off and turned on again as the pulse oximeter 300 (FIG. 3) alternates between the data off state 818 and the low duty cycle state 814 so as to maintain an average power consumption at the target level 830.

FIG. 9 illustrates a state diagram 900 for one embodiment of the control engine 440 (FIG. 4). In this embodiment, there are three control states, high duty cycle 910, low duty cycle 940 and data off 970, as described with respect to FIG. 8, above. If the control state is data off 970, an event triggers a data-off to high-duty-cycle transition 972. If the control state is low duty cycle 940, an event similarly triggers a low-duty cycle to high-duty-cycle transition 942. In this manner, the occurrence of an event initiates high duty sensor sampling, allowing high fidelity monitoring of the event. Similarly, if the control state is low duty cycle 940, low signal quality triggers a low-duty-cycle to high-duty-cycle transition 942. In this manner, low signal quality initiates higher duty sensor sampling, providing, for example, a larger signal-to-noise ratio.

Also shown in FIG. 9, if the control state is high duty cycle 910 and either an event is occurring or signal quality is low, then a null transition 918 maintains the high duty cycle state 910. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition 948 maintains the low duty cycle state 940, so that sampling is turned-off only when necessary to track the power target. Further, if the control state is data off 970 and no time-out has occurred, a null transition 978 maintains the data off state 970, providing a minimum power consumption.

18

<table>
<tr><td>9</td><td>10</td></tr>
</table>

In addition, FIG. 9 shows that when the control state is in a high duty cycle state 910, if neither an event nor low signal quality are occurring, then a high-duty-cycle to low-duty-cycle transition 912 occurs by default. Also, if the control state is low duty cycle 940, if neither an event nor low signal quality are occurring and the power consumption is above the target level for longer than a particular time interval, a low-duty-cycle to data-off transition 944 occurs by default, allowing power consumption to come down to the target level. Further, if the control state is data off 970, if no event occurs and a timeout does occur, a data-off to low-duty-cycle transition 974 occurs by default, preventing excessively long periods of no sensor sampling.

FIG. 10 illustrates an exemplar power consumption versus time profile 1000 for the post processor 430 (FIG. 4) during various control engine states. In one embodiment, the control engine 440 (FIG. 4) has three states related to the sampling control output 366 (FIG. 4) that affect post processor power consumption accordingly. One of ordinary skill in the art will recognize that the control engine may have greater or fewer states and associated power consumption levels. The profile 1000 shows the three control engine states 1010 and the associated post processor power consumption levels 1020. These three states are large overlap 1012, medium overlap 1014 and small overlap 1018.

As shown in FIG. 10, in the large overlap state 1012, the control engine 440 (FIG. 4) causes the post processor to process data blocks that have a comparatively small time shift 706 (FIG. 7A), and the post processor exhibits relatively high power consumption under these conditions, say 300 mw. In the medium overlap state 1014, the control engine 440 (FIG. 4) causes the post processor to process data blocks that have a comparatively larger time shift 706 (FIG. 7A). For example, the data blocks may be time shifted twice as much as for the large overlap state 1012, and, as such, the post processor performs only half as many computations and consumes half the nominal power, say 150 mw. In the small overlap state 1018, the control engine 440 (FIG. 4) causes the post processor to process data blocks that have a comparatively large time shift. For example, the data blocks may be time shifted twice as much as for the medium overlap state 1014. As such, the post processor performs only a quarter as many computations and consumes a quarter of the nominal power, say 75 mw, as for the large overlap state 1012. In one embodiment, the control engine 440 (FIG. 4) alters the data block overlap of the post processor in conjunction with the duty cycle of the emitter drivers described with respect to FIG. 5, above, and the front-end sampling described with respect to FIG. 6, above, so that the average power consumption of the pulse oximeter matches a target level indicated by the power status output 462 (FIG. 4) or so that the power consumption is otherwise reduced or minimized.

In a preferred embodiment, data blocks are time shifted by either about 0.4 sec or about 1.2 sec, depending on the overlap state of the control engine 440 (FIG. 4). In a more preferred embodiment, the data blocks are varied between about 1.2 sec and about 4.8 sec. In a most preferred embodiment, the data blocks are time shifted by either about 1.2 sec, about 2.4 sec or about 4.8 sec, depending on the overlap state of the control engine 440 (FIG. 4). Although the post-processing of data blocks is described above with respect to only a few overlap states and a corresponding number of particular data block time shifts, there may be many overlap states and a corresponding range of data block time shifts.

Further shown in FIG. 10, power consumption 1020 changes according to the control states 1010 during each of the time intervals 1050. In a first time interval 1052, the post processor is in a large overlap state 1012 and transitions to a medium overlap state 1014 during a second time interval 1054, so as to meet a power target during a high signal quality period, for example. During a third time interval 1055, the post processor enters a small overlap state 1018, for example to meet a power target by further reducing power consumption. In a forth time interval 1056, the post processor transitions back to a large overlap state 1012, such as during an event or low signal quality conditions.

