**No. 22-1890**

IN THE

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

_____

APPLE INC.,

*Appellant,*

*v.*

MASIMO CORPORATION,

*Appellee,*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NO. IPR2020-01523

**RESPONSE BRIEF OF APPELLANT MASIMO CORPORATION**

December 28, 2022

Joseph R. Re, Principal Counsel
Stephen C. Jensen
Joshua J. Stowell
Jarom D. Kesler
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404
*Attorneys for Appellee*
*Masimo Corporation*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Masimo Corporation certifies the following:

1.     The full name of every party represented by me is:

Masimo Corporation.

2.     The name of the real party-in-interest represented by me is:

Masimo Corporation.

3.     All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by me are:

BlackRock Inc.

4.     The name of all law firms and the partners or associates that appeared for the party in the lower tribunal or are expected to appear for the party in this court and who are not listed on the docket for the current case:

Knobbe, Martens, Olson & Bear, LLP: Stephen W. Larson, Jacob L. Peterson.

5.     The case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

- Masimo Corporation and Cercacor Laboratories, Inc. v. Apple Inc., U.S. District Court for the Central District of California, Case No. 8:20-cv-00048-JVS

6.    Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

None.

# TABLE OF CONTENTS

**Page No.**

CERTIFICATE OF INTEREST ........................................................... i

TABLE OF ABBREVIATIONS ........................................................ 1

STATEMENT OF RELATED CASES ............................................. 2

I.      INTRODUCTION ................................................................. 3

II.     STATEMENT OF THE ISSUES ......................................... 7

III.    STATEMENT OF THE CASE AND FACTS ....................... 8

    A.    The '703 Patent Discloses Innovative Low-Power Patient Monitors ...................................................................... 8

    B.    The Challenged Claims ............................................... 16

    C.    The Board's Construction Of "Processing Characteristics" ........ 17

    D.    Apple Failed To Show Unpatentability Of The Challenged Claims ............................................................. 20

        1.    Overview Of Diab ............................................. 21

        2.    Overview Of Amano .......................................... 21

        3.    The Diab + Amano Grounds Did Not Render The Challenged Claims Obvious ............................... 23

        4.    The Diab  + "GK-POSITA" Grounds Did Not Render The Challenged Claims Obvious ...................... 26

        5.    The Amano Grounds Did Not Render The Challenged Claims Obvious ............................... 27

IV.    SUMMARY OF THE ARGUMENT .................................. 27

V.     STANDARD OF REVIEW ................................................ 30

# TABLE OF CONTENTS
## *(cont'd)*

**Page No.**

VI.    ARGUMENT ................................................................. 32

    A.    The Board Correctly Construed "Processing Characteristics" ........................................................... 32

        1.    The Board's Construction Naturally Aligns With The Patent's Description Of The Invention .............................. 32

        2.    Apple Presented No Evidence Regarding The "Plain" Meaning Of "Processing Characteristics" ........................ 40

        3.    Apple's Attacks On The Board's Construction Fail.......... 43

            a.    Apple's Attempt To Read The Claims In Isolation Is Improper ............................................... 43

            b.    Claim 4 Supports The Board's Construction........... 45

            c.    Claim 8 Supports The Board's Construction........... 48

            d.    The Board Did Not Improperly Impute A Limitation From The Disclosed Embodiment......... 52

    B.    The Board Did Not Violate The APA ......................................... 54

    C.    The Board Correctly Determined That Diab And Amano Did Not Render The Challenged Claims Obvious...................... 65

        1.    Apple Did Not Show A Motivation To Combine Diab And Amano .............................................................. 66

        2.    The Board Did Not Apply An Incorrect Standard To Apple's Obviousness Arguments....................................... 67

VII.    CONCLUSION................................................................. 70

CERTIFICATE OF COMPLIANCE................................................................. 71

-iv-

# TABLE OF AUTHORITIES

**Page No(s).**

*In re Abbott Diabetes Care Inc.*,
  696 F.3d 1142 (Fed. Cir. 2012) .................................................. 53

*Andersen Corp. v. Fiber Composites, LLC*,
  474 F.3d 1361 (Fed. Cir. 2007) ........................................... 46, 47

*Arista Networks, Inc. v. Cisco Sys., Inc.*,
  908 F.3d 792 (Fed. Cir. 2018) .............................................. 42, 53

*Aristrocrat Techs. v. Int'l Game Tech.*,
  709 F.3d 1348 (Fed. Cir. 2013) ................................................. 46

*Astrazeneca AB v. Mutual Pharma., Co.*,
  384 F.3d 1333 (Fed. Cir. 2004) ........................................... 37, 52

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006) ................................................... 46

*Broadcom Corp. v. Qualcomm Inc.*,
  543 F.3d 683 (Fed. Cir. 2008) ................................................... 40

*Cioffi v. Google, Inc.*,
  632 F. App'x 1013 (Fed. Cir. 2015) ......................................... 47

*In re Cree, Inc.*,
  818 F.3d 694 (Fed. Cir. 2016) ................................................... 31

*Eon Corp. IP Holdings v. Silver Spring Networks*,
  815 F.3d 1314 (Fed. Cir. 2016) ................................................. 41

*Gillette Co. v. Energizer Holdings, Inc.*,
  405 F.3d 1367 (Fed. Cir. 2005) ................................................. 44

*Hamilton Beach Brands, Inc. v. f'Real Foods, LLC*,
  908 F.3d 1328 (Fed. Cir. 2018) ................................................. 32

## TABLE OF AUTHORITIES
### *(cont'd)*

**Page No(s).**

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 801 (Fed. Cir. 2021) ............................................................ 41, 43

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
   902 F.3d 1372 (Fed. Cir. 2018) ................................................................ 44

*Intellectual Ventures I LLC v. Unified Patents, LLC*,
   803 Fed. App'x. 403 (Fed. Cir. 2020) (unpublished) ................................. 58

*Kinetic Concepts, Inc. v. Blue Sky Med. Gp., Inc.*
   554 F.3d 1010 (Fed. Cir. 2009) ................................................................ 35

*Kraft Foods, Inc. v. Int'l Trading Co.*,
   203 F.3d 1362 (Fed. Cir. 2000) ................................................................ 47

*MagiSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
   687 F.3d 1377 (Fed. Cir. 2012) ................................................................ 44

*Medicines Co. v. Mylan, Inc.*,
   853 F.3d 1296 (Fed. Cir. 2017) .......................................................... 35, 47

*Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*,
   878 F.3d 1336 (Fed. Cir. 2018) ................................................................ 31

*Multiform Desiccants, Inc. v. Mezam, Ltd.*,
   133 F.3d 1473 (Fed. Cir. 1998) ................................................................ 33

*In re NuVasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016) ................................................................ 31

*Nystrom v. TREX Co.*,
   442 F.3d 1136 (Fed. Cir. 2005) ................................................................ 42

*Ormco Corp. v. Align Technology, Inc.*,
   463 F.3d 1299 (Fed. Cir. 2006) .......................................................... 53, 54

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*Personalized Media Commc'ns, LLC v. Apple Inc.,*
  952 F.3d 1336 (Fed. Cir. 2020) ................................... 30

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................. 32, 33, 52, 54

*In re Power Integrations,*
  884 F.3d 1370 (Fed. Cir. 2018) ............................................. 38, 42

*Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.,*
  24 F.4th 1406 (Fed. Cir. 2022) ..................................... 30

*Renishaw PLC v. Marposs Societa' per Azioni,*
  158 F.3d 1243 (Fed. Cir. 1988) ................................... 33

*Retractable Techs., Inc. v. Becton, Dickinson and Co.,*
  653 F.3d 1296 (Fed. Cir. 2011) ....................................... 43, 45, 47

*Samsung Elecs. Co. v. Elm 3DS Innovations, LLC,*
  925 F.3d 1373 (Fed. Cir. 2019) ....................................... 30, 31, 62

*Sirona Dental Sys. GmbH v. Institut Straumann AG,*
  892 F.3d 1349 (Fed. Cir. 2018) ................................... 31

*In re Smith Int'l, Inc.,*
  871 F.3d 1375 (Fed. Cir. 2017) ................................... 39

*Teva Pharm. U.S.A., Inc. v. Sandoz, Inc.,*
  575 U.S. 318 (2015).................................................. 30

*Trivascular, Inc. v. Samuels,*
  812 F.3d 1056 (Fed. Cir. 2016) ................................... 52

*Trustees of Columbia Univ. v. Symantec Corp.,*
  811 F.3d 1359 (Fed. Cir. 2016) ................................... 52

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

## OTHER AUTHORITIES

5 U.S.C. §706 ................................................................................. 31

77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012) ................................. 58

Office Patent Trial Practice Guide .................................................. 58

## TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| '703 patent | U.S. Pat. No. 8,457,703 |
| POR | Patent Owner Response |
| POSITA | Person of ordinary skill in the art |
| GK-POSITA | General knowledge of a POSITA |
| LED | Light emitting diode |
| IPR1523 | IPR No. IPR2020-01523 |
| APA | Administrative Procedure Act |

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, Counsel is aware of the following pending cases that will be directly affected by this Court's decision in the pending appeal:

- *Masimo Corporation and Cercacor Laboratories, Inc. v. Apple Inc.*, U.S. District Court for the Central District of California, Case No. 8:20-cv-00048-JVS

# I. **INTRODUCTION**

Masimo's U.S. Patent No. 8,457,703 ("the '703 patent") discloses and claims innovative and nonobvious approaches to managing the power consumption of a low-power patient monitor. Masimo's innovative monitor controls power consumption by effectively increasing or decreasing the number of input samples received and processed by the monitor. The patent discloses several mechanisms to increase or decrease the number of input samples including adjusting the duty cycle of the monitor's light sources or periodically shutting down the monitor's light detector. The monitor determines whether to adjust one of these sampling mechanisms by analyzing the signal received from the light detector. The inventors of the '703 patent recognized that the monitor could conserve power without sacrificing performance by reducing the number of samples when the patient's condition was stable or when the system received a high-quality signal from the light detector. Importantly, the '703 patent's monitor intermittently adjusts the number of samples during continuous operation of the monitor so that a clinician can continuously receive current patient information despite changes in monitor power consumption.

Every challenged claim in the '703 patent requires a patient monitor that continuously operates at a lower power consumption level and transitions to continuously operating at a higher power consumption level when certain

-3-

"processing characteristics" pass a threshold. The Board correctly construed "processing characteristics" based on the claims and specification to require that the "processing characteristics" are "determined from a signal received from one or more detectors configured to detect light." As explained above, the monitors disclosed in the '703 patent adjust sampling according to the patient's condition or the signal quality determined from the signal from the patient. In either case, the described method of managing power consumption directly depends on the signal received from the detector configured to detect light. Consequently, every challenged claim requires receiving at least one signal from a detector configured to detect light. The Court should reject Apple's sweeping construction that "processing characteristics" refers to any information that is processed, regardless of source, because the construction reads "processing characteristics" out of the claims and is inconsistent with the invention described in the '703 patent.