FIG. 11 illustrates a state diagram 1100 for one embodiment of the control engine 440 (FIG. 4). These states may function in parallel with, or in combination with, the sampling states described with respect to FIG. 9, above. In the illustrated embodiment, there are three control states, large overlap 1110, medium overlap 1140 and small overlap 1170, as described with respect to FIG. 10, above. If the control state is small overlap 1170, an event triggers a small overlap to large overlap transition 1172. If the control state is medium overlap 1140, an event similarly triggers a medium overlap to large-overlap transition 1142. In this manner, the occurrence of an event initiates the processing of more data blocks, allowing more robust signal statistics and higher fidelity monitoring of the event. Similarly, if the control state is medium overlap 1140, low signal quality triggers a medium overlap to large overlap transition 1142. In this manner, low signal quality initiates the processing of more data blocks, providing more robust signal statistics during lower signal-to-noise ratio periods.

Also shown in FIG. 11, if the control state is large overlap 1110 and either an event is occurring or signal quality is low, then a null transition 1118 maintains the large overlap state 1110. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition 1148 maintains the medium overlap state 1140, so that reduced data processing occurs only when necessary to track the power target. Further, if the control state is small overlap 1170, a null transition 1178 maintains this power saving state until the power target is reached or an event or low signal quality condition occurs.

In addition, FIG. 11 shows that when the control state is in a large overlap state 1110, if neither an event nor low signal quality are occurring, then a large overlap to medium overlap transition 1112 occurs by default. Also, if the control state is medium overlap 1140, if the power consumption is above the target level for longer than a particular time interval and no low signal quality condition or event is occurring, a medium overlap to small overlap transition 1174 occurs, allowing power consumption to come down to the target level. Further, if the control state is small overlap 1170, if no event occurs but the power target has been met, a small overlap to medium overlap transition 1174 occurs.

A low power pulse oximeter embodiment is described above as having a power status calculator 460 (FIG. 4) and an associated power target. Another embodiment of a low power pulse oximeter, however, functions without either a power status calculator or a power target, utilizing the sampling controls 362, 364, 366 (FIG. 3) in response to internal parameters and/or output parameters, such as signal statistics 344 (FIG. 3) and/or physiological measurements 342 (FIG. 3) to reduce power consumption except during, say, periods of low signal quality and physiological events.

One of ordinary skill in the art will recognize that various state diagrams are possible representing control of the emitter drivers, the detector front-end and the post-processor. Such state diagrams may have fewer or greater states with differing transitional characteristics and with differing relationships between sampling mechanisms than the particular embodi-

19

US 8,457,703 B2

11 | 12

ments described above. In relatively simple embodiments of the control engine **440** (FIG. **4**), only a single sampling mechanism is used, such as the sampling mechanism used to vary the duty cycle of the emitter drivers. The single sampling mechanism may be based only upon internal parameters, such as signal quality, only upon output parameters, such as those that indicate the occurrence of physiological events, or upon a combination of internal and output parameters, with or without a power target.

In relatively more complex embodiments of the control engine **440** (FIG. **4**), sampling mechanisms are used in combination. These sampling mechanisms may be based only upon internal parameters, only upon output parameters, or upon a combination of internal and output parameters, with or without a power target. In a particular embodiment, the emitter duty-cycle, front-end duty-cycle and data block overlap sampling mechanisms described above are combined. A "reduced overlap" state relating to the post-processing of data blocks is added to the diagram of FIG. **9** between the "low duty cycle" state and the "data off" state. That is, sampling is varied between a high duty cycle state, a low duty cycle state, a reduced overlap state and a data off state in response to signal quality and physiological events, with or without a power target.

The low power pulse oximeter has been disclosed in detail in connection with various embodiments. These embodiments are disclosed by way of examples only and are not to limit the scope of the claims that follow. One of ordinary skill in the art will appreciate many variations and modifications.

What is claimed is:

**1**. A method of managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor, the method comprising:

> driving one or more light sources configured to emit light into tissue of a monitored patient;
> receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue;
> continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;
> comparing processing characteristics to a predetermined threshold; and
> when said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level, wherein said continuously operating at said lower power consumption level comprises reducing activation of an attached sensor, said sensor positioning said light sources and said detectors proximate said tissue.

**2**. The method of claim **1**, wherein said reducing activation comprises reducing a duty cycle of said sensor.

**3**. The method of claim **1**, wherein during said operating at said higher power consumption level, monitoring when said processing characteristics recedes from said threshold; and when receded, transitioning to continuously operating said patient monitor at said lower power consumption level.