The Board also correctly found that Apple did not show that Diab, alone or in combination with Amano, discloses a patient monitor that continuously operates at a lower power consumption level and transitions to continuously operating at a higher power consumption level. On appeal, Apple argues that the Board violated the APA because it "failed to consider" Apple's argument that a POSITA would have found it obvious to "utilize only a subset" of Diab's motion artifact suppression module. The Board did not violate the APA. Apple did not raise this subset

argument in the IPR.  The only argument Apple raised before the Board was that a POSITA would have found it obvious to suspend Diab's motion artifact suppression module in its entirety.  For example, Apple argued in its Reply, "a POSITA would have found it obvious to suspend and not execute ***all of the operations*** of the motion artifact suppression module."  Thus, the Court should reject Apple's request to vacate and remand the Board's decision based on the APA.

The Board should also reject Apple's argument that the Board incorrectly applied "an inherency standard" to one of Apple's obviousness grounds.  Apple argued to the Board that suspending Diab's motion artifact suppression module "would result in Diab's device operating 'at a lower power consumption level.'" Apple did not argue that a POSITA would have been motivated to change Diab's operations to reduce power consumption or show that a POSITA would have reasonably expected success in doing so.  In fact, the phrase "reasonable expectation of success" does not appear in the portions of Apple's Petition or Reply discussing the "lower power consumption level" limitation.  Thus, it was Apple, not the Board, that relied on inherency.  The Board assessed Apple's inherency argument and made the factual finding that Diab's device would ***not*** necessarily result in Diab's device operating at a lower power consumption level.  Based on this factual finding, the Board concluded that Apple did not show that Diab satisfied the lower power

consumption limitation.  Apple has not shown, or even argued, that the Board's factual finding was unsupported by substantial evidence.

For at least these reasons, and those discussed below, the Court should reject the arguments raised by Apple on appeal and affirm the Board's Final Written Decision.

## II. <u>STATEMENT OF THE ISSUES</u>

1.     Whether the Board correctly relied on the claim language and specification in concluding that the "processing characteristics" are "determined from a signal received from one or more detectors configured to detect light."

2.     Whether Apple improperly raises a new argument on appeal that a POSITA would have been motivated to suspend and not execute a "subset" of Diab's motion artifact suppression module.

3.     Whether substantial evidence supports the Board's factual finding that Apple did not show that suspending Diab's motion artifact suppression module would result in lower power consumption.

4.     Whether substantial evidence supports the Board's factual finding that Apple failed to show a motivation to combine Diab and Amano, and whether that finding provides an alternative grounds for affirmance on the Diab and Amano grounds.

### III.  **STATEMENT OF THE CASE AND FACTS**

**A.**    **The '703 Patent Discloses Innovative Low-Power Patient Monitors**

Masimo's '703 patent describes novel approaches for reducing the power consumption of patient monitors, such as pulse oximeters. Pulse oximeters are devices that are widely used for monitoring the oxygen saturation level of a patient's arterial blood.  Appx54 (1:18-35).  As illustrated in Figure 1 below, conventional pulse oximetry systems include a sensor 110 that has red and infrared LED emitters 112 and a photodiode detector 114.  *Id*.  The LED emitters project light into the patient's tissue, which is detected by the photodiode detector as it emerges from the tissue.  *Id*.  A signal processor 156 in communication with the sensor calculates physiological measurements (e.g., oxygen saturation) based on the detected light.  *Id*. (1:38-47).  The monitor then displays the calculated measurements to the user through display 159.  *Id*.



FIG. 1 (Prior Art)

Appx43 (Fig. 1).

The '703 patent explains that practitioners increasingly began using pulse oximeters in portable, battery-operated applications. Appx54 (1:55-56). The portable applications created "an increasing demand for lower power and higher performance pulse oximeters." *Id.* (1:61-63). POSITAs attempted to meet the unmet, long-felt need for low-power pulse oximeters by developing oximeters having a "sleep mode." *Id.* (1:63-2:16). In a sleep mode, if the patient's physiological measurements (e.g., oxygen saturation) do not significantly change over a certain period of time, the oximeter's processor powers down, except perhaps

for a portion of memory. *Id.* The oximeter then periodically checks the patient's physiological measurements based on an internal timer to determine whether to wake up (i.e., power up the oximeter's processor). *Id.*

While pulse oximeters having a sleep mode could reduce power consumption, the '703 patent identifies several disadvantages to applying sleep-mode techniques to pulse oximetry. *Id.* (2:17-28). For example, when functioning in the sleep mode, the pulse oximeter is inactive and may miss critical patient events, such as sudden oxygen desaturation. *Id.* The pulse oximeter also does not reflect the time of the last active measurement, which can lead to confusion regarding the patient's status. *Id.*

The '703 patent discloses that simply reducing the duration of the sleep mode to miss fewer patient events did not result in effective power conservation. *Id.* The patent explains, "There is a trade-off between shorter but more frequent sleep periods to avoid a missed event and the increased processing overhead to power-up after each sleep period." *Id.* For at least this reason, sleep-mode pulse oximeters did not address the long-felt need for low-power pulse oximeters.

The inventions described in the '703 patent do not suffer from the disadvantages of sleep-mode pulse oximeters. The inventive oximeters do not power down the processors, as in sleep-mode pulse oximeters, but instead modify power consumption by effectively increasing or decreasing the number of input samples

-10-

received and processed by the oximeter. Appx56 (6:9-24). The inventive pulse oximeter determines the optimal number of samples for processing by evaluating the patient's physiological measurements and/or internal parameters, such as signal statistics. *Id.* (6:28-44); *see also id.* (5:11-27). The physiological measurements evaluated by the oximeter include, but are not limited to, oxygen saturation, pulse rate, and plethysmograph. *Id.* (5:13-16). The signal statistics include, but are not limited to, signal strength, noise, and motion artifact. *Id.* (5:16-17).

The '703 patent discloses several methods to continuously adjust the number of input samples received and processed by the oximeter. In one embodiment, the pulse oximeter increases or decreases the number of input samples by changing the duty cycle of current supplied by the oximeter's drivers to the LEDs. Appx56-57 (6:56-7:14). In a related *inter partes* review, the Board construed "duty cycle" to mean "the ratio of operating time (or on time) of a light source to the total time period during which the light sources is intermittently operated, expressed as a percentage." *Apple Inc. v. Masimo Corp.,* IPR2020-01524, Paper 29 at 17 (P.T.A.B. Apr. 29, 2022). Apple did not dispute this construction. *Id.* By changing the duty cycle, the oximeter adjusts the time that the light source is on per cycle, which results in generating a signal by a detector for the oximeter to process.

In a conventional pulse oximeter, the duty cycle used to drive the LEDs is constant during monitoring. Appx56-57 (6:56-7:14). However, maintaining a

constant duty cycle can result in significant power consumption because the LED drivers "require a significant portion of the overall pulse oximeter power budget." Appx56 (6:64-66). The '703 patent explains that "[i]ntermittently reducing the drive current duty cycle can advantageously reduce power dissipation without compromising signal integrity." Appx56-57 (6:66-7:1). In a preferred embodiment, the '703 patent discloses intermittently reducing the duty cycle of the LED drivers from 25% [red] to about 3.125% [green]. *Id*. (7:4-8); Appx47 (Fig. 5). As illustrated by Figure 8 (below), this reduction in duty cycle can "reduce power consumption on the order of 70 mw." Appx57 (7:1-4).



FIG. 8

Appx50 (Fig. 8, color added).

In another embodiment, the oximeter increases or decreases the number of input samples by varying the number of data blocks processed by the processor. Appx56 (6:2-8).  The data blocks include digitized samples of the signal received from the detector.  Figures 7A-B (below) "illustrate data blocks 700, which are processed by post processor 430." Appx49, 57 (7:40-41, Figs. 7A-B). As shown in Figure 7A below, each data block has n samples 702 of the pre-processor output. Appx57 (7:41-45).



FIG. 7A

Appx49 (Fig. 7A, color added).

Each data block has a relative time shift 706 from the preceding data block creating an overlap 708 between two adjacent data blocks 710, 720.  Appx57 (7:51-60).  "The greater the overlap 708, i.e. the smaller the time shift 706, the more data blocks there are to process in the post-processor 430 (FIG. 4), with a corresponding greater power consumption." *Id.* (7:55-58).  The '703 patent discloses that the

"overlap 708 between successive data blocks 710, 720 may vary from n-1 samples to no samples, i.e. no overlap." *Id.* (7:58-60).

Figure 7B (below) shows "there may be a sample gap 756 or negative overlap, i.e. samples between data blocks that are not processed by the post-processor, allowing further post-processor power savings." *Id.* (7:60-63).



FIG. 7B

Appx49 (Fig. 7B, color added).

In another embodiment, the oximeter adjusts the number of samples received by the processor by "intermittently remov[ing] power to the detector front-end." Appx56 (5:66-6:2). Figure 6 illustrates "a pre-processor output signal 610 over time depicting the result of intermittent sampling at the detector front-end 490 (Fig. 4)." Appx57 (7:15-17).



FIG. 6

Appx48 (Fig. 6, color added).  As shown, the "output signal 610 has 'on' periods

612 [blue], during which time the detector front-end 490 (Fig. 4) is powered-up and

'off' periods 614 [green], during which time the detector front-end 490 (FIG. 4) is

powered-down." *Id.* (7:20-24).  The oximeter receives and processes fewer samples

when the detector is in an off period.

During operation of the inventive patient monitor, an event, such as low

oxygen saturation or low signal quality, triggers the monitor to move from a low

sampling state to a high sampling state.  In one example, the monitor transitions from

a low duty cycle to a high duty cycle upon detecting an event.  Appx57 (8:43-57);

Appx51 (Fig. 9). Conversely, if the monitor is in a high duty cycle state and neither a patient event nor low signal quality occurs, the monitor transitions to a low duty cycle to conserve power. Appx58 (9:1-9). Thus, the monitor described and claimed by the '703 patent reduces power consumption and better addresses critical patient events or signal quality issues than a conventional monitor utilizing a sleep mode. Appx1366, ¶30.

## B.    <u>The Challenged Claims</u>

The '703 patent has six independent claims. Claims 1, 9, and 12 describe methods of managing power consumption by (a) reducing activation of an attached sensor, (b) reducing an amount of processing by a signal processor, or (c) including an override condition, respectively. Claims 15, 20, and 22 describe patient monitors configured to manage power consumption using similar techniques to those recited in the method claims.