**4**. The method of claim **1**, wherein said processing characteristics comprise signal characteristics from one or more light sensitive detectors.

**5**. The method of claim **4**, wherein said signal characteristics comprise signal strength.

**6**. The method of claim **4**, wherein said signal characteristics comprise a presence of noise.

**7**. The method of claim **4**, wherein said signal characteristics comprise a presence of motion induced noise.

**8**. The method of claim **1**, wherein said processing characteristics include determining an estimate of current power consumption and comparing said estimate with a target power consumption.

**9**. A method of managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor, the method comprising:

> driving one or more light sources configured to emit light into tissue of a monitored patient;
> receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue;
> continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;
> comparing processing characteristics to a predetermined threshold; and
> when said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level, wherein said continuously operating at said lower power consumption level comprises reducing an amount of processing by a signal processor.

**10**. The method of claim **9**, wherein said reducing comprises processing less data.

**11**. The method of claim **10**, wherein said processing less data comprises reducing an overlap in data blocks being processed.

**12**. A method of managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor, the method comprising:

> driving one or more light sources configured to emit light into tissue of a monitored patient;
> receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue;
> continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;
> comparing processing characteristics to a predetermined threshold; and
> when said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level, wherein said processing characteristics include an override condition.

**13**. The method of claim **12**, wherein said override condition comprises measurements during a critical care environment.

**14**. The method of claim **12**, wherein said override condition comprises one or more monitored parameters exhibiting predefined behavior.

**15**. A patient monitor configured to manage power consumption during continuous patient monitoring, the monitor comprising:

> an input configured to receive at least one signal responsive to light detected after attenuation by body tissue of a patient by a noninvasive sensor; and
> one or more processors continuously operating at a lower power consumption level to determine measurement values for one or more physiological parameters of said patient, said processors comparing processing characteristics to a predetermined threshold, and when said processing characteristics pass said threshold, said processors transitioning to continuously operating at a higher power consumption level, wherein processors reduce activation of an attached sensor.

20

US 8,457,703 B2

| 13 | 14 |

**16**. The monitor of claim **15**, wherein said processors reduce a duty cycle of said sensor.

**17**. The monitor of claim **15**, wherein during said operating at said higher power consumption level, said processors monitors when said processing characteristics recedes from said threshold; and when receded, said processors transition to continuously operating at said lower power consumption level.

**18**. The monitor of claim **15**, wherein said processing characteristics comprise signal characteristics from one or more light sensitive detectors.

**19**. The monitor of claim **15**, wherein said processing characteristics include determining an estimate of current power consumption and comparing said estimate with a target power consumption.

**20**. A patient monitor configured to manage power consumption during continuous patient monitoring, the monitor comprising:

an input configured to receive at least one signal responsive to light detected after attenuation by body tissue of a patient by a noninvasive sensor; and

one or more processors continuously operating at a lower power consumption level to determine measurement values for one or more physiological parameters of said patient, said processors comparing processing characteristics to a predetermined threshold, and when said processing characteristics pass said threshold, said processors transitioning to continuously operating at a higher power consumption level, wherein said processors reduce an amount of processing by a signal processor.

**21**. The monitor of claim **20**, wherein said processors reduce an overlap in data blocks being processed.

**22**. A patient monitor configured to manage power consumption during continuous patient monitoring, the monitor comprising:

an input configured to receive at least one signal responsive to light detected after attenuation by body tissue of a patient by a noninvasive sensor; and

one or more processors continuously operating at a lower power consumption level to determine measurement values for one or more physiological parameters of said patient, said processors comparing processing characteristics to a predetermined threshold, and when said processing characteristics pass said threshold, said processors transitioning to continuously operating at a higher power consumption level, wherein said processing characteristics include an override condition.

**23**. The monitor of claim **22**, wherein said override condition comprises measurements during a critical care environment.

**24**. The monitor of claim **22**, wherein said override condition comprises one or more monitored parameters exhibiting predefined behavior.

* * * * *

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify that on October 19, 2022, I electronically filed the foregoing

**OPENING BRIEF** of appellant using the Court's CM/ECF filing system.

Counsel for appellee were electronically served by and through the Court's

CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

*/s/ Lauren A. Degnan*
Lauren A. Degnan

## <u>CERTIFICATE OF COMPLIANCE</u>

The **OPENING BRIEF** of appellant is submitted in accordance with the

type-volume limitation of Fed. Cir. R. 32(b).  The brief contains 13,350 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R.

32(b)(2).  This **OPENING BRIEF** has been prepared in a proportionally spaced

typeface using Microsoft Word 2016 in Times New Roman, 14 Point.


Dated:  October 19, 2022                    */s/ Lauren A. Degnan*
                                            Lauren A. Degnan