Claim 1 is illustrative:

1. A method of managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor, the method comprising:

driving one or more light sources configured to emit light into tissue of a monitored patient;

receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue;

continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;

-16-

comparing processing characteristics to a predetermined threshold; and

when said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level,

wherein said continuously operating at said lower power consumption level comprises reducing activation of an attached sensor

said sensor positioning said light sources and said detectors proximate said tissue.

Appx59 (claim 1).

## C.    **The Board's Construction Of "Processing Characteristics"**

The term "processing characteristics" appears in each challenged claim. Appx9.  On appeal, Apple argues that it "did not seek construction of this term in its petition."  Br. at 8.  However, Apple proposed two constructions for "processing characteristics" in the Petition.  Appx9.  First, Apple "set[] forth a 'limiting interpretation requiring 'processing characteristics' to be obtained from a signal provided by a photodetector.'"  *Id.* (quoting Appx118; Appx403, ¶97).  Second, Apple "expresse[d] that 'the plain meaning of 'processing characteristics' includes characteristics or features obtained from or used for processing information.'"  *Id.* (quoting Appx119; Appx403, ¶98).  Apple's expert, Dr. Anthony, characterized the "'plain meaning' construction as constituting 'an alternative non-limiting interpretation.'"  *Id.* (quoting Appx403, ¶98).  During cross-examination, Dr. Anthony conceded that he had no opinion regarding whether the "limiting" or "alternative non-limiting" construction was correct.  Appx1584 (130:12-131:4)

("Wasn't necessary to inform my opinions to highlight which one is the correct one."); *see also* Appx1578-1584 (125:13-130:19). Nor did Apple identify any other evidence to show that the "alternative non-limiting" construction reflected the plain meaning of "processing characteristics." *See e.g.,* Appx119.

In response, Masimo urged the Board to adopt Apple's alternative non-limiting construction and "construe 'processing characteristics' to require that the processing characteristics are determined from a signal received from one or more detectors configured to detect light." Appx1289 (citing Appx1374, ¶44). Masimo demonstrated that the claims, specification, and extrinsic evidence supported this construction. *See* Appx10-13 (summarizing arguments); Appx1289-1293 (identifying evidence). Masimo also showed that under the correct construction, Apple could not meet its burden to show unpatentability. *See* Appx1339-1341 (identifying evidence).

In its Reply to the POR, Apple argued that Masimo's construction, a construction that Apple had proposed in the Petition, was suddenly "unjustifiably limiting" because the construction would render dependent claims 4 and 8 "meaningless." Appx1683. Apple now argued that the Board should adopt Apple's broader "alternative non-limiting" construction that "processing characteristics" "includes characteristics or features obtained from or used for processing

information." *Id.* at 25.  Apple provided no expert declaration in support of its attorney arguments in the Reply.

After reviewing both parties' arguments, the Board concluded that Masimo had "the better explanation for what a person of ordinary skill in the art would understand from the '703 patent as to what constitutes the 'processing characteristics' that factor into the patient monitoring described by the claims." Appx13.  The Board considered and rejected Apple's argument that Masimo's construction would render dependent claims 4 and 8 meaningless.  The Board found that Masimo "persuasively explains that claim 4 does not emerge as meaningless based on [Masimo's] construction of 'processing characteristics' but instead claim 4 further refines the understanding of the type of processing characteristics that are received from the light detectors, i.e., signal characteristics rather than physiological measurements."  Appx13-14.

The Board also shared Masimo's "view that the understanding of claim 8 taken in context of the Specification (e.g., Fig. 4), establishes that the estimate of power consumption is determined based on signals from the light detector 490." Appx14.  In contrast, the Board found that Apple's "views as to how claims 4 and 8 inform the meaning of 'processing characteristics' lack support and fall short."  *Id.* The Board explained "that it is inconsistent with the '703 patent to tease out the sweeping premise advanced by [Apple] that simply any information that is

processed, regardless of its source, can constitute the 'processing characteristics' that are employed as part of all of the challenged claims to monitor a patient based on light signals." Appx14. Instead, the Board relied "on the written description of the '703 patent as a useful guide in informing the meaning of 'processing characteristics,' and conclude[d] that the proper understanding of the term is that such characteristics are derived from signals from light detectors." *Id*.

## D.    Apple Failed To Show Unpatentability Of The Challenged Claims

The Board found that Apple failed to show by a preponderance of the evidence that the cited art rendered the challenged claims unpatentable. Appx37. Apple asserted eight grounds of unpatentability, as demonstrated by the below graphic from Apple's Petition:

| Ground | Claims | §103 Basis |
|--------|--------|------------|
| 1A | 9-10, 12-14, 20, 22-24 | Diab (APPLE-1007) and Amano |
| 1B | 11, 21 | Diab, Amano, and Edgar (APPLE-1005) |
| 1C | 1-7, 15-18 | Diab, Amano, and Turcott (APPLE-1006) |
| 2A | 9-10, 12-14, 20, 22-24 | Diab and the General Knowledge of a POSITA (GK-POSITA) |
| 2B | 11, 21 | Diab, GK-POSITA, and Edgar |
| 2C | 1-7, 15-18 | Diab, GK-POSITA, and Turcott |
| 3A | 9-10, 12-14, 20, 22-24 | Amano (APPLE-1004) |
| 3B | 1-3, 15-17 | Amano and Turcott (APPLE-1006) |

Appx71. As shown, every ground included Diab and/or Amano.

### 1.    Overview Of Diab

Diab is a Masimo patent that discloses methods of isolating a primary or secondary signal portion from a composite measured signal using signal-processing techniques.  Appx646 (3:16-21); Appx648-649 (8:65-9:4); Appx609-610 (Figs. 4-5).  Diab explains that composite measured signals, such as those obtained through physiological monitoring, generally include a desired signal (e.g., primary signal) and noise (e.g., secondary signal).  Appx645 (1:31-35, 2:4-15).  Conventional filtering techniques were often ineffective in isolating the desired signal from the noise due to an overlap in the frequency spectrum between the primary and secondary signals.  *Id*. (1:44-56).  Thus, Diab discloses a correlation canceller capable of isolating the desired signal or noise from a composite signal.  Appx646 (3:16-21); Appx648-649 (8:65-9:4); Appx609-610 (Figs. 4-5).

Diab does not disclose methods of reducing the power consumption of a patient monitor by intermittently reducing activation of an attached sensor, reducing an amount of processing by a signal processor, or including an override condition as required by the challenged claims of the '703 patent.  Appx1378-1380, ¶53.

### 2.    Overview Of Amano

Amano describes "a pulse wave examination apparatus which can judge the pulse condition objectively and accurately."  Appx512 (3:20-23).  Amano explains that "pulse waveforms by the classification of Chinese medicine" include Ping mai,

Hua mai, and Xuan mai. Appx511 (1:41-2:12); Appx495 (Figs. 45A-45C). Ping mai "is the pulse condition of a normal man in good health." Appx511 (1:47-49); Appx495 (Fig. 45A). Hua mai "is the pulse condition of a man who shows an abnormality in his blood stream condition." Appx511 (1:52-54); Appx495 (Fig. 45B). Xua mai "is the pulse condition of a man whose blood vessel wall tension has increased." Appx511 (1:64-66); Appx495 (Fig. 45C). Amano's apparatus outputs a qualitative classification that "displays the characters 'Hua mai, Ping mai, Xuan mai' or symbols, e.g., icons," which allow the doctor to recognize the pulse condition. Appx522 (23:4-9).

Amano's pulse wave examination apparatus utilizes different hardware and techniques to monitor a patient than those disclosed and claimed in the '703 patent. *See, e.g.*, Appx455 (Fig. 1) (illustrating system). For example, Amano's apparatus requires an acceleration sensor to detect the patient's body movement. Appx521 (21:9-12); Appx528 (35:25-27); Appx530 (40:65-41:3). In contrast, the low-power patient monitors in the '703 patent use signal processing techniques to detect features from the signal received from the optical detector, eliminating the need for other power-consuming hardware like an acceleration sensor. Appx56 (6:25-41); Appx46 (Fig. 4).

Apple focused on a small portion of Amano in the IPR. Amano discloses that when the acceleration sensor detects body movement, the apparatus suspends

specific operations in Amano's processing path (i.e., the body movement component eliminating section) to improve the signal-to-noise ratio and reduce power consumption.    Appx76-77 (citing Appx521 (21:65-22:6); Appx528 (35:54-64)). While Amano's power-saving techniques depend on the specific processing path in Amano's apparatus, Apple argued that Amano stood for a more sweeping proposition that suspending unnecessary processing operations results in reduced power consumption.  Appx77.

### 3. The Diab + Amano Grounds Did Not Render The Challenged Claims Obvious

Apple argued that the combination of Diab and Amano (or Diab/Amano plus a third reference) rendered the challenged claims obvious.  *See* Appx8 (identifying grounds).  The Board disagreed and cited three reasons for its decision.  Appx24-32.

First, the Board found that Apple did not show that Diab disclosed operating a patient monitor "at a lower power consumption level" and transitioning to operating the patient monitor "at a higher power consumption level," as required by the challenged claims.  Apple argued that Diab's motion artifact suppression module 580 satisfied these limitations.  Apple contended that Diab "teaches not executing the motion artifact suppression module 580 if motion is not detected."  Appx85. Apple also argued "it would have also been obvious to suspend and not execute the operations of Diab's motion artifact suppression module 580 if motion is not detected based on Amano's teaching of suspending 'the operations of…body

movement component eliminating section' 'when no body movement is present.'"
*Id.* (internal citations). Apple then speculated that a POSITA would have understood
that not executing Diab's motion artifact suppression module "reduces power
consumption based on Amano's teaching that suspending 'the operations of…body
movement component eliminating section' reduces power consumption." Appx86
(quoting Appx521 (21:65-22:6)).

The Board rejected Apple's arguments regarding the operation of Diab and
stated Apple's "assessment of what Diab would have taught a skilled artisan as to
the function of motion artifact suppression module 580 does not find adequate
support within Diab's own disclosure, and does not address sufficiently the impact
of Figures 20-21 on its position." Appx28. The Board agreed with Masimo "that
the record does not support [Apple's] view that Diab contemplates 'suspend[ing]
and not execut[ing]' motion artifact suppression module 580.'" *Id.* Rather, Masimo
successfully demonstrated that Diab's motion artifact suppression module operates
continuously, even when no motion is detected. Appx24-28 (summarizing
arguments). Thus, the Board found "unpersuasive [Apple's] apparent view that
Diab, itself, suggests reducing power consumption of its patient monitoring system
by suspending or shutting off operation of motion artifact suppression module 580."
Appx28.

Second, the Board found that Apple failed to show a motivation to combine Diab with Amano. Specifically, the Board rejected Apple's argument that "it would have been obvious to 'suspend and not execute the operations of Diab's motion artifact suppression module 580 if motion is not detected based on Amano's teaching….'" Appx28-29. The Board found Apple's argument "as to what one of ordinary skill in the art would have taken from the teachings of Diab and Amano" unpersuasive. Appx29. According to the Board, "[a]lthough Amano does teach that some of the modules of its particular system may be suspended, [Apple] does not explain adequately why a skilled artisan would have applied such a teaching to Diab's particular motion artifact suppression module 580." Appx29-30 (internal quotations omitted).

Third, the Board found that even if Apple had successfully shown that Diab's motion artifact suppression module were periodically suspended, Apple failed to show that Diab's system would operate at a "lower power consumption level," as required by the challenged claims. Appx30-32. "The main thrust of [Apple's] position is that suspending Diab's motion artifact suppression module would eliminate processing requirements and result in 'reduce[d] calculation time and power consumption.'" Appx30 (quoting Appx1691). However, the Board explained, "Although Amano does describe that its particular system enjoys reduced power consumption when its body movement component eliminating section 30 is

suspended, [Masimo] presents plausible reasoning and evidence that such power reduction may not occur in Diab's differently structured and configured system." Appx31. The Board specifically credited the testimony of Masimo's expert, Dr. Madisetti, that Diab's system would consume more power when no motion was detected. *Id.* (citing Appx1396-1397, ¶¶76-77; Appx1400-1402, ¶¶87-90).

## 4. The Diab + "GK-POSITA" Grounds Did Not Render The Challenged Claims Obvious

Apple also argued that the combination of Diab and the GK-POSITA rendered the challenged claims unpatentable. *See* Appx8 (identifying grounds). Apple's argument regarding these grounds was limited to two pages in the Petition and largely incorporated the arguments from the Diab and Amano grounds. Appx115-117. The Board summarized these grounds as follows, "These three grounds largely mirror those discussed above that employ Amano for its asserted teachings of reducing power consumption by not performing motion artifact suppression when no motion is detected." Appx34. However, for these grounds, Apple "seeks recourse to the 'general knowledge and ordinary level of skill' in proposing that 'changes in power consumption were obvious from changes in the amount of processing that are contemplated by Diab.'" *Id.* (quoting Appx115).

The Board found that Apple failed to show that these grounds rendered the challenged claims unpatentable for the same reasons as Diab and Amano. Appx35. The Board stated, "[w]e are not persuaded by [Apple] that the 'general knowledge'

of an ordinarily skilled artisan in lieu of Amano's teachings bootstraps these grounds to overcome the deficiencies discussed above in connection with the reasoning for, and potential implications of, suspending or eliminating Diab's motion artifact suppression module." *Id.*

### 5.    <u>The Amano Grounds Did Not Render The Challenged Claims Obvious</u>

Apple also argued that Amano or Amano combined with another reference rendered the challenged claims unpatentable. *See* Appx8 (summarizing grounds). Most relevant for this appeal, Apple argued that Amano's processing of the signal received from its acceleration sensor satisfied the "processing characteristics" limitation under Apple's broad "alternative, non-limiting" construction. Appx36 (citing Appx1706). The Board found that Apple failed to demonstrate unpatentability "[b]ecause in the context of the '703 patent, processing characteristics must be derived from detectors configured to detect light, and because there is no dispute that Amano's acceleration sensor is not such a detector." Appx36.

### IV.  <u>SUMMARY OF THE ARGUMENT</u>

The Board correctly found that the claimed "processing characteristics" are determined from one or more detectors configured to detect light. The Board's construction is supported by the claims and specification. The specification explains that the claimed patient monitors improve over the prior art by reducing power consumption without sacrificing performance. The monitors maintain a high level

of performance by reducing power consumption only when the patient's condition is stable, and the signal quality is high. The monitor determines the patient's condition and signal quality by assessing the signal received from the detector configured to detect light. The '703 patent does not disclose any embodiments where the measured signal does not originate from the detector.

Consistent with the specification, all the challenged claims require a patient monitor that receives a signal from a detector configured to detect light. The claims further recite than when the "processing characteristics" pass a threshold, the patient monitor transitions to a new state by adjusting the input received from the detector or by processing the received input differently. The Board correctly determined that a POSITA reading the claims in light of the specification would have adopted a construction proposed by Apple in its Petition and concluded that the "processing characteristics" are "determined from one or more detectors configured to detect light."

In contrast, Apple's other proposed construction that the "processing characteristics" "includes characteristics or features obtained from or used for processing information" reads the term out of the claim and is untethered to the specification. Under Apple's other construction, "processing characteristics" includes any information because all information is "obtained from or used for processing information." Yet, the patient monitors in the '703 patent could not

reduce power consumption without sacrificing performance by comparing *any* information to a threshold. The '703 patent specifically requires the comparison of information relating to the patient's condition or the signal quality. That information comes from the detector configured to detect light. Tellingly, Apple does not identify any disclosure in the patent that compares a processing characteristic that is not derived from the detector.

The Board also did not violate the APA. Apple argued before the Board that a POSITA would have found it obvious to suspend Diab's motion artifact suppression module in its entirety. Apple did not argue that a POSITA would have found it obvious to suspend a "subset" of Diab's motion artifact suppression module. Apple has belatedly raised this argument for the first time on appeal. Because Apple did not raise the argument before the Board, the Board did not violate the APA in not addressing it.

Lastly, the Board did not apply an inappropriate inherency standard to Apple's arguments regarding the combination of Diab and Amano. Apple argued that suspending Diab's motion artifact suppression module would inherently result in reduced power consumption. The Board found that the evidence did not support Apple's argument. Apple has failed to show that the Board's factual findings on this issue are unsupported by substantial evidence.

Moreover, even if the Board applied the wrong standard in analyzing this issue, the Board rejected the Diab and Amano grounds on an alternative basis. The Board found that Apple failed to show that a POSITA would have been motivated to combine Diab and Amano. Apple does not appeal the Board's factual findings regarding the motivation to combine. Thus, the Court should affirm the Board's conclusion that the grounds based on Diab and Amano do not render the challenged claims obvious for this alternative reason.

## V. <u>STANDARD OF REVIEW</u>

Claim construction is a question of law with underlying questions of fact. *Teva Pharm. U.S.A., Inc. v. Sandoz, Inc.*, 575 U.S. 318, 324-328 (2015). Here, the Board based its claim construction of "processing characteristics" on intrinsic and extrinsic evidence. This Court reviews "the Board's ultimate claim constructions and any supporting determinations based on intrinsic evidence de novo." *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.,* 24 F.4th 1406, 1413 (Fed. Cir. 2022) (citing *Personalized Media Commc'ns, LLC v. Apple Inc.,* 952 F.3d 1336 (Fed. Cir. 2020)). The Court reviews "any subsidiary factual findings involving extrinsic evidence for substantial evidence." *Id.*

"Obviousness is a question of law based on underlying facts." *Samsung Elecs. Co. v. Elm 3DS Innovations, LLC,* 925 F.3d 1373, 1380 (Fed. Cir. 2019). This Court reviews the Board's legal determinations de novo and its factual findings for

substantial evidence. *Id.* "Whether there was a motivation to combine references and a reasonable expectation of success in doing so to meet the limitations of the claimed invention are questions of fact." *Id.*

"Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence, meaning that 'it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.,* 878 F.3d 1336, 1341 (Fed. Cir. 2018) (quoting *In re NuVasive, Inc.,* 842 F.3d 1376, 1379 (Fed. Cir. 2016)). "If two 'inconsistent conclusions may reasonably be drawn from the evidence in record, the PTAB's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence.'" *Id.* (quoting *In re Cree, Inc.,* 818 F.3d 694, 701 (Fed. Cir. 2016)).

This Court reviews the Board's "procedures for compliance with the Administrative Procedure Act de novo" and the Court "must set aside the Board's decisions if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Sirona Dental Sys. GmbH v. Institut Straumann AG,* 892 F.3d 1349, 1352 (Fed. Cir. 2018) (quoting 5 U.S.C. §706).

# VI.  ARGUMENT

## A.    The Board Correctly Construed "Processing Characteristics"

The construction of "processing characteristics" impacts two of Apple's grounds of unpatentability – (a) Amano and (b) Amano with Turcott.  The Board appropriately relied on the claims and specification to conclude that the "processing characteristics" "are determined from a signal received from one or more detectors configured to detect light."  Appx14.  Additionally, the Board correctly rejected Apple's overly broad "alternative non-limiting" construction that "processing characteristics" "includes characteristics or features obtained from or used for processing information" because the construction was divorced from what the specification conveys is the invention.  *Id.*

### 1.    The Board's Construction Naturally Aligns With The Patent's Description Of The Invention

The Board's construction of "processing characteristics" naturally aligns with the '703 patent's description of the invention.  "Claim construction seeks to ascribe the meaning to claim terms as a person of ordinary skill in the art at the time of invention would have understood them."  *Hamilton Beach Brands, Inc. v. f'Real Foods, LLC*, 908 F.3d 1328, 1339 (Fed. Cir. 2018) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005) (en banc)).  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim, but in the context of the entire patent, including the

specification." *Phillips,* 415 F.3d at 1313. This Court has repeatedly affirmed that "[t]he best source of understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Id.* at 1315 (quoting *Multiform Desiccants, Inc. v. Mezam, Ltd.,* 133 F.3d 1473, 1478 (Fed. Cir. 1998)). Ultimately, the "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, correct." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1249 (Fed. Cir. 1988)).

The '703 patent solves a long-felt need by disclosing a patient monitor that reduces power consumption without sacrificing performance. Appx56 (6:4-8) ("These various sampling mechanisms provide the flexibility to reduce power without sacrificing performance during, for example, high noise conditions or oxygen desaturation events…."). The disclosed monitor reduces power consumption "by, in effect, increasing or decreasing the number of input samples received and processed." *Id.* (6:9-11). The monitor preserves performance by decreasing sampling (and power consumption) only when the patient's status and the signal quality indicates that it would be safe to do so. *Id.* (6:11-15) ("Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal quality periods or when critical measurements are necessary.").

The monitor determines the patient's status by evaluating "physiological measurements," including oxygen saturation, pulse rate, and plethysmograph, derived from the light detector's signal. *Id.* (5:11-14) ("the signal processor 340 derives the physiological measurements 342, including oxygen saturation, pulse rate and plethysmograph, from the input signal 322"). Similarly, the monitor determines signal quality by evaluating "signal statistics," including signal strength, noise, and motion artifact, derived from the light detector's signal. *Id.* (5:14-15) ("The signal processor 340 also derives signal statistics 344, such as signal strength, noise and motion artifact."). The physiological measurements and signal statistics form the "processing characteristics" required by the claims. Appx1376. When the "processing characteristics" exceed a threshold, the monitor recognizes that it is no longer safe to operate at a low sampling level and transitions to a higher sampling level. *See e.g.*, Appx51 (Fig. 9); Appx57 (8:43-57).

Importantly, the '703 patent's solution to the need for a reliable, low-power patient monitor depends on evaluating processing characteristics determined ***from a detector configured to detect light***. *See e.g., id.* (5:24-27 ("Advantageously, power dissipation is responsive not only to output parameters, such as the physiological measurements 342, but also to internal parameters, such as the signal statistics 344."). By assessing this critical signal, the monitor evaluates the patient's status or signal quality and determine whether it is safe to reduce sampling and power

consumption.  The '703 patent does not identify any other ways to evaluate the patient's status or the signal quality aside from evaluating the signal from the detector configured to detect light.

Consistent with the patent's purpose, the '703 patent discloses three ways to adjust the input samples: (1) reducing activation of the light sources, (2) powering down the detector front-end, or (3) processing less data received from the detector. *See e.g.*, Appx56 (5:55-6:8); Appx46 (Fig. 4).  In each case, the reduction in power consumption depends on the signal received from the detector configured to detect light.  *Id.*  The patent does not disclose any methods to reduce power consumption that are not based on the signal received from the detector.  Nor does the patent disclose any embodiments where a sensor signal is received from some other hardware, such as Amano's acceleration sensor.  Appx1375-1376, ¶47.

Moreover, all the patient monitors described in the '703 patent disclose a detector configured to detect light and that detector provides the sensor signal to the monitor's processor for adjusting the input samples.  *See e.g., Kinetic Concepts, Inc. v. Blue Sky Med. Gp., Inc.* 554 F.3d 1010, 1019 (Fed. Cir. 2009) (limiting construction of "wound," in part, because "[a]ll of the examples described in the specification involve skin wounds"); *Medicines Co. v. Mylan, Inc.,* 853 F.3d 1296, 1309 (Fed. Cir. 2017) (limiting construction to disclosed embodiment).  The '703 patent discusses three types of monitors: (1) conventional pulse oximeters, (2) a

sleep-mode pulse oximeters, and (3) inventive low-power pulse oximeters. Appx40 (title, abstract); Appx54 (1:18-51). Each of the pulse oximeters includes a sensor comprised of light sources and a detector configured to detect the light. Appx43-46 (Figs. 1-4); Appx54 (1:23-35); Appx56 (5:35-38). In each case, the signal from the detector is the sensor signal processed by the pulse oximeter to determine the patient's condition. *Id.* None of the pulse oximeters depend on alternative sensor hardware to determine the patient's condition.

The "Summary of the Invention" further establishes that the "processing characteristics" are determined from the signal received from the detector configured to detect light. Appx54-55 (2:29-4:32). The "Summary" describes several "aspects" of the inventive pulse oximeters. Each aspect depends on a sensor signal from a sensor (i.e., detector), and the oximeter processes that signal to determine whether it is safe to adjust sampling. For example, the '703 patent states:

> One aspect of a low power pulse oximeter is a sensor interface adapted to drive a pulse oximetry sensor and receive a corresponding input signal. A processor derives a physiological measurement corresponding to the input signal, and a display driver communicates the measurement to a display.

Appx54 (2:29-33); *see also id.* (2:61-63) ("An aspect of a low power pulse oximetry method comprises the steps of setting a power target and receiving an input signal from a pulse oximetry sensor.").

Finally, the preferred embodiment illustrates that the "processing characteristics" are derived from a detector configured to detect light. *See e.g., Astrazeneca AB v. Mutual Pharma., Co.,* 384 F.3d 1333, 1340 (Fed. Cir. 2004) ("the patentee's choice of preferred embodiments can shed light on the intended scope of the claims"). Figure 4 (below) illustrates the preferred embodiment and shows details "regarding the sensor interface 320, the signal processor 340 and the sampling controller 360." Appx56 (5:28-30). As shown, the detector front-end 490 [green] (i.e., detector) provides a "conditioned and digitized input signal 322 [red line] to the signal processor 340":



FIG. 4

Appx46 (Fig. 4, color added); Appx56 (5:35-38). The "signal processor 340 has a pre-processor 410 [blue] and a post processor 430 [purple]." Appx56 (5:40-41). The

"post processor 430 calculates the physiological measurements 342 and the signal statistics 344, which are output to a signal status calculator 450." *Id.*, (5:46-48). The physiological measurements and signal statistics are examples of processing characteristics and, as shown, are determined from the signal received from the detector front-end (i.e., detector). Appx1375-1376, ¶47.

In view of these disclosures, a POSITA reviewing the claims would have understood that the "processing characteristics" must be determined from one or more detectors configured to detect light. Appx1374-1376, ¶¶44-47. Method claims 1, 9, and 12 require "receiving one or more signals from one or more detectors configured to detect said light after attenuation by said tissue." Appx59 (11:37-39, 12:10-12, 12:34-36). Similarly, apparatus claims 15, 20, and 22 require "an input configured to receive at least one signal responsive to light detected after attenuation by body tissue of a patient by a noninvasive sensor." Appx59-60 (12:56-58, 13:19-21, 14:9-11). These limitations describe the only signal recited in the claims. Consistent with the specification, this signal is received from one or more detectors configured to detect light. Thus, the Board's construction of "processing characteristics" stays true to the claim language and naturally aligns with the described invention. *See* Appx1374-1375, ¶46 (testifying that a POSITA would have reasonably concluded that the "processing characteristics" were determined from the lone signal); *In re Power Integrations,* 884 F.3d 1370, 1377 (Fed. Cir. 2018)

("a proper claim construction analysis endeavors to assign a meaning to a disputed claim term 'that corresponds with how the inventor describes his invention in the specification'") (quoting *In re Smith Int'l, Inc.,* 871 F.3d 1375, 1383 (Fed. Cir. 2017)).

Additionally, claim 1 requires that the "processing characteristics" trigger transitions between the lower and higher power consumption states and that "continuously operating at said lower power consumption level comprises reducing activation of an attached sensor." Appx59 (11:43-50). Here, the claims link the activation of the sensor (comprised of light sources and a detector) to the analysis of the "processing characteristics." *See e.g.*, Appx54 (1:25-27) (explaining sensor includes LEDs and a photodiode detector). This claim is consistent with the description in the specification that the monitor can reduce the duty cycle when the patient's status and the signal quality indicate that it is safe to do so. Once again, the Board's construction of "processing characteristics" stays true to the claim language and naturally aligns with the described invention. *See* Appx1374-1375, ¶46 (testifying a POSITA would have reasonably concluded that the processing described in the claims depends on light from the detector).

Additionally, claims 4 and 18 further demonstrate that the "processing characteristics" are determined from a signal received from one or more detectors configured to detect light. Both claims recite, "wherein said processing

characteristics comprise signal characteristics from one or more light sensitive detectors." Appx59-60 (11:59-61, 13:9-11). Thus, these claims explicitly confirm that the processing characteristics are determined from a signal received from a detector configured to detect light.

## 2. Apple Presented No Evidence Regarding The "Plain Meaning" Of "Processing Characteristics"

Apple repeatedly argues that the Court should remand the case so that the Board can analyze the prior art "under the plain meaning of 'processing characteristics.'" Br. at 11; *see also id.* at 61 (the Court should instruct "the Board to proceed under the proper, plain-meaning construction for 'processing characteristics'"). However, Apple's briefing never expressly identifies the alleged "plain meaning."

Apple advanced two constructions for "processing characteristics" in the Petition. Appx118-119. However, in reply to the POR, Apple abandoned the proposed construction that Masimo adopted and instead focused on a broader "alternative, non-limiting" construction that "processing characteristics" "includes characteristics or features obtained from or used for processing information." Appx1683; Appx1707. Apple provided no expert declaration to support its reply arguments. Because Apple is barred from raising new claim constructions on appeal, Apple presumably asks this Court to adopt that broader construction. *See Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 694 (Fed. Cir. 2008) ("A party may not

introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below.").

While Apple characterizes its broad construction as the "plain meaning," Apple presented ***no evidence*** supporting that characterization before the Board and presents no evidence on appeal.  Apple identifies (1) no express definition of "processing characteristics" in the claims or specification, (2) no dictionary or technical definitions establishing a plain and ordinary meaning, and (3) no expert testimony establishing a plain and ordinary meaning.  While Apple's expert referred to the broad construction as the "plain meaning," he did not cite any evidence to support that statement and admitted during cross-examination that he had not formed an opinion regarding which of Apple's two constructions was correct, stating it "[w]asn't necessary to inform my opinions to highlight which one is the correct one."  Appx1584 (130:12-131:4); *see also* Appx1578-1584 (125:13-130:11).  On reply, Apple offered no expert declaration to address this deficiency.  Thus, no evidence supports Apple's argument that "processing characteristics" has a "plain meaning" – let alone Apple's suggested "plain meaning."

Further, Apple's construction is incorrect because it improperly reads "processing characteristics" out of the claim and is divorced from the specification. *See e.g.*, *Intel Corp. v. Qualcomm Inc.,* 21 F.4th 801, 810 (Fed. Cir. 2021) (rejecting a construction that would "erase" a term from the claims); *Eon Corp. IP Holdings v.*

*Silver Spring Networks,* 815 F.3d 1314, 1320 (Fed. Cir. 2016) ("A party is, therefore, 'not entitled to a claim construction divorced from the context of the written description and prosecution history.'") (quoting *Nystrom v. TREX Co.,* 442 F.3d 1136, 1144-45 (Fed. Cir. 2005)).

Apple construes "processing characteristics" as "characteristics or features ***obtained from*** or ***used for*** processing information." Appx1707 (emphasis added). However, as the Board recognized, Apple's construction would encompass "***any information*** that is processed, regardless of its source." Appx14 (emphasis added); *see In re Power Integrations,* 884 F.3d at 1376 (rejecting "board's overly expansive" construction because the term "coupled" would have no meaning); *Arista Networks, Inc. v. Cisco Sys., Inc.,* 908 F.3d 792, 798 (Fed. Cir. 2018) (rejecting overly broad construction). Yet, the specification does not just require the comparison of any information to a predetermined threshold. Rather, the '703 patent describes comparing specific processing characteristics, including physiological measurements and signal statistics, to a predetermined threshold to determine whether to increase or decrease sampling. *See e.g.*, Appx51 (Fig. 9); Appx57 (8:43-57). These processing characteristics depend upon and are determined from the signal from the detector configured to detect light. *Supra* §VI.A.1. Thus, Apple's construction that the "processing characteristics" can include ***any information*** is inconsistent with the specification.

Moreover, Apple has identified no embodiment in the '703 patent that compares "processing characteristics" that are not determined from a detector configured to detect light. Nor does any such embodiment exist. *Supra* §VI.A.1. For this additional reason, Apple's construction is untethered to the specification and erroneous.

### 3. <u>Apple's Attacks On The Board's Construction Fail</u>

#### a. <u>Apple's Attempt To Read The Claims In Isolation Is Improper</u>

Apple incorrectly asks the Court to interpret "processing characteristics" without reference to the specification. *See e.g., Retractable Techs., Inc. v. Becton, Dickinson and Co.,* 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("It is axiomatic that the claim construction process entails more than viewing the claim language in isolation."). Apple argues that "the term 'processing characteristics' is not limited under the plain claim language." Br. at 14. As noted above, Apple has presented no evidence that "processing characteristics" has a "plain meaning." *See e.g., Intel,* 21 F.4th at 809 (Apple has presented no evidence that the term "has a clear, undisputed meaning in either ordinary English or in relevant technical parlance"). Instead, Apple argues that the claims require "receiving one or more signals ***from one or more detectors configured to detect said light***" and that the absence of the bolded language in the "processing characteristics" limitation means that the "processing characteristics" limitation should be construed more broadly. Br. at 15 (emphasis

added).    However, the patentee is not required to repeat the same limitation throughout the claim.    Such a requirement would make patent claims unnecessarily long and unwieldy.    Apple's reliance on *Intellectual Ventures I LLC v. T-Mobile USA, Inc.,* 902 F.3d 1372 (Fed. Cir. 2018) is misplaced.    Br. at 15.    In that case, the Court was comparing claim language across different claims.    *Intellectual Ventures,* 902 F.3d at 1379.    The Court did not require the patentee to repeat the same limitation in the same claim.

Apple also argues that the use of "comprising" in claim 1 and 11 contradicts the Board's construction.    Appx16.    However, even where a party uses "comprising," the scope of the claims does not extend to undisclosed or unclaimed features, as Apple contends.    *See e.g., Gillette Co. v. Energizer Holdings, Inc.,* 405 F.3d 1367, 1371-72 (Fed. Cir. 2005) (finding that claim reciting three razor blades covered a device with four razor blades because claim used "comprising" and four blades was supported by the claim language, specification, and prosecution history); *see also MagiSil Corp. v. Hitachi Glob. Storage Techs., Inc.,* 687 F.3d 1377, 1383 (Fed. Cir. 2012) (finding that "comprising" did not extend claim beyond the disclosure in the specification).    Here, the Board correctly rejected Apple's "sweeping premise" that the "processing characteristics" could be "any information that is processed" because that construction was unsupported by the specification or claims.    Appx13-14.

-44-

The Board appropriately reviewed the claims in the context of the specification. *See e.g., Retractable,* 653 F.3d at 1305 (rejecting broad construction left open by claims but foreclosed by specification). Apple's contention that the Board skipped the claims in its analysis is incorrect. *See* Br. at 14 ("The Board's decision, however, skips this key part of the analysis…."). The Board evaluated independent claims 1 and 11 and appropriately rejected Apple's arguments regarding dependent claims 4 and 8, as discussed below. Appx10-14. Based on the Board's analysis, the Board correctly concluded that a POSITA reading the claim in the context of the specification would have concluded that the "processing characteristics" are derived from the "signals" identified earlier in the claim (i.e., the "one or more signals from one or more detectors configured to detect said light"). Appx13-14. Apple has not shown error in this construction.

### b.  Claim 4 Supports The Board's Construction

Apple argues that dependent claim 4 contradicts the Board's construction. Br. at 17-20. Claim 4 recites that the "processing characteristics comprise signal characteristics *from one or more light sensitive detectors*." Appx59 (11:59-61) (emphasis added). Apple focuses on the bolded portion of the claim. Apple argues that if "the Board were correct that 'processing characteristics,' properly construed, includes the notion of a light detector, it would be unnecessary and repetitive for claim 4 to include this limitation separately." Br. at 17. Notably, however, Apple

does not dispute the Board's conclusion that "claim 4 further refines the understanding of the type of processing characteristics that are received from the light detectors, i.e., signal characteristics rather than physiological measurements." Appx13-14. Moreover, overlap between claims is common and Apple has failed to show that this overlap alone is insufficient to reject the Board's construction, particularly where the overlap is part of a larger, limiting element. *See e.g.*, *Andersen Corp. v. Fiber Composites, LLC,* 474 F.3d 1361, 1370 (Fed. Cir. 2007) ("overlapping patent claims are not unusual, and the overlap does not require us to construe the 'composite composition' claims to cover subject matter that differs from the subject matter covered by the other two sets of claims").

Apple cites a number of cases where this Court rejected a claim construction because the construction rendered certain terms "superfluous." Those cases are inapplicable here. In those cases, a party attempted to read a limitation out of a claim entirely, i.e., rendering the limitation "superfluous." *See e.g.*, *Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950 (Fed. Cir. 2006) (rejecting construction that would read "a frusto-spherical basal surface portion" out of the claim); *Aristrocrat Techs. v. Int'l Game Tech.,* 709 F.3d 1348, 1357 (Fed. Cir. 2013) (rejecting a construction that would read the step "identifying prize" out of the claim). Here, the Board's construction does not read any limitation out of the claim. At most, the Board's construction makes the clause "from one or more light sensitive detectors"

in claim 4 duplicative. As noted above, overlapping claims are not uncommon and Apple has failed to show that this fact along renders the Board's construction improper. *Andersen,* 474 F.3d at 1370; *see also Medicines,* 853 F.3d at 1305 (finding claim construction resulting in overlapping claims not improper).

Apple also relies on this Court's unpublished opinion in *Cioffi v. Google, Inc.,* 632 F. App'x 1013 (Fed. Cir. 2015). Br. at 18. However, *Cioffi* is distinguishable. There, the Court found that nothing in the intrinsic evidence overcame the presumption created by claim differentiation. *Cioffi,* 632 F. App'x at 1019 ("We do not find, moreover, that anything in the prosecution history overcomes the presumption created by these claim differentiation principles."). That is not the case here. "Although claim differentiation is a useful analytic tool, it cannot enlarge the meaning of a claim beyond that which is supported by the patent documents, or relieve any claim of limitations imposed by the prosecution history." *Id.* (internal citations omitted); *see also Retractable,* 653 F.3d at 1305 ("Any presumption created by the doctrine of claim differentiation will be overcome by a contrary construction dictated by the written description or prosecution history."); *Andersen,* 474 F.3d at 1370 ("In such cases, we have held that 'the written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation.'") (quoting *Kraft Foods, Inc. v. Int'l Trading Co.,* 203 F.3d 1362, 1368 (Fed. Cir. 2000)). Here, the Board correctly found that the specification

establishes that the processing characteristics are determined from a detector configured to detect light. Appx14; *see also supra* §VI.A.1 (identifying specification support). Moreover, the Board found that the specification does not support Apple's construction that "simply any information that is processed, regardless of its source, can constitute the 'processing characteristics.'" *Id.* Apple has failed to present any evidence showing otherwise. For these reasons, claim 4 supports the Board's construction.

### c.    Claim 8 Supports The Board's Construction

Apple argues that dependent claim 8 "demonstrates that the Board erred by grafting the light detector limitation into the 'processing characteristics' term." Br. at 20. Claim 8 recites, "wherein said processing characteristics include determining an estimate of current power consumption and comparing said estimate with a target power consumption." Appx59 (12:1-4). Apple argues that the "power consumption estimate does not come from a light detector." Br. at 21.

The Board considered and rejected this argument. Appx12-14. The Board found that "the understanding of claim 8 taken in the context of the Specification (e.g., Fig. 4), establishes that the estimate of power consumption is determined based on signals from light detector 490." Appx14. The Board's conclusion was correct.

The '703 patent explains that the patient monitor determines an estimate of power consumption from the signal received from the detector configured to detect

-48-

light.  Specifically, the "detector front-end 490 receives an input signal 492 from a sensor attached to the sensor port 302 (FIG. 3) [red] and provides a corresponding conditioned and digitized input signal 322 to the signal processor 340."  Appx56 (5:35-38).



FIG. 3

Appx45 (Fig. 3, color added).  The signal processor 340 then digitizes and filters the signal before calculating "the physiological measurements 342 and the signal statistics 344, which are output to a signal status calculator 450."  *Id.* (5:40-48).  The signal status calculator 450 then provides the signal status output 452 to the control engine 440.  *Id.* (6:49-51).  The power status calculator 460 then uses the control state input 442, which indicates the current state of the control engine 440, "to

estimate the average power consumption of at least a portion of the pulse oximeter 300." *Id.* (6:42-55).

The red highlighting below illustrates the path traveled by the signal and demonstrates that the "process status calculator 460" [orange] estimates the current power consumption using a signal received from the detector front-end 490 [green]:



FIG. 4

Appx46 (Fig. 4, color added); *see also* Appx56 (5:28-6:55) (describing Figure 4). While the signal from the detector passes through other processing modules (e.g., pre-processor 410) before reaching the power status calculator 460, the power consumption estimate is still "determined from a signal received from one or more detectors [490] configured to detect light." *See e.g.,* Appx1375-1376, ¶47.  Notably,

the signal (item 492) from the detector configured to detect light is the only sensor input into the patient monitor.

Despite the above graphic, Apple argues that "the power consumption estimate relevant for claim 8 is 'received from' the power status calculator 460, and not from the light detector, i.e., detector front-end 490, which feeds into the signal processor 340." Br. at 22. Yet, Apple's argument is overly simplistic and ignores the inputs the power status calculator uses to calculate the power consumption estimate. Apple attempts to dismiss the signal path highlighted in red above by characterizing it as "lengthy." Br. at 22. However, Apple does not substantively dispute that the signal from the detector traverses the red path or that the signal is fed to the power status calculator to determine an estimate of current power consumption after some initial processing. Additionally, Apple presented no expert declaration supporting such arguments. Apple also argues that Masimo "cited no evidence for this clumsy interpretation of the '703 patent." *Id.* But that is inaccurate. Masimo cited the portions of the specification that describe Figure 4, as Masimo has done above. Appx1272 (citing Appx56 (5:28-6:55)). It is Apple that failed to provide expert testimony to support its arguments.

For these reasons, claim 8 is consistent with the Board's construction of processing characteristics.

-51-

### d.  The Board Did Not Improperly Impute A Limitation From The Disclosed Embodiment

Apple argues that the Board "overreli[ed] on the specification" and "erroneously import[ed] a limitation from the written description to the claims." Br. at 24.  Apple is incorrect.  "It is…entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips,* 415 F.3d at 1317; *see also Astrazeneca*, 384 F.3d at 1340 ("[W]hile it is of course improper to limit the claims to the particular preferred embodiments described in the specification, the patentee's choice of preferred embodiments can shed light on the intended scope of the claims.").  The Board does not have "unfettered license to interpret the words in a claim without regard to the full claim language and the written description." *Trivascular, Inc. v. Samuels,* 812 F.3d 1056, 1062 (Fed. Cir. 2016).  As demonstrated above, the Board appropriately relied on the specification to interpret the claims.  Appx9-14.

Apple also argues that "'departing from the plain and ordinary meaning of claim terms based on the specification' may occur 'in only two instances: lexicography and disavowal.'"  Br. at 24 (internal citations omitted).  Apple criticizes the Board for failing to address either instance.  *Id.*  Yet, this Court has previously rejected Apple's argument.  In *Trustees of Columbia Univ. v. Symantec Corp.,* 811 F.3d 1359, 1363 (Fed. Cir. 2016), this Court stated: "Our case law does not require explicit redefinition or disavowal.  Indeed, our en banc *Phillips* opinion

rejected this very approach." *Id.; see also Arista,* 908 F.3d at 797 ("Moreover, we have held that '[e]ven when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents.'") (quoting *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012)). Thus, the Board was not required to address lexicography or disavowal.

Apple additionally argues that the "Board's naked reliance on the disclosed embodiment is insufficient, without more, to read limitations from that embodiment into the claims." Br. at 28. But the Board did not base its construction exclusively on the disclosed embodiment. The Board considered the claims, and specifically Apple's arguments regarding dependent claims 4 and 8. Appx10-14. Moreover, the Board considered the specification as a whole. *See* Appx14 ("we rely on the written description of the '703 patent as a useful guide in informing the meaning of 'processing characteristics'"). As shown above, the specification reveals that the invention described in the '703 patent depends upon the signal received from the detector configured to detect light to reduce power consumption without sacrificing performance. *Supra* §VI.A.1. Thus, the patent's solution to resolving the disadvantages of the prior art compels the Board's construction.

Apple also argues that *Ormco Corp. v. Align Technology, Inc.,* 463 F.3d 1299 (Fed. Cir. 2006) supports Apple's arguments. It does not. The claim term at issue

in *Ormco* was "geometry." *Id.* at 1306. The Court resorted to a dictionary to define the term, noting that "where the meaning of a claim term is readily apparent, claim construction involves 'little more than the application of the widely accepted meaning of commonly understood words' and, in such cases, 'general purpose dictionaries may be helpful.'" *Id.* at 1306, n.5 (quoting *Phillips,* 415 F.3d at 1314). Unlike the term "geometry," Apple has presented no evidence to suggest that "processing characteristics" has a widely accepted meaning that can be determined from a general-purpose dictionary. Thus, *Ormco* is inapplicable here.

For these reasons, Apple has failed to show that the Board improperly construed processing characteristics.

## B.     **The Board Did Not Violate The APA**

Apple incorrectly argues that the Board violated the APA because the Board failed to address one of Apple's arguments regarding Diab. Apple claims that its argument before the Board regarding Diab was "two-fold." Br. at 41. It was not. Apple made a single argument with respect to Diab in the IPR. Apple argued that Diab satisfied the "lower power consumption" limitation in the challenged claims because "Diab teaches in cases of no detected motion that it does not execute the motion artifact suppression module 580, bypassing it altogether." *Id.*; *see also* Appx82-86; Appx1686-1690 (raising a single argument). The Board rejected this argument because the evidence showed that Diab never suspends the operation of

the motion artifact suppression module.  Appx24-28.  Apple does not appeal the Board's finding on this issue.  *See* Br. at 42 ("Apple accepts this finding for the limited purpose of this appeal").

Instead, Apple argues that it "also argued that an obvious modification of Diab would be to utilize only a subset of the motion artifact suppression module 580's processing when motion is not detected."  Br. at 42.  Yet, Apple never made this argument before the Board.  Tellingly, Apple does not quote a single citation from the record where it argued that Diab would suspend (or utilize) only a subset of the motion artifact suppression module when motion is not detected.  In fact, the word "subset" does not appear in Apple's Petition (Appx63-147) or Reply (Appx1677-1712).

Apple devotes approximately four pages of its appeal brief to the argument that a POSITA "would have known to modify Diab to suspend some of its processing when motion was not present."  Br. at 41-45.  Yet, Apple cites to the Petition only twice in this section.  In a first instance, Apple identifies an annotated graphic that it included in the Petition.  *Id.* at 43 (citing Appx83-84).  Apple relied on this graphic to support its argument that the motion artifact suppression module is suspended when motion is not detected.  Appx83-85.  Apple did not argue that the graphic reflected suspending a portion of the motion artifact suppression module.

In a second instance, Apple cites two pages of the Petition and claims that the pages included an argument "that it would have also been obvious not to execute this 'additional processing for motion artifact suppression' where 'motion is not detected.'" Br. at 43 (quoting Appx84-85). Apple's reorganization of the quotes in the appeal brief does not accurately reflect Apple's argument in the Petition. The cited section states:

> While Diab's explicit description that "[i]f motion is not detected, spectral estimation on the signals is carried out directly without motion artifact suppression" and "[i]n the case of motion, motion artifacts are suppressed using the motion artifact suppression module 580" ***teaches not executing the motion artifact suppression module 580 if motion is not detected***, it would have also been obvious ***to suspend and not execute the operations of Diab's motion artifact suppression module 580 if motion is not detected*** based on Amano's teaching of suspending "the operations of... body movement component eliminating section" "when no body movement is present"

Appx85 (emphasis added). As shown, Apple argued that Diab teaches, or it would have been obvious, to suspend the entire motion artifact suppression module. Apple did not argue that a POSITA would have understood to suspend a ***subset*** of the motion artifact suppression module, as Apple now argues on appeal.

Apple also repeatedly cites its Reply to Masimo's POR as allegedly including its "subset" argument. *See e.g.,* Br. at 43 (citing Appx1689-1690). Yet, a review of the Table of Contents reveals that Apple continued to argue that a POSITA would have found it obvious to suspend and not execute the motion artifact suppression module in its entirety:

-56-

II.   DIAB IN VIEW OF AMANO RENDERS CLAIMS 9-10, 12-14, 20, AND
      22-24 OBVIOUS (GROUND 1A) ............................................................4

   A. Diab in view of Amano teaches operating at "a lower power consumption
      level" and "a higher power consumption level." ......................................4

      1.  A POSITA would have found it obvious to suspend and not execute
          Diab's motion artifact suppression module if motion is not detected. .4

      2.  A POSITA would have been motivated to apply Amano's teachings to
          suspend and not execute operations of Diab's motion artifact
          suppression module if no motion is detected to reduce calculation time
          and power consumption. ................................................................8

      3.  Suspending operations of the motion artifact suppression module
          would result in Diab's device operating "at a lower power
          consumption level," thereby "reducing an amount of processing by a
          signal processor." ........................................................................9

Appx1678.   As shown, Apple never mentions suspending a ***subset*** of the motion

artifact suppression module.

Moreover, the body of Apple's Reply is consistent with the headings in the

Table of Contents.  For example, Apple argued:

> Alternatively, because Diab's FIG. 21 DC removal module 583 and the
> bandpass filter module 585 are the same as the FIG. 20 DC removal
> and bandpass filter module 578, a POSITA would have found it obvious
> to suspend and not execute ***all the operations of the motion artifact
> suppression module 580*** and instead provide the clean plethysmograph
> waveform from the FIG. 20 DC removal and bandpass filter module
> 578.

Appx1689-1690 (emphasis added).  Apple's argument could not have been clearer

– a POSITA would have found it obvious to suspend all of the operations of the

motion artifact suppression module.

In the current appeal, Apple attempts to recast the above argument as

describing "the motivation for suspending the ***motion-focused operations*** in the

motion artifact suppression module 580." Br. at 44 (emphasis added). Apple's new argument on appeal is clearly inconsistent with its Reply. The term "motion-focused operations" does not appear in the above quote, or any other portion of Apple's IPR briefs. Simply put, Apple identifies no portion of its IPR briefs where it raised, and therefore preserved, an argument that a POSITA would have found it obvious to suspend a subset of the motion artifact suppression module.

Apple also argues that it "clarified" its argument at the oral hearing. Br. at 44 (quoting Appx2006 (9:13-19); Appx2008-2009 (11:9-12:15)). Even if Apple raised this new argument for the first time at oral argument, "it is impermissible to present new arguments at oral hearing" and, therefore, Apple "has forfeited this argument." *Intellectual Ventures I LLC v. Unified Patents, LLC,* 803 Fed. App'x. 403, 406 (Fed. Cir. 2020) (unpublished) (citing Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012).

However, Apple did not raise this "subset" argument at the oral hearing. Rather, Apple continued to argue that a POSITA would have found it obvious to suspend and not execute the motion artifact suppression module in its entirety. For example, Apple argued, "one of skill would find it obvious in view of Diab's other disclosure as well as the namesake of module 580 itself that it ***foregoes*** motion artifact suppression processes when informed of no motion…." Appx2004 (7:16-18) (emphasis added); *see also* Appx2003 (6:19-21) ("It describes what happens

when motion is not detected.  Spectral estimation of signals is carried out without motion artifact suppression.  Motion artifact suppression does not occur.").

On appeal, Apple focuses on a small portion of the oral hearing transcript that is anything but clear and certainly does not present the argument that a POSITA would have found it obvious to suspend a "subset" of the motion artifact suppression module.  Apple cites to seven lines of the oral transcript discussing Apple's Slide 17.  Br. at 44 (citing Appx2006 (9:13-19)); *see also* Appx2005-2006 (8:21-9:12) (showing discussion related to Slide 17).  Slide 17, shown below, included a figure and text from Masimo's POR demonstrating that the motion artifact suppression module must operate continuously to generate the clean plethysmograph waveform:



Appx1893 (quoting POR 34).   Slide 17 does not include any argument that a POSITA would have found it obvious to suspend a "subset" of the motion artifact suppression module.

Further, the portion of the argument cited by Apple is consistent with Apple's argument in the briefs that a POSITA would have found it obvious to suspend the motion artifact suppression module in its entirety, not a subset of the module. Apple's attorney stated, "a POSITA would find it obvious to suspend performance of processes after which module 580 is named, the ones that deal with motion artifact suppression in the absence of motion…." Appx2006 (9:14-16).  There is nothing in this statement to suggest suspending less than the entire motion artifact suppression module.

Apple's attorney continued: "recall figure 21 – we just saw it – which showed that several of the module 580 sub-components, there's a DC band filter and a bandpass filter but they're not fully devoted to artifact suppression so it's possible that you could suppress the activities, ***the motion artifact suppression***, you could suspend those and nevertheless still get to a place where the lead line would be present and that's not addressed in the arguments that they've given us." Appx2006 (9:16-22) (emphasis added).  Again, nowhere in this cited section, or anywhere else in the transcript, does Apple clearly argue that a POSITA would have found it obvious to suspend a subset of the motion artifact suppression module.

Apple also suggests that "dialogue with the Board" supports its argument that it raised its "subset" argument at the oral hearing. Br. at 44 (citing Appx2008 (11:9-23)). It does not. In the cited portion, Judge Cocks asked if it was Apple's position that the "purple signal" shown in Apple's Slide 13 (reproduced below) "could pass through the motion artifact suppression module without undergoing motion artifact suppression." Appx2008 (11:9-12).



Appx1889 (Slide 13). Apple responded, "But, Your Honor, I think you're asking is that possible and the answer is we believe so." Appx2008 (9:13-17). Apple says

nothing about suspending a "subset" of the motion artifact suppression module, and certainly does not argue that a POSITA would have found it obvious to do so.

Judge Cocks went on to enquire about the purpose of the purpose of the green line for the "infrared snapshot." *Id.* (11:17-23). Again, Apple argued, consistent with the briefing, that "in the absence of motion, you need not pursue ***all of the processing that it contemplates on motion artifacts***...." Appx2009 (12:7-9) (emphasis added). This statement is consistent with the briefing where Apple argued "that a POSITA would have found it obvious to suspend and not execute ***all the operations*** of the motion artifact suppression module 580." Appx1689-1690 (emphasis added). Again, Apple did not mention suspending a subset of the motion artifact suppression module.

This Court has stated that "[w]e will not fault the Board for analyzing Petitioners' obviousness grounds in the way presented in the Petition." *Samsung,* 925 F.3d at 1383. Here, Apple has identified no portions of its Petition where it argued that a POSITA would have found it obvious to suspend a subset of Diab's motion artifact suppression module. Thus, the Board did not "gloss[] over Apple's alternative argument" because Apple never made the argument. Br. at 45.

The revisionist nature of Apple's argument is on further display in the portion of its appellate brief titled, "Modification of Diab's Motion Suppression Artifact Module According to Diab's Teaching Sets Up a *Prima Facie* case of Obviousness."

Br. at 51-54.  Here, Apple attempts to make the "subset" argument it wishes it made in the IPR.  Notably, Apple cites no portion of its Petition (Appx63-147) or Reply to the POR (Appx1677-1712) in this section.  Apple's significant shift in arguments between the IPR and this appeal is best appreciated by comparing Apple's annotations of Figure 21 included in the Petition and Reply (top figure below) with the **_new_** annotations Apple included in its appellate brief (bottom figure below):



APPLE-1007, Detail of FIG. 21 (annotated)

Appx85; Appx1689.



FIG. 21

Br. at 52.

Before the Board, Apple argued that the red boxes in the top figure "show[]
an example…of the additional processing performed by the motion artifact
suppression module when motion is detected."  Appx1688-1689; *see also* Appx84-
85.  Based on the red boxes, Apple argued, "a POSITA would have found it obvious
to suspend and not execute ***all the operations*** of the motion artifact suppression
module 580 and instead provide the clean plethysmograph waveform from the FIG.
20 DC removal and bandpass filter module 578."  Appx1689-90 (emphasis added);
*see also* Appx85 ("it would have also been obvious to suspend and not execute the
operations of Diab's motion artifact suppression module 580 if motion is not
detected….").

Now, on appeal, Apple includes red Xs in the bottom figure to identify the portions of the motion artifact suppression module that could allegedly be suspended.  Br. at 51-52.  Tellingly, this new figure with the red Xs was never presented to the Board.  Also of note is that Apple cites no expert testimony in this section purportedly establishing a *prima facie* case that a POSITA would have found it obvious to suspend a subset of the motion artifact suppression module.

For all of these reasons, the Board did not violate the APA.

## C.    The Board Correctly Determined That Diab And Amano Did Not Render The Challenged Claims Obvious

Apple argued that Diab and Amano rendered obvious the claim limitations requiring transitioning from a lower power consumption level to a higher power consumption level.  Br. at 54-55.  The Board disagreed and found that the evidence did not support Apple's arguments.  Appx28-32.  On appeal, Apple accuses the Board of erring by "applying a heightened standard akin to inherency that was legally incorrect and inconsistent with the scope of the challenged claims."  Br. at 55.  Apple is incorrect.  As discussed below, the Board did not apply a heightened standard.

However, before addressing the inherency issue raised by Apple, the Court should appreciate that the Board provided an alternative ground for rejecting Apple's arguments concerning Diab and Amano.  In addition to finding that Diab and Amano did not satisfy the power consumption limitations, the Board found that Apple had

failed to show that a POSITA would have been motivated to combine Diab and Amano. Appx29-30. Apple ***does not*** appeal this finding. Thus, even if the Board erred in analyzing the application of Diab and Amano to the power consumption limitations, Apple has not shown that the Court should vacate the Board's obviousness conclusion with respect to the grounds based on Diab and Amano.

### 1.    Apple Did Not Show A Motivation To Combine Diab And Amano

The Board found that Apple failed to show a motivation to combine Diab and Amano. Appx29-30. Apple has not appealed the Board's factual findings with respect to the motivation to combine. Thus, the Court should affirm the Board's conclusion that Apple's grounds based on the combination of Diab and Amano (Grounds 1A-1C in the Petition) do not render the challenged claims obvious.

In the Final Written Decision, the Board stated, "we do not find [Apple's] position persuasive as to what one of ordinary skill in the art would have taken from the teachings of Diab and Amano." Appx29. The Board explained that "[a]lthough Diab and Amano are both directed to systems for the physiological monitoring of patients, we agree with [Masimo] that 'Diab and Amano disclose different processing algorithms that result in different outputs that are not directly applicable to each other.'" *Id*. (quoting Appx1307); *see also* Appx1393-1395, ¶¶70-73 (supporting POR). The portion of Masimo's brief that the Board cited was titled,

"A POSITA Would Not Have Been Motivated To Combine Diab And Amano." Appx1307.

The Board further agreed with Masimo "that where Diab discloses producing 'multiple patient-monitoring outputs, including a heart rate and clean plethysmograph waveform,' the portions of Amano on which [Apple] relies seemingly produce a 'single output' that is descriptive of a patient's pulse condition." Appx29 (quoting Appx1307). The Board concluded that "[a]lthough Amano does teach that some of the modules of its particular system may be suspended, [Apple] does not explain adequately why a skilled artisan would have applied such a teaching to Diab's particular motion artifact suppression module 580." Appx29-30.

Apple has not appealed the Board's factual findings that a POSITA would not have been motivated to combine Diab with Amano. Thus, the Court should affirm the Board's decision finding that Diab and Amano do not render the challenged claims obvious.

## 2.    The Board Did Not Apply An Incorrect Standard To Apple's Obviousness Arguments

The challenged claims require continuously operating a patient monitor "at a lower power consumption level" and transitioning to continuously operating a patient monitor "at a higher power consumption level" when the processing characteristics pass a threshold. *See e.g.*, Appx59 (11:32-51). Apple argued that

"suspending Diab's motion artifact suppression module would eliminate its processing requirements and result in 'reduce[d] calculation time and power consumption.'" Appx30 (quoting Appx1691). Apple argued that a POSITA would have understood that suspending Diab's motion artifact suppression module would result in lower power consumption based on Amano. Br. at 55.

The Board rejected Apple's argument stating, "We are not persuaded by [Apple's] view that suspending Diab's motion artifact suppression module necessarily will result in reduced power consumption." Appx31. The Board stated, "Although Amano does describe that its particular system enjoys reduced power consumption when its body movement component eliminating section 30 is suspended, [Masimo] presents plausible reasoning and evidence that such power reduction may not occur in Diab's differently structured and configured system." *Id.* (internal citations omitted). The Board subsequently credited the testimony of Masimo's expert, Dr. Madisetti, over Apple's expert, Dr. Anthony, to conclude that "the same power consumption reduction attributed in Amano may not occur in Diab's differently structured system." *Id*. (citing Appx1396-1397, ¶¶76-77; Appx1400-1402, ¶¶87-90). Because "the premise of supposed power reduction is the foundational reason that [Apple] advances in combining the teachings of Amano with Diab," the Board concluded that Apple had "not met its burden of persuasion on this issue." Appx31-32.

As shown, the Board did not rely on an inappropriate inherency standard in its analysis. Apple, not the Board, relied on inherency. Apple argued that "suspending operations of the motion artifact suppression module *would* result in Diab's device operating 'at a lower power consumption level.'" Appx1691; Appx1695 (emphasis added); *see also* Appx85-86 (making same argument). Apple never argued that a POSITA would have been motivated to modify Diab to reduce power consumption. Nor did Apple explain how a POSITA would have modified Diab to reduce power consumption or show that a POSITA would have reasonably expected success in doing so. The phrase "reasonable expectation of success" does not appear in the portions of Apple's Petition or Reply discussing the "lower power consumption level" limitation.

The Board assessed the argument that Apple raised – that suspending operation of the motion artifact suppression module *would* reduce power consumption. Based on the evidence, the Board made a factual finding that Diab's device *would not* necessarily result in Diab's device operating at a lower power consumption level. Appx30-32 (citing Appx1318-1320). The evidence credited by the Board showed that Diab's oximeter would consume *more* power when motion was not detected – the opposite of Apple's argument. Appx1396-1397, ¶¶76-77. For example, Diab discloses that its output filter slows down if motion is large but will "sample much faster" if there is little or no motion. Appx669 (50:23-27). Dr.

Madisetti explained that a "POSITA would have recognized that a module that samples 'much faster' will process more data and ***increase*** the power consumption level." Appx1396, ¶76.  The Board found that as "between the conflicting testimony of Dr. Anthony and Dr. Madisetti on this matter, we find more credible the testimony of Dr. Madisetti in explaining why the same power consumption reduction attributed in Amano may not occur in Diab's differently structured system."  Appx31 (citing Appx1396-1397, ¶¶76-77).  Apple has failed to show that the Board's factual findings on this issue were unsupported by substantial evidence.

## VII.  <u>CONCLUSION</u>

For the foregoing reasons, the Court should affirm the Board's Final Written Decision finding that Apple failed to meet its burden to show that the challenged claims are unpatentable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  December 28, 2022        By:  */s/ Joshua J. Stowell*
                               Joseph R. Re, Principal Counsel
                               Stephen C. Jensen
                               Joshua J. Stowell
                               Jarom D. Kesler

Attorneys for Appellee,
Masimo Corporation

# <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a).  This brief contains 13,345 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.


                              KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  December 28, 2022          By:  */s/ Joshua J. Stowell*
                                   Joseph R. Re, Principal Counsel
                                   Stephen C. Jensen
                                   Joshua J. Stowell
                                   Jarom D. Kesler

                                   Attorneys for Appellee,
                                   Masimo Corporation


56558747